2012-1696

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

_____

### OIP TECHNOLOGIES, INC.
*Plaintiff-Appellant,*

**v.**

### AMAZON.COM, INC.
*Defendant-Appellee.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA IN CASE NO. 12-CV-1233, JUDGE EDWARD M. CHEN

_____

## PRINCIPAL BRIEF OF APPELLANT OIP TECHNOLOGIES, INC.

_____

Matthew D. Powers
Steven S. Cherensky
Paul T. Ehrlich
Aaron M. Nathan
Stefani C. Smith
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 360
Redwood Shores, CA 94065
Telephone: (650) 802-6000
Facsimile: (650) 802-6001

*Attorneys for Plaintiff-Appellant OIP Technologies, Inc.*

August 18, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

OIP TECHNOLOGIES, INC. V. AMAZON.COM, INC.

No. 2012-1696

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant OIP Technologies, Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

    OIP TECHNOLOGIES, INC.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    Same.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    ENTREPRENEURS CAPITAL FUND VIII, L.P.
    NORWEST VENTURE PARTNERS VIII, L.P.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Tensegrity Law Group LLP:
    Matthew D. Powers, Steven S. Cherensky, Paul T. Ehrlich, Monica M. Eno, Stefani C. Smith and Aaron M. Nathan

Dated: August 18, 2014      /s/ *Matthew D. Powers*

                           Matthew D. Powers

Tensegrity Law Group LLP

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ............................................................. 1

JURISDICTIONAL STATEMENT ............................................................... 2

STATEMENT OF THE ISSUE ON APPEAL .............................................. 2

STATEMENT OF THE CASE ....................................................................... 2

STATEMENT OF THE FACTS ..................................................................... 3

I.      Overview ............................................................................................ 3

II.     Amazon Tests The OIP Invention, Learns From The Oip Inventors How It Improves Amazon's Existing System, And Takes It ................................. 5

III.    The Patent Office Determines That OIP's Invention Deserves Protection ... 8

IV.     Amazon's Motion To Dismiss .......................................................... 16

V.      The District Court Declares OIP's Patent Invalid Under Section 101 And Improperly Dismisses OIP's Lawsuit .......................................................... 17

SUMMARY OF THE ARGUMENT ........................................................... 21

ARGUMENT ................................................................................................ 27

I.      Standard Of Review ......................................................................... 28

II.     The District Court's Rejection Of OIP's Claims Is Inconsistent With The Supreme Court's Decision In *Alice* ............................................................. 29

        A.      Step 1: OIP's Claims Are Not Drawn To An Abstract Idea Under *Alice* ......................................................................................... 33

        B.      Step 2: Even If The OIP Claims Involve An Abstract Idea They Are Patentable Under *Alice* Because The Claims Are Drawn To Specific Improvements Of Existing Technology ............................. 41

                1.      *Alice* Shows Why OIP's Claims Pass Section 101 Under *Diehr* ................................................................................. 41

2. *Alice* Also Shows Why OIP's Claims Are Not Prohibited
By *Benson* and *Flook* ........................................................... 50

CONCLUSION ................................................................................ 54

# TABLE OF AUTHORITIES

## Cases

*Accenture Global Servs. v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013) ............................................................ 28

*Alice Corp. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ................................................................. passim

*Bancorp Services, L.L.C. v. Sun Life Assur. Co. of Canada*,
    771 F. Supp. 2d 1054, 1065 (E.D. Mo. 2011), *aff'd*, 687 F.3d 1266 (Fed. Cir.
    2012) .......................................................................................... 18

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada*,
    687 F.3d 1266 (Fed. Cir. 2012) ........................................................... 31

*Bilski v. Kappos*,
    561 U.S. 593, 130 S. Ct. 3218 (2010) .................................................. 46

*CyberSource v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ...................................................... 19, 31

*DealerTrack, Inc. v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012) ...................................................... 19, 31

*K-Tech Telecomms., Inc. v. Time Warner Cable, Inc.*,
    714 F.3d 1277 (Fed. Cir. 2013) ........................................................... 28

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011) ..................................................................... 29

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ..................................................................... 29

*Ultramercial, Inc. v. Hulu*, LLC, 722 F. 3d 1335 (Fed. Cir. 2013) ...................... 28

*WildTangent, Inc. v. Ultramercial LLC*,
    134 S. Ct. 2870 (June 30, 2014) ........................................................... 28

## Statutes

28 U.S.C. § 1295 (a)(1) ........................................................................ 2

28 U.S.C. § 1331 ................................................................................. 2

28 U.S.C. § 1338(a) ............................................................................. 2

37 C.F.R. § 41.50 (b) .......................................................................... 47

**Other Authorities**

Interim Guidance for Determining Subject-Matter Eligibility for Process Claims in View of *Bilski v. Kappos*
   75 Fed. Reg. 43,922 (July 27, 2010) ................................................ 47

Manual of Patent Examining Procedure § 1213.02
   (8th ed. Aug. 2001, rev. July 2010) .................................................. 48

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action that gave rise to this appeal was previously before this or any other appellate court.  No other case is known to counsel for OIP Technologies, Inc. to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The United States District Court for the Northern District of California ("district court") had original subject matter jurisdiction over the action on appeal pursuant to 28 U.S.C. §§ 1331 and 1338(a). A45. On September 11, 2012, the district court entered final judgment. A1-35. On September 24, 2012, OIP Technologies, Inc. ("OIP"), timely noticed its appeal. A42. This Court has jurisdiction pursuant to 28 U.S.C. § 1295 (a)(1).

## STATEMENT OF THE ISSUE ON APPEAL

Whether the district court erred in granting Amazon's motion to dismiss OIP's complaint for patent infringement by concluding that U.S. Patent No. 7,970,713 was drawn to unpatentable subject matter under 35 U.S.C. § 101 and disregarding the facts as pled by the non-moving party.

## STATEMENT OF THE CASE

On March 12, 2012, OIP sued Amazon.com, Inc. ("Amazon") for infringement of U.S. Patent No. 7,970,713 ("713 patent") based on Amazon's software systems and services for automated testing and selection of prices for products and services offered for sale through e-commerce websites including www.amazon.com. A44-74 (Complaint). Amazon moved to dismiss OIP's complaint arguing that the 713 patent was drawn to unpatentable subject matter. A75-153 (Motion Briefing). On September 11, 2012, the district court granted

Amazon's motion, finding all sixty-two claims invalid as being drawn to ineligible subject matter under 35 U.S.C. § 101, and entered final judgment in the case. A1-35 (Order; Judgment). On September 24, 2012, OIP timely noticed its appeal. A42.

On jointly-filed motions of the parties, this Court twice stayed the appeal, once pending the outcome of this Court's *en banc* consideration of *CLS Bank International v. Alice Corp.*, and again while that case was pending before the Supreme Court. *See* Case No. 2012-1696, ECF No. 27 (Nov. 29, 2012), ECF No. 29 (July 29, 2013). Following the Supreme Court's decision in *Alice*, the parties jointly moved to set a briefing schedule. Case No. 2012-1696, ECF No. 30 (July 3, 2014). This Court lifted the stay and scheduled OIP's opening brief to be filed by August 18, 2014. Case No. 2012-1696, ECF No. 31 (July 16, 2014).

## STATEMENT OF THE FACTS

### I. OVERVIEW

The OIP inventors claimed a novel system and method to improve existing e-commerce technology by enabling it to pick more accurate prices for goods and services. This was a recognized problem in the industry that no one, including Amazon, could solve. The record on the motion to dismiss already reflected the pioneering quality of the OIP inventors' technological contribution to e-commerce. In moving to dismiss OIP's complaint, Amazon told the district court that OIP's

invention was so old, so well understood, and such a basic expression of fundamental economic truth that: "a merchant in a bazaar could have performed OIP's 'invention' centuries ago—and no doubt did." A146. Amazon told the district court that "[a]ny electronic commerce merchant is undoubtedly familiar" with the invention as characterized by Amazon. A148. But as reflected in OIP's complaint, more than a decade before Amazon told the district court that the OIP inventors had not claimed a real technological improvement, OIP performed a trial demonstration of its invention for Amazon. A47. In this trial, the OIP software caused such a massive improvement over Amazon's then-existing e-commerce pricing technology that it increased the contribution margin of Amazon's consumer electronics unit by ***seven percent of revenue*** over less than a two-month period. *Id*. If applied to all of Amazon's business, the OIP invention was estimated to represent more than a ***$100 million*** increase in contribution margin for 2002 alone. A48. Amazon's e-commerce pricing technology had not been able to do this without OIP's technology despite practically unlimited resources and more reason than anyone on Earth to try.

During and after the Amazon trial, the OIP inventors taught Amazon how the inventive technology worked and discussed the possibility of an acquisition of OIP by Amazon. A47-48. But Amazon did not pay for the OIP invention as it should have done. A48. Instead, Amazon simply took what it wanted. A48-49.

And more than a decade later, after the then-pending OIP patent had issued and OIP had sued Amazon for infringement, Amazon convinced the district court, contrary to prevailing law and the facts as pled, that what Amazon could not build for itself was too old, too easy, and too abstract to deserve protection despite its obvious value.

In reaching this conclusion, the district court committed fundamental errors of law, disregarding the 713 patent's technological contribution to pre-existing and inferior technology. The district court also failed to credit the facts as pled in OIP's complaint as it was required to do, supporting its conclusion instead by finding its own contrary facts, outside the pleadings and based on no record or discovery. The following provides a detailed account of the facts that led to this appeal.

## II. AMAZON TESTS THE OIP INVENTION, LEARNS FROM THE OIP INVENTORS HOW IT IMPROVES AMAZON'S EXISTING SYSTEM, AND TAKES IT

The facts as pled in OIP's complaint—and as not sufficiently credited by the district court—tell the story of the OIP inventors' concrete technological invention, a substantial improvement over Amazon's inferior price setting technology, and how Amazon learned of it, tried it out, and took it from them.

In 1999, Andrew Atherton and Vladimir Gorelik founded a Silicon Valley startup called Resonant Commerce to develop, build, and commercialize a hosted

software system for price selection in e-commerce.  A46.  The founders had the vision to help e-commerce companies increase their profitability through price optimization.  *Id*.  In 2000, Resonant Commerce changed its name to Optivo Corporation.  *Id*.  The Optivo team worked to develop its technology throughout 2000 and late that year began customer testing of a commercial embodiment of the Optivo Pricing Solution.  A47.  Over several months, Optivo demonstrated the high value of its technology through independent trials for drugstore.com, acehardware.com, and cameraworld.com.  These trials showed improvements in gross margins for these e-commerce vendors ranging from 15% to 40%, which represented substantial increases in the generally low-margin e-commerce retail markets.  *Id*.  On April 30, 2001, the Optivo Pricing Solution, which was a hosted solution for e-commerce price selection, was released for general availability and publicly launched.  A46-47.

In June 2001, it was agreed that Amazon's consumer electronics unit would receive a trial demonstration of Optivo's technology subject to a Non-Disclosure Agreement that covered both the details and the existence of the trial.  A47.  During this trial, which was conducted from mid-July to late August 2001, the Optivo technology increased Amazon's contribution margin by 7% of revenue, and Optivo answered detailed technical questions from Amazon about the Optivo technology.  *Id*.  Following this trial, which was a demonstrated success, Amazon

expressed interest in further trials of the Optivo technology in other Amazon business units. *Id.*

On September 18, 2001, Andrew Atherton, Vladimir Gorelik, and other Optivo employees met with more than ten Amazon representatives at Amazon's corporate headquarters in Seattle to talk about Amazon's potential acquisition of Optivo and its technology. A47-48. The parties agreed that this meeting too would be covered by the Non-Disclosure Agreement. A48. At this meeting, the Optivo team presented a detailed description of Optivo's patent-pending technology, answered questions about Optivo technology, and presented the results of Optivo's trial demonstration for Amazon's consumer electronics unit and an explanation of how by using the Optivo technology throughout Amazon's entire business, Amazon could thereby realize substantially greater contribution margins. Specifically, Optivo told Amazon that, if scaled across all of Amazon's business units, the Optivo technology would increase Amazon's total contribution margin by more than $100 million in 2002. A48, A49.

Despite the demonstrated improvement that the Optivo technology represented over Amazon's existing price-setting technology, Amazon chose not to buy Optivo or its technology. Amazon did however interview two Optivo engineers, including having the Optivo engineers meet personally with Jeff Bezos—Amazon's Founder, President, CEO, and Chairman of the Board. Both

Optivo engineers were asked technical questions during their day of interviews and both were offered jobs at Amazon as Pricing Statisticians. A48.

On multiple occasions including the September 18, 2001, meeting, Optivo informed Amazon that its technology was the subject of pending patent applications. A48-49. OIP alleged in its complaint, that Amazon proceeded to implement infringing automated price testing and selection in its online e-commerce sales websites. A49.

## III. THE PATENT OFFICE DETERMINES THAT OIP'S INVENTION DESERVES PROTECTION

On May 10, 2000, more than a year before the Amazon trial, Andrew Atherton, Vladimir Gorelik, and Nina Barrameda Zumel filed United States Patent Application No. 09/568,001 with the United States Patent and Trademark Office ("Patent Office"). The 001 application, which eventually issued as the 713 patent, was directed to the inventors' innovative price optimization approaches that leveraged the unique technological attributes of online e-commerce, and enabling automated testing and selection of prices for goods and services sold online, the same technology Amazon learned from Optivo.

As the 713 patent explains, traditional pricing methods have certain important limitations when applied to e-commerce. A213 (713 Patent at 1:53-2:22). For instance, in a manual pricing model, prices can be set for a particular good by considering various market factors such as: the good itself, brand strength,

market conditions, business goals, seasons, past sales, etc. *Id*. at 1:62-66.  But a merchandiser taking this approach is essentially guessing as to the shape of the demand curve and therefore as to the optimal price.  *Id*. at 1:64-2:1, 2:3-12.  Furthermore, when demand changes in unpredictable ways, the merchandiser's price cannot automatically respond and continuous manual intervention is not practical or possible.  *Id*. at 2:13-19.

In today's e-commerce environment, both the merchandiser and the customer have more information about the market for goods in several ways, including the use of price databases on the merchant side and shopping robots on the consumer side.  For example, shopping robots can search dozens of vendor websites, increasing the speed at which pricing changes influence customer perceptions.  A214 (713 Patent at 4:13-19).  But simply automating traditional approaches does not necessarily improve a merchant's price-setting ability, as these traditional approaches were inherently uncertain and approximate—educated guesses—to begin with.  A213 (713 Patent at 2:23-29).  Thus an on-line setting for commerce may only magnify the problems of traditional pricing methods, especially as the number of marketed goods increases and pricing rules become more complex.  *Id.* at 2:20-23).  Solving these problems through other computer-automated means, such as auctions, strains customer convenience and choice.  *Id*. at 2:30-37.

The OIP inventors sought to overcome the limitations of the prior art by developing a process that selects prices for a product through live price testing without inconveniencing customers by conducting an auction. A213 (713 Patent at 2:28-45); A214 (713 Patent at 4:26-28). The 713 patent discloses a piece of software called a "pricing module" responsible for implementing the pricing mechanism of an e-commerce system.



A209 (713 Patent at Fig. 4 (highlighting added)). The pricing module is described, in the section of the specification entitled "Architecture Configuration and Details" (A215) as follows:

> The electronic commerce environment of FIG. 4 differs from the prior art systems in that prices, e.g. the price 424, is no longer provided by the vendor's database, e.g. the database 102. Instead, the price is

provided by the pricing module 410. The pricing module 410 will
determine the price according to analysis of data in the datamart 400
and the vendor selected pricing approach for a pricing unit.

A215 (713 Patent at 6:12-19). The specification thus discloses a specific piece of

software that modifies and improves an existing e-commerce system. The

specification further discloses the resulting difference between the prior art and the

claimed technology with respect to how closely an e-commerce system can match

prices to demand over time.



A207 (713 Patent, Fig. 2 (left)); A211 (713 Patent, Fig. 6 (right)). As the figures

show, in the figure on the right, the average difference between demand for a

product or service and the price charged by the e-commerce merchant at the same

point in time is much less. As the specification explains:

FIG. 2 illustrates the impact that traditional, manual, pricing
methodologies have as demand changes over time. The graph 200
shows the passage of time on the X-axis. The relative demand of a
given product overtime is represented by the dotted curve 202. The
pricing under a manual pricing model is shown as the stepped solid
line 204. Notice that while the manual price 204 can be adjusted, e.g.

11

> by a merchandiser, based on current market conditions, it only roughly tracks the demand, and therefore the optimal price
>
> Thus, at times when demand is peaking-and therefore higher prices could be charged-the manual price does not respond. Similarly, as demand dips sharply, the manual price does not respond either. Further, because of the need for manual intervention to adjust the manual price 204, the price may not be adjusted frequently enough to capture either large or small market trends.

A213 (713 Patent at 2:3-19). The specification further explains that "[s]ome automated pricing models have been developed that facilitate the adjustment of manual prices based on predictive estimates of demand. These models typically emulate the assumptions that a merchandiser would use and can automate the process of adjusting prices in response to the inputs to the predictive models. ***The results do not look significantly different from Figure 2***." *Id*. at 2:23-29 (emphasis added). Thus, according to the disclosure of the specification, prior art systems were not as effective as the claimed invention was believed, and proved to be, in large part because the industry did not have the ability to obtain more accurate information about consumer demand for the goods and services offered for sale on existing e-commerce platforms.

By contrast, the specification explains that Figure 6 (on the right above) "illustrates the goals of automatic pricing with graph 600 illustrating that the automatic price 602 for a pricing unit follows demand 202 for a pricing unit [so that] the vendor is able to have her/his prices follow demand and receive a better

price for the pricing unit at each time and thus greater overall profits." A216 (713 Patent at 8:20-25).

The claims of the 713 patent focus on a specific process implemented in a computerized, networked system for testing prices using actual offers, gathering statistics, automatically estimating outcomes based on those statistics, and determining new prices. The full text of issued Claim 1 is as follows:

1. A method of pricing a product for sale, the method comprising:

testing each price of a plurality of prices by sending a first set of electronic messages over a network to devices;

wherein said electronic messages include offers of said product;

wherein said offers are to be presented to potential customers of said product to allow said potential customers to purchase said product for the prices included in said offers;

wherein the devices are programmed to communicate offer terms, including the prices contained in the messages received by the devices;

wherein the devices are programmed to receive offers for the product based on the offer terms;

wherein the devices are not configured to fulfill orders by providing the product;

wherein each price of said plurality of prices is used in the offer associated with at least one electronic message in said first set of electronic messages;

gathering, within a machine-readable medium, statistics generated during said testing about how the potential customers responded to the offers, wherein the statistics include number of sales of the product made at each of the plurality of prices;

using a computerized system to read said statistics from said machine-readable medium and to automatically determine, based on said statistics, an estimated outcome of using each of the plurality of prices for the product;

> selecting a price at which to sell said product based on the estimated outcome determined by said computerized system; and
>
> sending a second set of electronic messages over the network, wherein the second set of electronic messages include offers, to be presented to potential customers, of said product at said selected price.

A220 (713 Patent at 16:2-39). The 713 patent also has numerous dependent claims that impose additional limitations such as: (a) including web pages with advertisements in the second set of sent messages (claim 5); (b) repetition of claimed process until the price generates an outcome within a predetermined statistical confidence (claim 8); (c) generating statistics by generating a conversion ratio (and/or a look-to-buy ration) for each price (claims 17-18). A220-221.

During prosecution, the Patent Office closely considered the concrete technological contribution claimed in the 713 Patent. The examiner rejected the pending claims over the Walker patent, which was drawn to vending machines employing an automated pricing mechanism, which the Examiner contended was similar to that of the independent claims of the OIP patent. A630-34, 735-43, 779-786, 797-804. Specifically, the Walker patent related to "automatically testing, monitoring and managing the pricing and other sales information associated with products sold by vending machines." A769. The OIP inventors were forced to appeal the examiner's conclusions to the Board of Patent Appeals and Interferences. The applicants explained to the Board that the following limitations were not found in the Walker patent:

14

> wherein the devices are programmed to communicate offer terms, including the prices contained in the messages received by the devices;
>
> wherein the devices are programmed to receive offers for the product based on the offer terms;
>
> wherein the devices are not configured to fulfill orders by providing the product . . .

A821.    As the applicants then argued, these "limitations are not satisfied by fulfillment devices in general, nor any of the specific 'vending machines' disclosed in Walker." *Id*. The applicants then elaborated on the point as follows:

> It should be noted that Jay Walker (the "New Age Edison" according to Forbes magazine) is the first-listed inventor in the Walker patent. Mr. Walker is a pioneer in the field of e-commerce, with skills well above the "ordinary skill in the art" standard. For example, he is the primary innovator behind Priceline.com and Walker Digital. . . .
>
> Given the superlative nature of Walker's skills in the specific field of the present invention, it would be absurd to conclude that extending Walker's techniques generally to e-commerce would have been obvious to one skilled in the art **even though it was not obvious to Jay Walker himself.**

A821-22 (emphasis in original). The applicants further argued that:

> [T]he most probative evidence of what one skilled in the art would actually have thought of at the time of the invention is what someone of exceptional skill in the art actually thought of at the time of the invention. Thus, Walker's patent is the best evidence of what a highly skilled person would think of, and Walker's patent lacks any consideration of expressly claimed features of the present claims.

A872.    The Board ruled in the OIP inventors' favor that there was no preponderant evidence of obviousness  A906.  The Board's decision confirmed that providing a mechanism for gathering data about consumer demand, estimating outcomes, and selecting more accurate prices on that basis, was a patentable improvement to e-

commerce technology, distinct from Walker's patentable improvement to vending machine technology. The 713 patent issued on June 28, 2011.

## IV. AMAZON'S MOTION TO DISMISS

When moving to dismiss OIP's complaint, Amazon told the district court that "OIP's patent seeks to own the very idea of setting prices for goods using the law of supply and demand [sic]—an essential building block of economic theory and the cornerstone of modern commerce." A80. Amazon also lodged factual allegations (with no evidentiary support), which contradicted the facts as pled by OIP. Amazon told the district court that: "an individual could perform [the 713 claimed] steps entirely mentally—or at least with a pen and paper—by making offers and gathering statistics in person." A146. And even though Amazon learned how to practice the claimed technology from the OIP inventors, Amazon even went so far as to proclaim that "[a]ny electronic commerce merchant is undoubtedly familiar with collecting and analyzing statistics from customers and using that data to adjust prices. Such steps are just the sort of 'well-understood,' 'routine,' and 'conventional' steps", A148, that are not eligible for patent protection and that "a merchant in a bazaar could have performed OIP's 'invention' centuries ago—and no doubt did." A146.

Following OIP's explanation that many forms of price optimization exist other than those claimed in the 713 patent, at the day of oral argument, having first

argued that the 713 patent claimed the abstract idea of "setting prices for goods using the law of supply and demand [sic]," A80, Amazon changed its position and argued that "offer-based pricing" was the abstract idea at issue in the case. A169, 170, 174, 183, 191. OIP pointed out that Amazon's attempt to narrow the purported abstract idea:

> [made] the entire argument circular, because once you define the abstract idea as being what the claim says, of course, you monopolize the abstract idea. . . . you can't define the abstract idea so narrowly that it's concrete. . . .
>
> You can't make the abstract idea so concrete that it's now no longer abstract. The abstract idea, as the motion framed it—and in fairness I think the motion properly framed it that way—is price optimization. That is the abstract idea.
>
> And if you had a claim that said optimize pricing and do it on a computer, all the cases I think would teach that isn't enough.

A180-82. When pressed by the Court to provide a real answer to what the abstract idea even was, Amazon admitted: "Your Honor, I think ultimately it's price optimization, but it doesn't matter whether you think of it as price optimization or the way they have characterized it, price testing based on offers in an electronic commerce environment." A182.

## V. THE DISTRICT COURT DECLARES OIP'S PATENT INVALID UNDER SECTION 101 AND IMPROPERLY DISMISSES OIP'S LAWSUIT

In ruling on Amazon's motion the district court used the machine-or-transformation test to disregard the 713 patent claim limitations that establish not just the presence of a computer, but steps drawn to specific improvements to a pre-

existing computer-based e-commerce system. The court began by stating that "[m]erely listing 'a network' or 'devices' . . . is insufficient to impose meaningful limitations on the claim's scope." A23 (quotations omitted). The court rejected these "network" and "device" limitations, as well as the "machine-readable medium" limitation and the "computerized system" limitation as insufficient based on the conclusion that "'storing, retrieving, and providing data . . . are inconsequential data gathering and insignificant post solution activity' . . . [and t]hese inconsequential functions are all that the devices and networks identified by Plaintiff provide." A23-24 (quoting *Bancorp Services, L.L.C. v. Sun Life Assur. Co. of Canada*, 771 F. Supp. 2d 1054, 1065 (E.D. Mo. 2011), *aff'd*, 687 F.3d 1266 (Fed. Cir. 2012)). The district court went on to acknowledge that "'machine-readable medium' and 'computerized system' each refer to computer implementation" but dismissed these claim limitations, reasoning that "the fact that claims may require implementation on a computer does not demonstrate that the claim satisfies [the machine or transformation test]." A24.

The district court proceeded to find that the other limitations failed the machine or transformation test. First, the district court assessed that the "gathering, within a machine-readable medium, statistics generated during said testing" limitation was a "mere data-gathering step[ that] cannot make an otherwise nonstatutory claim statutory." A24 (quoting *CyberSource v. Retail Decisions, Inc.*,

654 F.3d 1366, 1370 (Fed. Cir. 2011)). Next the district court criticized this step by claiming that it does not "specify how the [medium is] specifically programmed to perform the steps claimed in the patent. The claims are silent as to how a computer aids the method, the extent to which a computer aids the method, or the significance of a computer to the performance of the method." A25 (quoting *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012)). The district court concluded that "the only element of the claimed calculation that might take it outside the realm of the human mind is the claim term 'automatically,' but to do a calculation 'automatically' simply refers to the computer's inherent value in performing calculations *more quickly*, a characteristic that does not render the computer 'integral' to the claimed method." A26 (emphasis in original).

The district court's dismissal of all computer-related elements flowed from its adoption of Amazon's unsupported and procedurally improper claim that "absent the computer limitations, which the Court has already rejected as insignificant, 'a merchant in a bazaar could have performed OIP's invention centuries ago—and no doubt did.'" A28. The district court opined that after the "insignificant computer-based limitations are set aside . . . nothing remains in the claims but the abstract idea of [measuring a demand curve and optimizing price] by performing calculations and manipulating the results." A28 (quotations and citations omitted). According to the court "these steps describe what any business

owner or economist does in calculating a demand curve for a given product." A28. According to the district court, "[i]n the final analysis, the patent simply instructs businesses to apply the concepts of supply and demand." A30. The district court offered its own facts in support of its conclusion, opining that "anyone who seeks to use the laws of supply and demand to calculate a demand curve and an optimum price . . . must first gather data from which to make a calculation, and after she has made it . . . must tell customers about the new price." A30. The district court did not credit the facts as pled that contradicted these new findings, including that Amazon did not know how to use the OIP technology until the OIP inventors provided the technology to do it.

Finally, the district court rejected OIP's argument that its claims did not preempt all uses of the idea of price optimization because OIP's invention "leaves room for other iterations of the principle, such as using vendor databases, cost databases, surveys of competitive prices, online auctions, and other methods." A32. The district court opined that "a patent need not *wholly* preempt the abstract idea of price optimization in all its forms in order to be ineligible under §101; rather the degree of preemption relevant to the § 101 analysis is a relative concept." A32 (emphasis in original). The district court stated that the "central question" remains whether a patent claims "broad monopoly rights over a basic concept, fundamental principle, or natural law **without a concomitant contribution to the**

*existing body of scientific and technological knowledge*" and the district court concluded simply: "the 713 patent does."    A33 (quotations omitted, emphasis added).  The district court's finding that the inventors did not contribute enough to the existing body of technological knowledge to justify their claims disregarded both the specific improvement claimed in the 713 Patent and the associated technology which, as pled, had the ability to improve the contribution margin of Amazon itself by hundreds of millions of dollars.

## SUMMARY OF THE ARGUMENT

This case is about a real invention in a real technological field in which Amazon has long been hugely dominant.  The OIP inventors came up with a new way to get better information about consumer demand for goods and services sold through online retail platforms and to use that information to set better prices, automatically.  The inventors demonstrated and taught that technology to Amazon, including a trial run that resulted in an increase in contribution margin by 7% of revenue over less than a two-month period.  This technology was estimated at the time to represent potential value to Amazon in the hundreds of millions of dollars.  And when Amazon was done with its trial, rather than buy the technology as it could have done, Amazon took what it had learned from the inventors for itself.  And yet, despite the fact that Amazon's entire business is based on just this sort of

technology, Amazon's position is essentially that these complex pricing systems are not technological enough to warrant any patent protection.

In *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), the Supreme Court reaffirmed an analytic framework for Section 101 questions that shows why the 713 patent claims eligible subject matter and why the district court's decision should be reversed: "First, we determine *whether* the claims at issue are directed to one of those patent-ineligible concepts. *If so*, we then ask '[w]hat else is there in the claims before us?'" *Id.* at 2355 (citation omitted).

The Supreme Court, in determining that the claims in *Alice* were drawn to abstract ideas, subjected the *Alice* claims to the same test it applied in *Bilski*, finding that they were:

> [D]rawn to the concept of intermediated settlement, i.e., the *use of a third party to mitigate settlement risk*. Like the risk hedging in Bilski, the concept of intermediated settlement is "'*a fundamental economic practice long prevalent in our system of commerce*.'" . . . the use of a third-party intermediary (or "clearing house") is also a *building block of the modern economy*. . . .

*Id.* at 2350 (citations omitted, emphasis added). The 713 patent does not claim any basic economic principle, including any of the abstract-idea formulations Amazon and the district court adopted. The claims do not recite or require a demand curve. And they do not recite or require the "law of supply and demand." Rather, the claims are written to protect a testing regime and software system that *enables* price optimization as a result of using it. The claimed testing regime and software

22

are capable of allowing e-merchants to sell their goods and services at prices more closely tracking demand for those goods and services.  And as a result, the prices of those merchants' goods and services will more accurately describe a demand curve if that is how the merchants choose to use the software.  But the claims themselves include no such limitations.

As further proof, in opposing Amazon's motion, OIP informed the Court of numerous other approaches to price setting such as determining prices solely from vendor databases, e.g. MSRP; determining prices (even if automatically) solely from cost databases or input prices, e.g., cost-plus pricing; determining prices (even if automatically) solely from comparison with competitor prices, e.g. averaging of competitor prices; determining prices solely through online auctions; determining prices by undifferentiated promotional sales (without testing), e.g., 20% sales or fixed/limited-time offers; determining new prices in any manner not based on the automatically estimated outcomes; and determining prices in any manner where outcomes are not automatically estimated based on the generated statistics. A118.  Indeed, Amazon was unable to deny this, and the district court acknowledged that there are numerous forms of price optimization that do not practice the 713 patent claims.  A32.

At oral argument, Amazon attempted to cure this fallacy by recasting the supposed abstract idea so narrowly that it effectively became concrete, and

ultimately telling the district court that what supposed abstract idea was even at issue "***doesn't matter***." A182. This is inconsistent with the Supreme Court's statements about the underlying concern of Section 101 analysis being preemption. If the abstract idea is very broad, such as price optimization, then it is clear from the record that OIP does not preempt it. By contrast, if Amazon can recast the abstract idea so narrowly that it merely restates the claim itself in abstract terminology, then the test is meaningless because all claims preempt all uses of the invention as actually claimed and therefore all claims could be construed to be abstract if that were really the test. Whether or not the claim is drawn to an abstract idea is a substantive question and it requires a specific answer that takes into account both what the claim actually says and what the supposed abstract idea actually is. The district court should have denied Amazon's motion on this basis alone. But ultimately, the district court disregarded every single actual element of the 713 patent's independent claims—to say nothing of its dependent claims—and then, conducting impermissible and ungrounded fact-finding based on no evidence, reached the incorrect conclusion that OIP had merely claimed "what any business owner or economist does in calculating a demand curve for a given product," and that "a merchant in a bazaar could have performed OIP's invention centuries ago—

and no doubt did." A28. This improper and inaccurate fact-finding is already sufficient reason to reverse the decision of the district court.[1]

*Mayo* step 2 provides another clear reason to reverse. As the Court wrote in *Alice*, the claim at issue in *Diehr* "employed a well-known mathematical equation, but [used it] in a process designed **to solve a technological problem** in conventional industry practice." *Alice*, 134 S. Ct. at 2358 (quotations omitted, emphasis added). Specifically *Diehr's* invention:

> [U]sed a "thermocouple" to record constant temperature measurements inside the rubber mold—something "the industry ha[d] not been able to obtain." The temperature measurements were then fed into a computer, which repeatedly recalculated the remaining cure time by using the mathematical equation . . . . In other words, the claims in *Diehr* were patent eligible because they improve an existing technological process, not because they were implemented on a

---

[1] While *Bilski* and *Alice* looked to the prior art to determine whether the concepts of hedging and intermediated settlement were already known, this was not a matter of anticipation or of obviousness under Sections 102 or 103, but rather to establish these two concepts as fundamental ideas and building blocks of the economy. This approach strongly suggests that like obviousness Section 101 inquiries can turn on underlying questions of fact. Moreover, whereas the Court in *Bilski* and in *Alice* did look to the prior art to help establish that hedging and intermediated settlement are abstract ideas, the district court in this case went further with its ungrounded factual determinations and did not simply use them to justify its conclusion that the laws of supply and demand are fundamental economic concepts. Rather the court made the additional leap of declaring that, holding aside computer-related elements the court held as nugatory, the OIP invention **as claimed** was **actually practiced** by a hypothetical prior artist centuries ago. This determination sounds not in Section 101 but in obviousness or anticipation—and it was essential to the district court's holding. The district court's conflation of Section 101 with Sections 102 and 103 underscores the error of its holding.

computer."

*Id*. (citations and quotations omitted).  Like the surveillance regime of *Diehr*, used for gathering previously inaccessible information about the remaining cure time of rubber, the 713 patent claims a system and method that measures and uses previously unobtainable real-time information about consumer demand and uses it to radically improve an existing technological process.  Thus, even *if* the 713 patent claims included such an abstract idea, they would do so only in the context of applying it in a specific way to a technological problem with the result that real technology is improved.  Thus, under *Diehr*, as explained again and reaffirmed by the Supreme Court in *Alice*, OIP's claims are drawn to patentable subject matter and the district court decision should be reversed.

In concluding that the 713 patent was invalid, the district court ignored the claims as actually written, the specification and file history, and the facts as pled by OIP.   Simply  following  the  Supreme  Court's  most  recent  guidance demonstrates that the claims at issue here should stand.  And this Court's recent Section 101 jurisprudence is consistent with that result.  This appeal shows why the Supreme Court's repeated guidance on how to apply section 101 correctly must be heeded so that the exception does not "swallow all of patent law."  *Id*. at 2354. The OIP inventors had legitimate rights in real technology that they first taught Amazon how to make and use.  Amazon in turn used the stigma of business-

method abstraction to take away those rights.  If Amazon's position is now sanctioned by this Court, that essentially means that no matter how narrow or broad the claims, there are no patentable inventions involving computers that do not include a specific non-computer related piece of hardware, such as the thermocouple found in *Diehr*.  Applying *Alice*, this case can be decided on the basic proposition that if Amazon's e-commerce is real technology, then an invention that ***improves*** e-commerce by providing a better pricing mechanism is real as well and deserves to be protected.

## ARGUMENT

The Supreme Court has repeatedly endorsed a substantive distinction between sweeping claims that preempt all uses of an abstract idea—which are not patentable—and claims drawn to concrete and particular uses of such ideas to make real-world improvements to actual technology, which are patentable.  The district court failed to apply this distinction, and incorrectly concluded that OIP's claimed inventions claimed abstract ideas.  The district court only reached its erroneous conclusions by committing the additional errors of disregarding the facts as pled by OIP, which it was required to credit when deciding a motion to dismiss, an error it compounded by replacing the facts it was obligated to credit with its *ex nihilo* fact finding.

## I.    STANDARD OF REVIEW

The standard of review on a motion to dismiss is a purely procedural issue to which the Federal Circuit applies regional circuit law. *K-Tech Telecomms., Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1282 (Fed. Cir. 2013).

> The Ninth Circuit reviews de novo challenges to a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The court's review is generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of judicial notice.  In undertaking this review, the court accept[s] the plaintiffs' allegations as true and construe[s] them in the light most favorable to plaintiffs.

*Id.* (citations and quotations omitted).  The Federal Circuit applies its "own law, however, with respect to issues of substantive patent law.  Patent eligibility under § 101 presents an issue of law that we review de novo." *Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-1341 (Fed. Cir. 2013) (citations omitted).[2]

---

[2]  The Court in *Accenture* also acknowledged that "[t]his legal conclusion may contain underlying factual issues." *Id.* at 1341 (citing *Ultramercial, Inc. v. Hulu, LLC*, 722 F. 3d 1335, 1339 (Fed. Cir. 2013) (certiorari granted, vacated, and remanded *sub nom. WildTangent, Inc. v. Ultramercial LLC*, 134 S. Ct. 2870 (June 30, 2014))).  *Accenture* was addressing the subsequently vacated opinion in *Ultramercial* at the time, and so the viability of that point is subject to question. While unsettled, the better view is that Section 101 can turn on underlying questions of fact, just as obviousness does.  As the Supreme Court has explained, "[t]o receive patent protection a claimed invention must, among other things, fall within one of the express categories of patentable subject matter, § 101, and be novel, § 102, and nonobvious, § 103. . . .  In evaluating whether these and other statutory conditions have been met, PTO examiners must make various factual determinations—for instance, the state of the prior art in the field and the nature of

## II.    THE DISTRICT COURT'S REJECTION OF OIP'S CLAIMS IS INCONSISTENT WITH THE SUPREME COURT'S DECISION IN *ALICE*

Writing in *Alice*, the Supreme Court once again clarified and affirmed the distinction between patent-ineligible abstract ideas and patent-eligible inventions, along with the principle on which the distinction is based.  As the Court explained: "We have long held that [section 101] contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134 S. Ct. at 2354 (quotation and citation omitted).  As the Court explained:

"We have described the concern that drives this exclusionary principle

---

the advancement embodied in the invention. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011) (citations omitted).  Further, "[w]hile the ultimate question of patent validity is one of law, the same factual questions underlying the PTO's original examination of a patent application will also bear on an invalidity defense in an infringement action."  *Id.* at 2242-43 (citations and quotations omitted).  Accordingly, while unsettled, and notwithstanding that the Court in *i4i* was addressing Section 102, it does appear that the better view is that while Section 101 questions are questions of law, they can turn on underlying facts.  The Supreme Court in *i4i* wrote: "We consider whether §282 requires an invalidity defense to be proved by clear and convincing evidence.  We hold that it does."  *Id.* at 2242.  Further, in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 n.10 (2014), the Court wrote that the "presumption of validity does not alter the degree of clarity that §112, ¶2 demands from patent applicants; to the contrary, it incorporates that definiteness requirement by reference" (citing 35 U.S.C. § 282, ¶2), while also "leav[ing . . .] for another day" the question of "whether factual findings subsidiary to the ultimate issue of definiteness trigger the clear-and-convincing-evidence standard[.]"  *Id.*    Particularly because, as discussed in *Nautilus, id.*, the Section 112 requirements are treated separately in § 282, whereas Section 101, like Sections 102 & 103, are not, there is reason to believe its subsidiary questions of fact are subject to the clear and convincing evidence standard of proof.

as one of pre-emption. Laws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work. [M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws."

*Id*. (quotations and citations omitted). Having stated the reason why abstract ideas

are not patentable, the Supreme Court also gave the following warning:

At the same time, we tread carefully in construing this exclusionary principle lest it swallow all of patent law. At some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept. [A]pplication[s] of such concepts to a new and useful end, we have said, remain eligible for patent protection."

*Id*. (quotations and citations omitted).

In *Alice*, the Supreme Court acknowledged a fundamental difference

between using a trivial bit of technology to justify closing off the public's access to

an abstract idea, in and of itself, and ***developing*** a new technological application of

an idea to solve a real-world problem:

[W]e must distinguish between patents that claim the building block[s] of human ingenuity and those that integrate the building blocks into something more . . . thereby transform[ing] them into a patent-eligible invention. The former would risk disproportionately tying up the use of the underlying ideas, and are therefore ineligible for patent protection. The latter pose no comparable risk of pre-emption, and therefore remain eligible for the monopoly granted under our patent laws.

*Id*. at 2354-5 (quotations and citations omitted, emphasis added).[3] The Supreme

Court recognized that the doctrine exists only to exclude the first category of so-

called "inventions" from patent protection, to prevent overreaching patents on

basic building-block ideas from halting progress. But Supreme Court's warning to

"tread carefully" lest the abstract-ideas exception "swallow all of patent law" is no

---

[3] This Court's recent section 101 cases are consistent with the core guidance of *Alice* that while claims drawn to an abstract idea as such with the only effective additional requirement being to "do it using a computer" are not patentable, claims drawn to an application of that idea to improve an existing technological process are patentable, including when a computer is involved. In particular, in those recent cases where this Court has found computer-related claims invalid under section 101, the claims have fallen on the wrong side of the distinction as addressed most recently in *Alice* between *Benson* and *Flook* on the one hand and *Diehr* on the other. *See, e.g., CyberSource v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) (rejecting claims to computer based credit card fraud detection where, "[s]uch a method that can be performed by human thought alone is merely an abstract idea and is not patent-eligible"); *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (rejecting "Dealertrack's primary argument [] that the 'computer-aided' limitation in the preamble sufficiently limits the claims to an application of the idea" of a clearing house to render it patentable when the patent did "not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent"); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) (rejecting claims that include "[n]o such technological advance [but] merely employ computers to track, reconcile, and administer a life insurance policy with a stable value component—*i.e.*, the computer simply performs more efficiently what could otherwise be accomplished manually."). Each of these cases can be seen to run afoul of the principles expressed in *Alice* that, as discussed herein, the 713 claims satisfy. Although the analytic framework sanctioned by the Supreme Court has undergone a recent intense period of refinement, the core principles have not changed, and just as the OIP inventors' substantial technological contribution is protected under the law as expressed by *Alice*, it passes under these other cases just as well.

idle premonition.  As the Court acknowledges, there exists a whole category of true

discoveries that hinge on the introduction of an idea, even an abstract idea, to a

technology that is improved by the applied idea thanks to the inventor's creativity

and diligence.    To exclude these true inventions because they involve the

***application*** of abstract principles is a perversion of the law and undermines the

progress that the Constitution charged it to protect.  Recognizing the importance of

getting Section 101 analysis right in each particular case, the Supreme Court has

repeatedly provided a "framework for distinguishing patents that claim laws of

nature, natural phenomena, and abstract ideas from those that claim patent-eligible

applications of those concepts." *Id*. at 2355 (citations to *Mayo* omitted).  In *Alice*,

when applying the two-step framework of *Mayo* in the context of computer-

implemented business method claims, the Court explained:

> First we determine ***whether*** the claims at issue are directed to one of
> those patent-ineligible concepts.  ***If so***, we then ask 'what else is there
> in the claims before us?'  To answer that question, we consider the
> elements of each claim both individually and as an ordered
> combination to determine whether the additional elements transform
> the nature of the claim into a patent-eligible application.

*Id*.  Thus, before proceeding any further, courts must first ask ***whether*** the claim is

truly drawn to an abstract idea in the first place.  If not, then the analysis is at an

end and the claims remain intact.  There is no presumption that an abstract idea lies

at the heart of every claim and courts are not permitted simply to presume that a

claim is drawn to one.  First they must test this hypothesis and only if they first

correctly decide that the claims are drawn to an unpatentable abstract idea, may they inquire into whether the other elements of the claim, taken separately or together, are "enough" to assure the court that the claims represent a genuine technological invention.

OIP's claims in the present appeal are not drawn to unpatentable abstract ideas, and even to the extent they include applications of such ideas, they constitute substantive technological advancements in the application of those ideas to specific technological problems that were known and remained unsolved at the time of the invention. Accordingly, under the Supreme Court's framework as set forth in *Mayo* and reaffirmed and clarified in the context of computer-implemented business methods in *Alice*, the 713 claims are drawn to eligible subject matter and the district court's decision must therefore be reversed.

### A. Step 1: OIP's Claims Are Not Drawn To An Abstract Idea Under *Alice*

Under the Supreme Court's framework, the first step is to assess whether the claims at issue are drawn to an abstract idea. Applying the analysis set forth in *Alice*, it is clear that they are not. The Supreme Court began its explanation of step one, by reciting that:

> The "abstract ideas" category embodies "the longstanding rule that '*[a]n idea of itself is not patentable*.'" . . . "A *principle, in the abstract, is a fundamental truth; an original cause; a motive*; these cannot be patented, as no one can claim in either of them an exclusive right".

*Id*. at 2355 (citations omitted). The Court proceeded to apply step one by justifying a comparison of Alice's claims to those of Bilski: "all members of the Court agree[d] that the patent at issue in *Bilski* claimed an abstract idea," which the Court explained was "the basic concept of hedging, or protecting against risk." *Id.* at 2356. As the Court noted, "[h]edging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class." *Id*. (quotations omitted). The Court then subjected Alice's claims to the same test:

> On their face, the claims before us are drawn to the concept of intermediated settlement, i.e., the ***use of a third party to mitigate settlement risk***. Like the risk hedging in *Bilski*, the concept of intermediated settlement is "'***a fundamental economic practice long prevalent in our system of commerce***.'" . . . The use of a third-party intermediary (or "clearing house") is also a ***building block of the modern economy***. . . Thus, intermediated settlement, like hedging, is an "abstract idea" beyond the scope of § 101.

*Id*. (citations omitted, emphasis added). Finding that Alice's claims were in fact drawn to a fundamental economic practice, as such, the Supreme Court stated "we need not labor to delimit the precise contours of the 'abstract ideas' category [when] there is no meaningful distinction between the concept of risk hedging in *Bilski* and the concept of intermediated settlement at issue here." *Id*. at 2357.

Thus, both *Bilski* and *Alice* addressed claims that were drawn to fundamental economic practices long known and used by those in the art. But the specific techniques recited in OIP's claims, including specific software and hardware used

to control the prices of goods and services for e-commerce vendors, cannot realistically be termed "fundamental economic practices" or "building blocks of the modern economy" in the way that risk hedging and intermediated settlement can be.  The district court found that OIP claimed the abstract idea of price optimization in the same way that Bilski claimed the entirety of hedging, or that Alice claimed all intermediated settlement.  As an initial matter, even a cursory examination of the claims shows that they do not in fact claim the putative abstract idea the district court said that they did.

The district court said that "[i]n simple English, the 713 patent in essence teaches nothing more than the calculation of a demand curve based on consumer response to different price points."  A28.  And Amazon's motion papers informed the court that "OIP's patent seeks to own the very idea of setting prices for goods using the law of supply and demand [sic]."  A80.  The record establishes however that the 713 claims do nothing of the sort.  For instance, the claims do not recite or require a demand curve; nor the "law of supply and demand."  Rather, the claims are drawn to a testing regime and software system that *enables* price optimization for merchants who use it.  The claimed testing regime and software allow the price of goods and services to track demand for those goods and services more closely— thus more accurately resembling a demand curve for merchants who choose to use the software that way.  But the claims themselves include no such limitations.

As the Court acknowledged, there are numerous forms of price optimization that the 713 patent does not claim. A32. Amazon did not dispute this, and instead changed its proposed abstract idea to "offer-based pricing," A169, 170, 174, 183, 191, ultimately telling the district court that how the abstract idea was defined "***doesn't matter***." A182 (emphasis added). Amazon's admission at oral argument that its position did not depend on what the supposed abstract idea even was signals a refusal to address the fundamental concern of Section 101: preemption. If the abstract idea allegedly at issue is broad, then the 713 patent claims do not preempt it. If it is as narrow as the 713 patent claims themselves, but recast in abstract terminology, then the test is meaningless. Indeed, the narrowest version of the abstract idea Amazon presented to the district court, which the district court ultimately appeared to adopt, was crafted merely to restate the claim itself in abstract terms and leaving out the specific claim elements. Just as artful draftsmanship cannot change what is not patentable into what is, neither can artful brief-writing turn a real invention into an abstraction merely by eliminating most of the words from the claims. The Supreme Court has made very clear, as discussed above, that the distinction between what is patentable and what is not patentable is substantive: it requires comparing the claims as they are actually written to an abstract idea to which they are alleged to be drawn—such a comparison cannot be performed in the abstract.

In compressing the claims into the so-called abstract idea of "calculation of a demand curve based on consumer response to different price points," A28, the district court ignored every single claim limitation of the independent claims, to say nothing of the dependent claims. Claim 1 again has the following relevant limitations: Testing a plurality of prices; using devices that cannot fulfill orders; gathering statistics generated about how customers reacted to the offers; using that data to estimate outcomes (i.e. mapping the demand curve over time for a given product); automatically selecting and offering a new price *based on* the estimated outcome. A220 (713 Patent at 16:2-39). Apparently ignoring this entire series of steps, the district court concluded that OIP had only claimed "what any business owner or economist does in calculating a demand curve for a given product,"[4] such that "a merchant in a bazaar could have performed OIP's invention centuries ago— and no doubt did." A28.

The court's conclusion is contradicted by the district court's own acknowledgment of the other forms of price optimization. A32. The patent

---

[4] While it may be correct that any business owner would want to use the OIP invention, Amazon has put forth no evidence that any business owner other than Amazon actually does it. Moreover, as reflected in OIP's complaint, the facts that must be taken as true are that Amazon itself was not doing it until the OIP inventors taught Amazon how, and Amazon expended great effort to get the invention. Thus, it is entirely improper to find now that as a matter of fact any business owner uses the OIP invention. Whether any particular business owner uses OIP's statistical calculations as a basis for pricing is a fact question and it must be tested in discovery.

discloses that prior art forms of automated price selection "typically emulate the assumptions that a merchandiser would use and can automate the process of adjusting prices in response to the inputs to the predictive models" and states that the demand mapping resulting from those prior art systems resembles the price and demand plot of Figure 2. A213 (713 patent at 2:23-29). At the same time, the pleadings establish that the OIP inventors discovered a technology that worked substantially better than what is depicted in Figure 2. Indeed, if the court had been right that anyone could practice the invention manually, then Figure 2 (manual pricing) should not have looked any different from Figure 6 (inventive dynamic pricing). Thus, the court's conclusion that the 713 patent claims an abstract idea is contradicted by the 713 patent itself. Even holding aside the expressly computer-related elements, no version of the supposed abstract idea articulated by the court would require anyone to practice the 713 patent claims. Unlike the claims in *Bilski* and in *Alice*, the OIP claims simply are not drawn to the "abstract idea" the district court identified at Amazon's urging, and certainly not to setting prices based on the "law of supply and demand [sic]." The district court's decision should be reversed on this basis alone.

Amazon invited this error with the arguments described above, and with its conclusory declaration that the 713 patent only discloses that "price optimization would be more efficient 'on a computer system'" but did not provide "a word

about how that system should be programmed or what the software should contain, [ . . . leaving] the heavy lifting to the public to create real world systems[.]" A146. This statement was doubly untrue, first because it ignored, and invited the court to ignore, the undisputed other forms of price optimization that OIP did not claim; and second because, as explained in OIP's complaint, it was in fact none other than the OIP inventors who did the heavy lifting to build a real world system that Amazon actually used, and who taught Amazon how to use it. Further, when Amazon told the district court that "an individual could perform [the 713 claimed] steps entirely mentally—or at least with a pen and paper—by making offers and gathering statistics in person[,]" (*id.*), this too invited error because there was no factual basis for such a conclusion anywhere in the record, and certainly none on which the district court was entitled to rely when ruling on Amazon's motion to dismiss. Indeed, the idea of an army of human beings somehow tracking Amazon page views, gathering consumer reactions to prices during those page views, performing statistical analysis on those reactions, and resetting prices, all on a global scale and fast enough to let prices track actual changes in demand requires not just impermissible fact-finding but flights of fancy. And the notion becomes even more implausible when one attempts to apply it in a brick-and-mortar setting. Amazon presented facts to the district court in the guise of subject matter that

could somehow be properly established by attorney argument.  It could not.  But the district court did so anyway.

The district court's assertion that the claimed invention is simply "what any business owner or economist does in calculating a demand curve for a given product," A28, is not based on any fact of record and is contradicted by the facts as pled.  In reality, Amazon's own conduct shows that OIP's invention was not "what any business owner" does to calculate demand.  Amazon was as motivated and as successful as anyone in pricing and selling products online.  But Amazon did not practice the specific technique claimed in the 713 patent until after the OIP inventors taught Amazon how.  Amazon's need for OIP's inventive technology, as opposed to the bare idea to optimize prices, can be reasonably inferred from Amazon's interest in the Optivo product, the talk of acquisition, and attempting to hire Optivo engineers.  The concrete nature of OIP's solution can be seen by dramatic gains observed by Amazon during the beta tests.  OIP's efforts involve real technology and are deserving of protection.  If the OIP invention were merely a well-known fundamental economic practice then Amazon would have done it on its own.  The 713 claims are drawn to that concrete technological improvement to Amazon's then-existing e-commerce system, and not to any fundamental economic building block or practice. Thus, in the framework of *Mayo* and *Alice*, the inquiry should be at an end and the decision below reversed.

**B.    Step 2: Even If The OIP Claims Involve An Abstract Idea They Are Patentable Under *Alice* Because The Claims Are Drawn To Specific Improvements Of Existing Technology**

Even if the district court were right, and the 713 claims were truly drawn to an abstract idea of calculating "a demand curve based on consumer response to different price points," A28, such that the second step of *Mayo* would come into play, reversal would still be appropriate. All the facts before the Court show that the claims are drawn to an inventive application of these ideas to dramatically improve existing technology.

"At *Mayo* step two," the Court explained, "we must examine the elements of the claim to determine whether it claims an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application. . . . more than a drafting effort designed to monopolize the [abstract idea]. . . . more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'" *Alice*, 134 S. Ct. at 2357 (quotations omitted). The Court explained the second step of the analysis through reference to the principles undergirding its prior decisions in *Benson*, *Flook*, and *Diehr*.

**1.    *Alice* Shows Why OIP's Claims Pass Section 101 Under *Diehr***

The Supreme Court's discussion of *Diehr* in *Alice* shows affirmatively why these claims deserve protection. In *Diehr*, the Court "held that a computer-implemented process for curing rubber was patent eligible, but not **because** it

involved a computer." *Id*. at 2358. Indeed, the patent as issued to James Diehr acknowledges in the first sentence of its summary of the invention that it "uses computers of well-known type" and that "[m]odern computers act so rapidly that [the] recalculations [required by the invention] are no burden and can easily be done each second [and i]n fact, a computer can work much faster than that[.]" U.S. Patent No. 4,344,142 ("Diehr patent") at 2:18, 2:38-41. Thus, it is clear that not only was the presence of the computer not what justified the patentability of Diehr's invention, but Diehr's invention did not involve any improvement to computer technology as such at all. Rather, Diehr took advantage of a generic computer whose capabilities admittedly ***exceeded*** the functional requirements of his invention. In fact, none of the core elements of Diehr's invention were unknown to the rubber curing industry. In addition to the generic computers, the industry was already measuring the temperature of the rubber mold ("the mold temperature . . . is thermostatically maintained") Diehr patent at 1:26-27. and the abstract Arrhenius equation was well known in the art. The problem was that the curing process was based on educated guesses about the proper cure time rather than automatic adjustments to the cure time:

> [T]he mold temperature, even though it is thermostatically maintained, is not likely to be identical with this supposed temperature. The actual temperature of the mold may vary rather widely and the correction of the temperature by the thermostat may take some time.

. . .

> The thermostats are usually actuated within a plus or minus 2% [sic] to cause the device to heat until it reaches the nominal temperature, but this is not sufficient to assure that the temperature has been maintained as an average during the entire molding operation—as a matter of fact it rarely if ever has.

Diehr patent at 1:25-30, 1:39-44. Thus, the correct time to completion of the process of curing rubber was unknown because it was based on an often inaccurate and partly informed guess about the temperature of the mold over the course of time. The result of this problem for rubber-curing was that rubber was that "the rubber [would] tend to be overcured in almost every instance." *Id*. at 1:50-52. In *Diehr*, the Supreme Court explained in *Alice*, "[t]he claim employed a well-known mathematical equation, but [used it] in a process designed ***to solve a technological problem*** in conventional industry practice." *Alice*, 134 S. Ct. at 2358 (citations and quotations omitted, emphasis added). Specifically Diehr's invention:

> [U]sed a "thermocouple" to record constant temperature measurements inside the rubber mold—something "the industry ha[d] not been able to obtain." The temperature measurements were then fed into a computer, which repeatedly recalculated the remaining cure time by using the mathematical equation . . . . In other words, the claims in *Diehr* were patent eligible because they improve an existing technological process, not because they were implemented on a computer."

*Id*. (citations and quotations omitted).

Diehr's invention provided a surveillance system for monitoring the internal temperature of a rubber mold and using that information to automatically and

repeatedly calculate the remaining time until the rubber was properly cured. So too here, the OIP inventors provided a way to monitor the demand as a function of price for a given product over time and use that information to set prices for that product automatically and repeatedly that more accurately tracked consumer demand. That information, according to the 713 patent, existed but was not readily accessible before the invention, which meant that merchants were required to "*guess[]* the shape of the demand curve." A213 (713 patent at 1:67). In *Diehr*, the information about the internal temperature of rubber molds existed, but it was not used in conjunction with the Arrhenius equation to calculate the correct remaining time automatically. Diehr solved that problem by inventing the novel "surveillance system," Diehr patent at 2:23, that gathered that information and fed it into a computer to repeatedly recalculate the remaining time. In OIP's case, while information about how many customers purchased a given item at a given price was likely available, such information had never been gathered, as in the 713 patent, and used in an e-commerce system to provide dynamic and automatic estimates of demand, and then used by software such as the 713 patent's pricing module to provide dynamic pricing.

Moreover, just as the *Diehr* invention's use of generic, readily-available computers did not limit patentability because those computers were used to improve existing rubber-curing technology, the patentability of the 713 patent

claims is not hampered by the use of generic computers because the 713 patent uses computers to improve e-commerce pricing technology. The technological innovation in *Diehr* thus did not rest on any specific piece of hardware, be that a prior-art thermocouple, rubber mold, or computer. Nor could it have been the mere implementation of the Arrhenius equation using a computer that transformed the *Diehr* invention into patentable subject matter. Rather the technological innovation that justified Diehr's patent was the combination of these elements, including the Arrhenius equation and the tangible elements, to solve a real-world problem that was known in the industry.

Both the *Diehr* patent and the OIP invention relate to novel testing regimes for obtaining information and using that information automatically with general purpose computer processing, to improve existing industries. By implementing the inventive testing regime disclosed in the 713 patent, the OIP inventors were able to construct a piece of software that improved upon the then-existing e-commerce technology. Amazon itself experienced a 7% improvement by revenue in the contribution margin of its consumer electronics unit when testing the OIP inventors' technology, a convincing demonstration that the 713 patent represented an ***improvement*** to an existing technological process sufficient to pass the threshold test of patentability under *Diehr*. The story of the OIP invention has all the same hallmarks as *Diehr* except that it involves business and money. And that is not a

reason to find that the OIP invention is not an improvement to an already existing but inferior technology, to wit: e-commerce.[5]

The prosecution history of the 713 patent, and the Walker patent in particular, show the concrete nature of the OIP invention under *Diehr* as read by *Alice* as well. Specifically, the Walker patent relates to improving vending machines through a price testing method. The OIP inventors had to distinguish the Walker reference by ***limiting*** their claims to machines that, unlike vending machines, had no ability to fulfill orders in response to payment. *See, e.g.*, A660-61. Thus, the 713 patent issued with limitations not found in Walker, and claims that were in this respect narrower than Walker. And yet Walker was patent eligible. Given that the 713 patent included additional limitations over and above the Walker reference, it is not plausible that it would be considered broader and therefore more preemptive than Walker. Because Walker generally discloses an improvement to vending machines using what is, by hypothesis, a similar method

---

[5] If Amazon is right, it becomes difficult to envision what business method patents could ever survive a challenge under section 101. The Supreme Court was expressly asked to reach that conclusion and it did not do so: "The Court first considers two proposed categorical limitations on 'process' patents under §101 that would, if adopted, bar petitioners' application in the present case: the machine-or-transformation test and ***the categorical exclusion of business method patents***." *Bilski v. Kappos*, 561 U.S. 593, 130 S. Ct. 3218, 3225 (2010) (emphasis added). The Court then concluded that "Section 101 . . . precludes the broad contention that the term 'process' categorically excludes business methods." *Id.* at 3228.

to OIP's, the 713 patent undoubtedly does not preempt all uses of offer-based price optimization, let alone all uses of the law of demand in setting prices. Nor is it plausible that Walker's pricing invention for vending machines is a technological (rather than abstract) innovation, and therefore subject-matter eligible, while OIP's patent is not. A finding that the 713 patent claims ineligible subject-matter would be tantamount to concluding that applying dynamic pricing to improve a ***vending machine*** is sufficiently technological to be patent-eligible while applying that dynamic pricing method to improve a global system of e-commerce is somehow not.

Additionally, the Board confirmed the patentability of the 713 claims with *Bilski* and Section 101 freshly in mind. The claims as ultimately issued were actually before the Board after the Supreme Court's decision in *Bilski*, and the Board reversed the patent examiner's rejection and *granted* patentability without mentioning *Bilski* or raising any issue under 35 U.S.C. § 101. This was well after the Patent Office had issued its guidelines in July 2010 for assessing subject matter eligibility in light of *Bilski*. Interim Guidance for Determining Subject-Matter Eligibility for Process Claims in View of *Bilski v. Kappos*, 75 Fed. Reg. 43,922 (July 27, 2010). If the Board had seen any reason to believe the claims of the 713 patent were not subject matter eligible, it could have *sua sponte* issued a rejection on that basis. *See* 37 C.F.R. § 41.50 (b) (granting Board the authority to deny

patentability on any new grounds); Manual of Patent Examining Procedure §
1213.02 (8th ed. Aug. 2001, rev. July 2010) (same). But even in a time of
heightened sensitivity to the issue of patent eligibility, particularly with respect to
business methods, and particularly with respect to their implementation in
computers, the Board confirmed the claims. A902-907.

In sum, the Patent Office had already validated as patentable the
improvement of a mere vending machine by incorporating the same "abstract ideas"
supposedly at stake in the 713 patent, and yet the district court concluded that
achieving massive improvements in Amazon's global online sales system had
nothing to contribute beyond an ancient concept and a trivial and generic computer
implementation.

The Supreme Court's analysis of the Alice patent in contrast with *Diehr*
supports the patentability of OIP's claims. In explaining its conclusion that Alice's
claims were not patentable, the Supreme Court found that the claim elements of
Alice's patent, taken separately, "are well-understood, routine, conventional
activit[ies] previously known to the industry. . . [and] do[] no more than require a
generic computer to perform generic computer functions." *Alice*, 134 S. Ct. at
2359 (citation and quotation omitted). The Court also found that "[v]iewed as a
whole, [Alice's] method claims simply recite the concept of intermediated
settlement as performed by a generic computer [and contained] no specific or

limiting recitation of . . . improved computer technology." *Id.* (quotations and citations omitted). By contrast, OIP's claims represent insights about how to measure demand that are applied to existing e-commerce systems to make those systems work better than they were able to work in the hands of prior artists such as Amazon—a company with access to all the ***generic*** computer functionality that the OIP inventors had but that still did not achieve the same result. As described above, the 713 patent specification describes a specific implementation that performs a process that was not in the prior art and is implemented in a computer "architecture" that also was not in the prior art. Likewise, the claims reflect implementation in an existing e-commerce system of a process that provides more accurate measurements of demand over time and therefore improved price selection over the prior art systems described in the specification. And OIP's complaint reflects that the OIP inventors actually did the heavy lifting of creating that technology, demonstrated its effectiveness at providing previously unattainable results to Amazon and others in the industry, and quite correctly sought to protect their innovation.[6]

---

[6] Amazon's position that a better way of setting prices is not a patentable improvement to genuine technology in the e-commerce space rings hollow not only because Amazon's entire e-commerce business is manifestly technological and its major purpose is selling things such that it is self-evidently improved by improved pricing, but also because Amazon has sought and even recently obtained patents on pricing related subject matter. *See, e.g.,* U.S. Patents Nos. 8,620,768

## 2. *Alice* Also Shows Why OIP's Claims Are Not Prohibited By *Benson* and *Flook*

The *Alice* Court's discussion of *Benson* and *Flook* shows why OIP's claims do not fail under the prohibition against claiming mere computer implementations of abstract ideas as such. The Court also reaffirmed that "[s]imply appending conventional steps, specified at a high level of generality, was not enough to supply an inventive concept." *Alice*, 134 S. Ct. at 2357 (quotations omitted). The Court explained that this same principle applies when assessing whether the mere presence of a computer changes things.

> In *Benson* . . . we considered a patent that claimed an algorithm implemented on a general-purpose digital computer. Because the algorithm was an abstract idea, the claim had to supply a new and useful application of the idea in order to be patent eligible. But ***the computer implementation did not supply the necessary inventive concept***; the process could be carried out in existing computers long in use. We accordingly held that simply implementing a mathematical principle on a physical machine, namely a computer, [i]s not a patentable application of that principle.

*Id*. (quotations and citations omitted). Thus, as explained again in *Alice*, *Benson*

---

("Method and system for price suggesting using item-specific attributes"); 8,131,581 ("Forecasting demand for products"); 8,639,581 ("Pricing for foreign marketplaces"); 8,005,697 ("Performing automated price determination for tasks to be performed"); 8,458,010 ("Monitoring and enforcing price parity"). Amazon's ongoing application for and receipt of patents on the very kind of technology it has argued does not qualify for patent protection further demonstrates why OIP should be entitled to litigate this issue in light of all the facts, and not have its rights disposed of based on ungrounded factual determinations that are contradicted by OIP's complaint.

exemplifies the premise that "[t]he ***introduction of a computer*** into the claims does not alter the analysis at *Mayo* step two." *Id.* In other words, if a patent claim is drawn to an abstract idea as such, merely implementing it on a general-purpose computer does not affect the outcome because the mere presence of the computer does not supply an inventive step. But *Benson* does not foreclose the inverse situation, where a computer-based technology is improved by an inventive application of an abstract idea.

The Court's discussion of *Flook* confirms and elaborates on this point. In that case, the Court explained, "the formula itself was an abstract idea . . . and the computer implementation was purely conventional." *Id*. at 2358 . In *Alice*, the Court reiterated its explanation of *Flook* from *Bilski*: "*Flook* stands for the proposition that the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Id*. (citation and quotation omitted). By contrast, when the implementation is not purely conventional, or where an abstract idea is not merely limited to a technological environment but ***introduced to improve that technology***, *Flook* does not exclude such claims. Thus, in *Flook*, the Court "rejected the argument that implement[ing] a principle in some specific fashion will ***automatically*** fal[l] within the patentable subject matter of §101." *Id*. (quotations and citations omitted, emphasis added). In other words, once a claim is

51

drawn to an abstract idea, just as it is not enough merely to add the words "apply it," it is for the same reason not enough merely to say the words "apply it with a computer." *Id*. In sum, *Benson* and *Flook* do not limit the patentability of claims that improve computer-based technology, including like Amazon's as it existed in 2001, by ***applying*** abstract ideas to them.

While *Benson* and *Flook* eliminate claims that recite an abstract idea and add nothing to it but the requirement that it be implemented in a computer or some other specific fashion, the present case does not turn on this issue. The inventive step of the OIP invention is not based on the mere presence of a computer, be it general-purpose or otherwise. Rather, the presence of a computer, indeed a network of computers already in use for e-commerce, is assumed as a starting point, and the OIP invention provides a substantial upgrade for that pre-existing technology. The OIP invention was not "purely conventional" in the terms of *Flook* for three reasons. First, the claims cover a specific technique within the field of price optimization and other techniques of record for optimizing prices do not practice the claims. Thus, the claimed method is not the conventional outcome of a merchant attempting to optimize prices. Second, the patent specifically criticizes the attempts at computerized pricing in the prior art as inferior. A207, A211, A213. Specifically, the patent makes it clear that "the merchandiser is ***guessing*** the shape of the demand curve" when setting prices manually. A213

(713 patent at 1:67 (emphasis added)). And the patent describes the prior art automated pricing technology as "typically emulat[ing] the assumptions that a merchandiser would use," (*Id.* at 2:25-26), and therefore yielding similar results. And the manual price setting of the merchandiser is shown in Figure 2 of the 713 patent to be inaccurate as compared to the invention. Third, OIP's complaint shows that Amazon already had its own e-commerce technology and that the OIP invention, when tested for less than two months, improved the contribution margin of an Amazon business unit by 7% of revenue versus whatever might have been the inferior and perhaps conventional pricing technology already in use. A47. Each of these reasons is sufficient to reject the court's ungrounded assumption that the 713 claims merely cover what is conventional.

As reflected by the prosecution history of the 713 patent, the inventions claimed therein are specific improvements applying a similar principle as that of the Walker patent, but to a different computer-based technology, specifically e-commerce technology such as already existed, and was already in use by many including especially—albeit inferior in form—by Amazon at the time of the invention. Because the 713 patent claims more than the "calculation of a demand curve based on consumer response to different price points." A28. Thus, because the OIP invention does not involve the mere draftsman's introduction of computer-

related limitations to the general application of a principle, it does not run afoul of *Benson* or of *Flook*.

## CONCLUSION

In telling the district court that the 713 patent claimed abstract ideas, Amazon accused OIP of leaving "the heavy lifting to the public to create real world systems." A146 (Reply at 9). Amazon's accusation is a strong clue that OIP's claims are on the right side of the dividing line the Supreme Court has drawn between the patentable and the unpatentable: Amazon effectively admits that there is "heavy lifting" to be done and "real world systems" that constitute real technological applications of what Amazon contends is the abstract idea of price optimization. Moreover, contrary to Amazon's accusation that OIP left the heavy lifting to others, according to OIP's complaint, which the district court was bound to accept as true, it was the OIP inventors who first created not just any "real world system" but the very same one that Amazon used when the OIP inventors taught Amazon how to do what Amazon had not accomplished for itself. Amazon has held a dominant position over the field of electronic retail commerce for many years. Amazon cannot reasonably dispute that this position was won and protected at least in part through genuine advancements in the technology used to sell goods and services on the internet. A key piece of the real technology Amazon is alleged to use every day was supplied without compensation by the OIP inventors. In

asserting that the 713 patent claimed inventions that would have been known and used by an ancient merchant in a "bazaar" the district court engaged in impermissible fact finding contrary to the pleadings and the 713 patent itself. Rather than let the case proceed to discovery as was proper, the court ruled incorrectly on factual matters it was not allowed to address at all. OIP was wrongly denied its day in court when the district court relied on those ungrounded and improper factual determinations in ruling the 713 patent ineligible for protection. For this and for all of the forgoing reasons, OIP respectfully requests that this Court reverse the judgment of the district court and remand for further proceedings on OIP's claim for patent infringement.

Dated: August 18, 2014                    Respectfully submitted,


                                          /s/    Matthew D. Powers
                                          Matthew D. Powers
                                          Steven S. Cherensky
                                          Paul T. Ehrlich
                                          Aaron M. Nathan
                                          Stefani C. Smith
                                          TENSEGRITY LAW GROUP, LLP
                                          555 Twin Dolphin Drive, Suite 360
                                          Redwood Shores, CA 94065
                                          Phone:  (650) 802-6000
                                          Fax:  (650) 802-6001

                                          *Attorneys for*
                                          *Plaintiff-Appellant OIP Technologies, Inc.*

United States District Court
For the Northern District of California

1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                   NORTHERN DISTRICT OF CALIFORNIA
7
8    OIP TECHNOLOGIES, INC.,                    No. C-12-1233 EMC
9              Plaintiff,
10       v.                                     **ORDER GRANTING DEFENDANT'S
                                                MOTION TO DISMISS**
11   AMAZON.COM, INC.,
                                                **(Docket No. 33)**
12             Defendant.
13   _____/
14
15               **I.    INTRODUCTION**
16       Pending before the Court is Defendant Amazon's motion to dismiss for failure to state a
17   claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Docket No. 33.  Defendant
18   argues that Plaintiff OIP's patent is facially invalid under 35 U.S.C. § 101 because it covers non-
19   patent-eligible subject matter.  Having considered the parties' submissions and oral argument, and
20   for the reasons set forth below, the Court **GRANTS** Defendant's motion to dismiss under § 101.
21          **II.    FACTUAL & PROCEDURAL BACKGROUND**
22       In the Complaint, Docket No. 1, Plaintiff alleges as follows.  Plaintiff OIP is the successor to
23   Optivo Corporation.  Compl. ¶ 19.  Defendant Amazon is the world's leading online retailer with its
24   headquarters in Seattle, Washington.  OIP owns the patent at issue in this case – U.S. Patent No.
25   7,970,713 ("the '713 patent") – entitled "Method and Apparatus for Automatic Pricing in Electronic
26   Commerce."  Compl., Ex. 1.  OIP's invention was designed to facilitate e-commerce price selection
27   and optimization.  *Id.* ¶ 9.  Marketed as the Optivo Pricing Solution, the invention allowed for
28   "automated testing and selection of prices for goods and services sold online."  *Id.* ¶ 10.  Optivo

United States District Court

For the Northern District of California

1    released the product in 2001and allowed e-commerce companies to participate in trials of the

2    technology.  *Id.* ¶ 11.

3         Amazon's consumer electronics unit participated in a trial demonstration in June 2001,

4    increasing its contribution margin by 7% of revenue.  *Id.* ¶¶ 13-14.  The parties exchanged

5    information under a Non-Disclosure Agreement during that time.  *Id.* ¶ 13.  The parties met on

6    September 18, 2001, to discuss Amazon's potential acquisition of Optivo and its technology.  *Id.* ¶

7    16.  At that meeting, Optivo presented a detailed presentation regarding the patent-pending

8    technology, and projected that using the Optivo technology could increase margins by $100 million.

9    *Id.* ¶ 17.  Amazon declined to purchase Optivo, but offered employment to two Optivo engineers for

10   the job title of "Price Statisticians."  *Id.* ¶ 18.  Both engineers fielded technical questions about the

11   Optivo technology during the interview.  *Id.*

12        Approximately ten years later, on June 28, 2011, the '713 patent issued.  *Id.* ¶ 19.  The

13   abstract to the '713 patent states:

14        An automatic pricing method and apparatus for use in electronic
          commerce environments is described. Automatic pricing uses live
15        price testing to estimate and measure demand for specific
          products--taking into account where appropriate, a vendor selected
16        segmentation scheme. The results of live price testing are compared
          using a vendor selected goal function, e.g. profit maximization, to
17        select a new price. A goal function that balances short term gains
          versus long term gains based on customer lifetime value is described.
18        The live price testing approach used is designed to minimize losses
          due to price testing through statistical methods. Additionally, methods
19        for distributing price testing across time so as to avoid problems
          caused by too many ongoing tests as well as side effects from testing
20        are described. The selected price is a win for both purchasers and
          vendors as the automatic price will approximate the efficiency of a
21        reverse auction without the inconvenience of the auction format while
          being goal maximizing for the vendor. For example, a vendor that
22        normally sets prices of items for sale to customers can use
          embodiments of the invention to great effect.

23

24   Compl. Ex. 1, at 1.  The '713 patent contains two independent claims, which the Court reproduces

25   below.  Claim 1, the independent method claim, states:

26        A method of pricing a product for sale, the method comprising:

27        [1] testing each price of a plurality of prices by sending a first set of
          electronic messages over a network to devices;

28

2

**A2**

**United States District Court**

For the Northern District of California

1    [a] wherein said electronic messages include offers of said product;

2

3    [b] wherein said offers are to be presented to potential customers of said product to allow said potential customers to purchase said product for the prices

4    included in said offers;

5    [c] wherein the devices are programmed to communicate offer terms, including the prices

6    contained in the messages received by the devices;

7    [d] wherein the devices are programmed to receive offers for the product based on the offer terms;

8

9    [e] wherein the devices are not configured to fulfill orders by providing the product;

10    [f] wherein each price of said plurality of prices is used in the offer associated with at least one electronic

11    message in said first set of electronic messages;

12    [2] gathering, within a machine-readable medium, statistics generated during said testing about how the potential customers responded to the

13    offers, wherein the statistics include number of sales of the product made at each of the plurality of prices;

14

15    [3] using a computerized system to read said statistics from said machine-readable medium and to automatically determine, based on

16    said statistics, an estimated outcome of using each of the plurality of prices for the product;

17    [4] selecting a price at which to sell said product based on the estimated outcome determined by said computerized system; and

18

19    [5] sending a second set of electronic messages over the network, wherein the second set of electronic messages include offers, to be presented to potential customers, of said product at said selected price.

20

21  Compl. Ex. 1. Claim 27, the independent medium claim, describes:

22    A computer-readable medium carrying instructions which, when executed by one or more processors, cause the one or more processors

23    to price a product for sale by performing the steps of:

24    [1] testing each price of a plurality of prices by sending a first set of electronic messages over a network to devices;

25

26    [a] wherein said electronic messages include offers of said product;

27    [b] wherein said offers are to be presented to potential customers of said product to allow said potential

28

**A3**

customers to purchase said product for the prices
included in said offers;

[c] wherein the devices are programmed to
communicate offer terms, including the prices
contained in the messages received by the devices;

[d] wherein the devices are programmed to receive
orders for the product based on the offer terms;

[e] wherein the devices are not configured to fulfill
orders by providing the product;

[f] wherein each price of said plurality of prices is used
in the offer associated with at least one electronic
message in said first set of electronic messages;

[2] gathering, within a machine-readable medium, statistics generated
during said testing about how the potential customers responded to the
offers, wherein the statistics include number of sales of the product
made at each of the plurality of prices;

[3] using a computerized system to read said statistics from said
machine-readable medium and to automatically determine, based on
said statistics, an estimated outcome of using each of the plurality of
prices for the product;

[4] selecting a price at which to sell said product based on the
estimated outcome determined by said computerized system; and

[5] sending a second set of electronic messages over the network,
wherein the second set of electronic messages include offers, to be
presented to potential customers, of said product at said selected price.

*Id.*

Thus, the two independent claims are identical but that Claim 27 provides for a "computer-readable medium" capable of performing the method of Claim 1. The remaining claims are dependent claims, based off of Claims 1 or 27.

On March 12, 2012, OIP filed this suit alleging that Amazon infringes the '713 patent by, *e.g.*, "making and using software systems for automated testing and selection of prices for products and services offered for sale on www.amazon.com wherein statistics are generated during the testing, estimated outcomes are determined, and prices are selected for a subsequent offer for sale of a product or service based on the estimated outcomes." *Id.* ¶ 24. OIP further alleges that Amazon's infringement of the '713 patent "has been and continues to be willful." *Id.* ¶ 26. Plaintiff alleges that

4

**A4**

United States District Court

For the Northern District of California

1   Amazon has had notice that the patent was pending since at least 2001, because Plaintiff directly so

2   informed it.  *Id.* ¶ 20.

3                              **III.    DISCUSSION**

4   A.    Legal Standard

5           Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the

6   failure to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A motion to

7   dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged.  *See Parks*

8   *Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion, a court

9   must take all allegations of material fact as true and construe them in the light most favorable to the

10  nonmoving party, although "conclusory allegations of law and unwarranted inferences are

11  insufficient to avoid a Rule 12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir.

12  2009).  While "a complaint need not contain detailed factual allegations . . . it must plead 'enough

13  facts to state a claim to relief that is plausible on its face.'"  *Id.*  "A claim has facial plausibility when

14  the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

15  defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see*

16  *also Bell Atl. Corp v. Twombly*, 550 U.S. 544, 556 (2007).  "The plausibility standard is not akin to a

17  'probability requirement,' but it asks for more than sheer possibility that a defendant acted

18  unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

19  B.    Patent Eligibility Under 35 U.S.C. § 101

20          Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and

21  useful process, machine, manufacture, or composition of matter, or any new and useful improvement

22  thereof, may obtain a patent therefore, subject to the conditions and requirements of this title."  35

23  U.S.C. § 101.  "In choosing such expansive terms modified by the comprehensive 'any,' Congress

24  plainly contemplated that the patent laws would be given wide scope."  *Bilski v. Kappos*, 130 S. Ct.

25  3218, 3225 (2010).

26          Notwithstanding the broad scope of § 101, however, there are three judicially-created

27  exceptions to § 101 patent-eligibility: "laws of nature, physical phenomena, and abstract ideas."

28  *Bilski*, 130 S. Ct. at 3225; *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289,

1301 (2012). These principles are not patent-eligible because "'they are the basic tools of scientific

and technological work,'" which are "'free to all men and reserved exclusively to none.'" *Mayo*,

132 S. Ct. at 1293 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972), and *Diamond v.*

*Chakrabarty*, 447 U.S. 303, 309 (1980)).

In deciding whether a patent falls into one of these exceptions, courts have often used the

"machine-or-transformation" test, under which "[a] claimed process is surely patent-eligible under §

101 if: (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a

different state or thing." *Bilski*, 130 S. Ct. at 3224 (citations omitted). The Supreme Court has

recently confirmed that this test is not dispositive, though it is still an "important and useful clue."

*Id.* at 3226; *see also id.* at 3227 ("[T]he machine-or-transformation test is a useful and important

clue, an investigative tool, for determining whether some claimed inventions are processes under §

101.").

Beyond the machine-or-transformation test, a court is obligated to hew closely to established

precedents in this area to determine whether an invention falls within one of the exceptions to §

101's broad eligibility. *See id.* at 3231 ("Rather than adopting categorical rules that might have

wide-ranging and unforeseen impacts, the Court resolves this case narrowly on the basis of this

Court's [prior] decisions."). Whether a claim recites patent-eligible subject matter is a question of

law. *See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012); *CyberSource Corp. v.*

*Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011).

The Federal Circuit has cautioned "that the 'disqualifying characteristic' of abstractness must

exhibit itself 'manifestly' 'to override the broad statutory categories of patent eligible subject

matter.'" *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 685 F.3d 1341, 1349 (Fed. Cir. 2012) (quoting

*Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010)) ("[S]ection 101 does

not permit a court to reject subject matter categorically because it finds that a claim is not worthy of

a patent.")). Thus, § 101 is merely a 'coarse eligibility filter,' not the final arbiter of patentability."

 *Classen Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057, 1066 (Fed. Cir. 2011) (quoting

*Research Corp.*, 627 F.3d at 869). Notwithstanding this forgiving standard, however, the Federal

Circuit has acknowledged that "[t]he patent system represents a carefully crafted bargain that

United States District Court

For the Northern District of California

6

**A6**

United States District Court

For the Northern District of California

1    encourages both the creation and the public disclosure of new and useful advances in technology, in

2    return for an exclusive monopoly for a limited period of time." *Highmark, Inc. v. Allcare Health*

3    *Mgmt. Sys., Inc.*, --- F.3d ----, No. 2011-1219, 2012 WL 3181659, at *17 (Fed. Cir. Aug. 7, 2012)

4    (quoting *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998)). "A patentee does not uphold his end of

5    this 'bargain' if he seeks broad monopoly rights over a basic concept, fundamental principle, or

6    natural law without a concomitant contribution to the existing body of scientific and technological

7    knowledge." *Id.*

8        In the instant case, Defendant argues that the '713 patent's claims fail to meet the coarse

9    eligibility filter of § 101 because they fail the machine-or-transformation test and because they are

10   directed to the abstract idea of price optimization, which is a fundamental economic principle that is

11   reserved for the public.[1]  For the reasons set forth below, the Court agrees.

12       1.    Procedural Posture

13       As a preliminary matter, Plaintiff argues that it is premature to consider Defendant's

14   eligibility challenges to the patent because the Court has yet to construe any of the claim elements,

15   so the meaning of terms like "testing," "computer system," and "automatically" may have bearing

16   on the subject matter eligibility analysis.  Thus, Plaintiff argues it is too early to examine patent

17   eligibility because claims construction and evidence may shed light on the distinction between an

18   attempt to patent an abstract idea and an attempt to patent a practical application of that idea in a

19   permissible manner under § 101.  However, Plaintiff fails to explain how claims construction would

20   materially impact the § 101 analysis in the instant case; instead, it merely asserts in conclusory

---

[1]  The Court may examine the claims of the '713 patent together despite the fact that one independent claim is a method claim and the other describes a computer-readable medium claim. The Federal Circuit has confirmed that "a machine, system, medium, or the like may in some cases be equivalent to an abstract mental process for purposes of patent ineligibility."*Bancorp Services, L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 2012 WL 3037176, at *9 (Fed. Cir. July 26, 2012) (citations omitted).  This case presents such an example because the medium claim "recites a computer readable medi[um] for controlling a computer to perform the same . . . steps of method claim [1], repeated word for word." *Id.* (internal quotation marks omitted).  Therefore, "[t]here is no material difference between these two categories of claims in the asserted patents," and the Court need not distinguish between the method and medium claims in its analysis because they are "equivalent for purposes of patent eligibility under § 101." *Id.  See also Bancorp Services, L.L.C. v. Sun Life Assur. Co. of Canada*, 771 F. Supp. 2d 1054, 1065 (E.D. Mo. 2011), *aff'd*, 687 F.3d 1266 (Fed. Cir. 2012) ("[M]erely reciting data or instructions on a stored machine readable medium does not make a claim statutory under § 101.").

7

1    fashion that construction "will undoubtedly impact the scope of the claims and could have bearing

2    on the subject matter eligibility analysis."  Opp. at 22.

3         In addition, Amazon points out that courts have considered § 101 eligibility at the motion to

4    dismiss stage, and that therefore its motion is not *per se* premature.  *See, e.g.*, *Glory Licensing LLC*

5    *v. Toys "R" Us, Inc.*, No. 09-4252, 2011 WL 1870591, at *4 (D.N.J. May 16, 2011) (finding patent

6    ineligible under § 101 on a 12(b)(6) motion); *Ultramercial, LLC v. Hulu, LLC*, No. 09-6918, 2010

7    WL 3360098, at *7 (C.D. Cal. Aug. 13, 2010) (same).  Indeed, while the Federal Circuit reversed

8    *Ultramercial* on the merits of the § 101 analysis, it confirmed that it "has never set forth a bright line

9    rule requiring district courts to construe claims before determining subject matter eligibility," and

10   that "in [that] case, the subject matter at stake and its eligibility [did] not require claim

11   construction."  *Ultramercial, LLC v. Hulu, LLC*, 657 F.3d 1323, 1325 (Fed. Cir. 2011) *cert. granted,*

12   *judgment vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 132 S. Ct. 2431 (2012); *see*

13   *also Bancorp Services, L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 2012 WL

14   3037176, at *5 (Fed. Cir. July 26, 2012) ("Although *Ultramercial* has since been vacated by the

15   Supreme Court, we perceive no flaw in the notion that claim construction is not an inviolable

16   prerequisite to a validity determination under § 101.").

17        Accordingly, the Court concludes that the procedural posture of this case does not render

18   Amazon's motion premature.

19        2.   <u>Summary of § 101 Jurisprudence</u>

20        The parties agree that the issue at bar is whether the '713 patent is patent-ineligible because

21   it is an abstract idea.  As the Federal Circuit has acknowledged, "When it comes to explaining what

22   is to be understood by 'abstract ideas' in terms that are something less than abstract, courts have

23   been less successful."  *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1259 (Fed. Cir. 2012); *see*

24   *also id.* at 1260 (describing "the murky morass that is § 101 jurisprudence").  Given this uncertainty,

25   a brief summary of the competing case law on this subject is instructive to set the '713 patent in this

26   case in context.

27   ///

28   ///

8

**A8**

a.    Supreme Court

In *Bilski*, the Supreme Court considered a "patent application claim[ing] a procedure for instructing buyers and sellers how to protect against the risk of price fluctuations in a discrete section of the economy." 130 S. Ct. at 3224.[2]  In other words, the patent described a method for hedging against risk.  The Court provided a helpful summary of its most important prior jurisprudence regarding § 101:

> In *Benson*, the Court considered whether a patent application for an algorithm to convert binary-coded decimal numerals into pure binary code was a "process" under § 101.[3]  409 U.S. [at] 64–67.  The Court

---

[2]  Claim 1 consisted of the following steps:

> (a) initiating a series of transactions between said commodity provider and consumers of said commodity wherein said consumers purchase said commodity at a fixed rate based upon historical averages, said fixed rate corresponding to a risk position of said consumers;

> (b) identifying market participants for said commodity having a counter-risk position to said consumers; and

> (c) initiating a series of transactions between said commodity provider and said market participants at a second fixed rate such that said series of market participant transactions balances the risk position of said series of consumer transactions.

*Id.* at 3223-24.

[3]  For example, Claim 13 read:

> A data processing method for converting binary coded decimal number representations into binary number representations comprising the steps of

> (1) testing each binary digit position '1,' beginning with the least significant binary digit position, of the most significant decimal digit representation for a binary '0' or a binary '1';

> (2) if a binary '0' is detected, repeating step (1) for the next least significant binary digit position of said most significant decimal digit representation;

> (3) if a binary '1' is detected, adding a binary '1' at the (i 1)th and (i 3)th least significant binary digit positions of the next lesser significant decimal digit representation, and repeating step (1) for the next least significant binary digit position of said most significant decimal digit representation;

> (4) upon exhausting the binary digit positions of said most

United States District Court

For the Northern District of California

9

**A9**

United States District Court

For the Northern District of California

1    first explained that "'[a] principle, in the abstract, is a fundamental
2    truth; an original cause; a motive; these cannot be patented, as no one
     can claim in either of them an exclusive right.'" *Id.* at 67 (quoting [*Le*
3    *Roy v. Tatham*, 55 U.S. 156, 175 (1852)]). The Court then held the
     application at issue was not a "process," but an unpatentable abstract
4    idea. "It is conceded that one may not patent an idea. But in practical
     effect that would be the result if the formula for converting ...
5    numerals to pure binary numerals were patented in this case." 409 U.S.
     at 71. A contrary holding "would wholly pre-empt the mathematical
6    formula and in practical effect would be a patent on the algorithm
     itself." *Id.*, at 72.

7    In *Flook*, the Court considered the next logical step after *Benson*.
     [*Parker v. Flook*, 437 U.S. 584 (1978).] The applicant there attempted
8    to patent a procedure for monitoring the conditions during the catalytic
     conversion process in the petrochemical and oil-refining industries.[4]
9    The application's only innovation was reliance on a mathematical
     algorithm. 437 U.S. at 585–586. *Flook* held the invention was not a
10   patentable "process." The Court conceded the invention at issue,
     unlike the algorithm in *Benson*, had been limited so that it could still
11   be freely used outside the petrochemical and oil-refining industries.
     437 U.S. at 589–590. Nevertheless, *Flook* rejected "[t]he notion that
12

_____

13   significant decimal digit representation, repeating steps (1) through (3)
     for the next lesser significant decimal digit representation as modified
14   by the previous execution of steps (1) through (3); and

15          (5) repeating steps (1) through (4) until the second least
     significant decimal digit representation has been so processed.
16

17   *Benson*, 409 U.S. at 74.

18   [4] Claim 1 of the patent described the method as follows:

19          1. A method for updating the value of at least one alarm limit on at
     least one process variable involved in a process comprising the
20   catalytic chemical conversion of hydrocarbons wherein said alarm
     limit has a current value of Bo + K; wherein Bo is the current alarm
21   base and K is a predetermined alarm offset which comprises:

22          (1) Determining the present value of said process variable, said
     present value being defined as PVL;
23
            (2) Determining a new alarm base B1, using the following
24   equation: $B1 = Bo(1.0–F) + PVL(F)$ where F is a predetermined
     number greater than zero and less than 1.0;
25
            (3) Determining an updated alarm limit which is defined as B1
26   + K; and thereafter

27          (4) Adjusting said alarm limit to said updated alarm limit
     value.
28

*Flook*, 437 U.S. at 596-97.

10

**A10**

United States District Court

For the Northern District of California

post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process." *Id.* at 590. The Court concluded that the process at issue there was "unpatentable under § 101, not because it contain[ed] a mathematical algorithm as one component, but because once that algorithm [wa]s assumed to be within the prior art, the application, considered as a whole, contain[ed] no patentable invention." *Id.* at 594. As the Court later explained, *Flook* stands for the proposition that the prohibition against patenting abstract ideas "cannot be circumvented by attempting to limit the use of the formula to a particular technological environment" or adding "insignificant postsolution activity." [*Diamond v. Diehr*, 450 U.S. 175, 191-92 (1981)].

Finally, in *Diehr*, the Court established a limitation on the principles articulated in *Benson* and *Flook*. The application in *Diehr* claimed a previously unknown method for "molding raw, uncured synthetic rubber into cured precision products," using a mathematical formula to complete some of its several steps by way of a computer. 450 U.S. at 177.[5] *Diehr* explained that while an abstract idea, law of nature, or

---

[5] For example, Claim 11 described "[a] method of manufacturing precision molded articles from selected synthetic rubber compounds in an openable rubber molding press having at least one heated precision mold, comprising:

     (a) heating said mold to a temperature range approximating a pre-determined rubber curing temperature,

     (b) installing prepared unmolded synthetic rubber of a known compound in a molding cavity of predetermined geometry as defined by said mold,

     (c) closing said press to mold said rubber to occupy said cavity in conformance with the contour of said mold and to cure said rubber by transfer of heat thereto from said mold,

     (d) initiating an interval timer upon the closure of said press for monitoring the elapsed time of said closure,

     (e) heating said mold during said closure to maintain the temperature thereof within said range approximating said rubber curing temperature,

     (f) constantly determining the temperature of said mold at a location closely adjacent said cavity thereof throughout closure of said press,

     (g) repetitively calculating at frequent periodic intervals throughout closure of said press the Arrhenius equation for reaction time of said rubber to determine total required cure time v as follows:
$$\ln v = cz + x$$
wherein c is an activation energy constant determined for said rubber being molded and cured in said press, z is the temperature of said mold at the time of each calculation of said Arrhenius equation, and x is a constant which is a function of said predetermined geometry of said

11

**A11**

mathematical formula could not be patented, "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Id.* at 187. *Diehr* emphasized the need to consider the invention as a whole, rather than "dissect[ing] the claims into old and new elements and then ... ignor[ing] the presence of the old elements in the analysis." *Id.* at 188. Finally, the Court concluded that because the claim was not "an attempt to patent a mathematical formula, but rather [was] an industrial process for the molding of rubber products," it fell within § 101's patentable subject matter. *Id.* at 192–193.

*Bilski*, 130 S. Ct. at 3230.

Applying this precedent to the patent for hedging against risk, the *Bilski* Court first found that the fact that the patent failed the machine-or-transformation test was not dispositive. *Id.* at 3226-28. Second, the Court found that the patent could not be ineligible solely because it claimed a "business method." *Id.* at 3228-29. The Court reasoned that "the Patent Act leaves open the possibility that there are at least some processes that can be fairly described as business methods that are within patentable subject matter under § 101," even though in practice many business method patents might be invalid under other sections, such as §§ 102, 103, and 112. *Id.* at 3229.

Notwithstanding these caveats, however, the Court nonetheless concluded that the patent was ineligible because its claims "explain the basic concept of hedging, or protecting against risk." *Id.* at 3231. The Court found that "[t]he concept of hedging, described in claim 1 and reduced to a mathematical formula in claim 4, is an unpatentable abstract idea, just like the algorithms at issue in *Benson* and *Flook*. Allowing petitioners to patent risk hedging would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Id.* The Court

---

mold,

(h) for each repetition of calculation of said Arrhenius equation herein comparing the resultant calculated total required cure time with the monitored elapsed time measured by said interval timer,

(i) opening said press when a said comparison of calculated total required cure time and monitored elapsed time indicates equivalence, and

(j) removing from said mold the resultant precision molded and cured rubber article.

*Diehr*, 450 U.S. at 181 n.5.

**A12**

1  additionally determined that the fact that certain claims covered only the energy and commodities

2  markets did not render the invention eligible because under *Flook*, "limiting an abstract idea to one

3  field of use or adding token postsolution components did not make the concept patentable." *Id.*

4       More recently, in *Mayo*, the Supreme Court considered a method for accurately determining

5  the dosage of certain drugs for autoimmune diseases based on the way different bodies metabolized

6  those drugs. 132 S. Ct. 1289. Although researchers understood the general correlation between

7  certain metabolite levels in a person's blood and the likely safety and effectiveness of a certain

8  dosage, prior to the patent, "those in the field did not know the precise correlations between

9  metabolite levels and likely harm or ineffectiveness. The patent claims at issue here set forth

10  processes embodying researchers' findings that identified these correlations with some precision."

11  *Id.* at 1295.[6] The Court nonetheless concluded that the patents merely claimed a natural law

12  "describing the relationships between the concentration in the blood of certain thiopurine

13  metabolites and the likelihood that the drug dosage will be ineffective or induce harmful

14  side-effects," and that "the claimed processes have [not] transformed these unpatentable natural laws

15  into patent-eligible applications of those laws." *Id.* at 1294. The *Mayo* Court found that "the steps

16  in the claimed processes (apart from the natural laws themselves) involve well-understood, routine,

17  conventional activity previously engaged in by researchers in the field." *Id.* In effect, the Court

18  concluded, because the patent merely claimed "steps that must be taken in order to apply the laws in

19  question, the effect is simply to tell doctors to apply the law somehow when treating their patients."

20

21       [6] For example, Claim 1 described "[a] method of optimizing therapeutic efficacy for treatment of an immune-mediated gastrointestinal disorder, comprising:"

22       (a) administering a drug providing 6-thioguanine to a subject having said immune-mediated gastrointestinal disorder; and

23

24       (b) determining the level of 6-thioguanine in said subject having said immune-mediated gastrointestinal disorder,

25       wherein the level of 6-thioguanine less than about 230 pmol per $8 \times 10^8$ red blood cells indicates a need to increase the amount of said drug subsequently administered to said subject and

26       wherein the level of 6-thioguanine greater than about 400 pmol per $8 \times 10^8$ red blood cells indicates a need to decrease the amount of

27       said drug subsequently administered to said subject.

28  *Mayo*, 132 S. Ct. at 1295 (internal citations and quotation marks omitted).

**United States District Court**
For the Northern District of California

*Id.* at 1299-1300. Accordingly, the claimed method was patent-ineligible because it merely described a law of nature; it added no "elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself." *Id.* at 1294 (citations omitted).

　　　　b.　Federal Circuit

Against this backdrop of Supreme Court jurisprudence, the Federal Circuit has considered numerous § 101 challenges, many of which are instructive to the instant case. For example, in *SiRF Tech., Inc. v. Int'l Trade Comm'n*, the court considered a patent directed to "calculating an absolute position of a GPS receiver." 601 F.3d 1319, 1332 (Fed. Cir. 2010). The court found that this invention satisfied the machine-or-transformation test because "a GPS receiver is a machine and is integral to each of the claims at issue." *Id.* The GPS receiver was essential to the patented method, which described, *inter alia*, "computing absolute position by updating an estimate of position of the GPS receiver, providing an estimate of the time at which a GPS receiver receives a plurality of satellite signals, and computing the position of the GPS receiver." *Id.* (internal quotation marks omitted). In addition, the court concluded that "the presence of the GPS receiver in the claims places a meaningful limit on the scope of the claims" because "there is no evidence here that the calculations here can be performed entirely in the human mind." *Id.* at 1332-33.

Similarly, in *Research Corp.*, the court "upheld the patentability of a claimed method 'for rendering a halftone image of a digital image by comparing, pixel by pixel, the digital image against a blue noise mask.' [*Research Corp.*, 627 F.3d at 868]. Because the method required the manipulation of computer data structures (*e.g.*, the pixels of a digital image and a two-dimensional array known as a mask) and the output of a modified computer data structure (a halftoned digital image), the method could not, as a practical matter, be performed entirely in a human's mind." *CyberSource*, 654 F.3d at 1376 (describing *Research Corp.*). Instead, the court found that the "invention presents functional and palpable applications in the field of computer technology," and that "inventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act." *Research Corp.*, 627 F.3d at 868-69.

14

**A14**

1    In contrast, in *CyberSource*, the court considered a patent describing a "method for verifying

2    the validity of a credit card transaction over the Internet." 654 F.3d at 1370.[7] The court found that

3    the patent failed the machine-or-transformation test because "the plain language of claim 3 does not

4    require the method to be performed by a particular machine, or even a machine at all." *Id.* The

5    court rejected the plaintiff's argument that the patent was tied to the Internet as a "machine"

6    because, even assuming the Internet was a machine, "nothing in claim 3 requires an infringer to use

7    the Internet to obtain th[e] data (as opposed to obtaining the data from a pre-compiled database). The

8    Internet is merely described as the source of the data. We have held that mere [data-gathering]

9    step[s] cannot make an otherwise nonstatutory claim statutory." *Id.* (citations and internal quotation

10   marks omitted). Beyond the machine-or-transformation test, the court found that the invention was

11   patent-ineligible "because it is drawn to an unpatentable *mental process*–a subcategory of

12   unpatentable abstract ideas." *Id.* at 1371 (emphasis added). Because "[a]ll of claim 3's method

13   steps can be performed in the human mind, or by a human using a pen and paper," the patent merely

14   described an abstract idea. *Id.* at 1372. Furthermore, "even if some physical steps are required to

15   obtain information from the database (*e.g.*, entering a query via a keyboard, clicking a mouse), such

16   data-gathering steps cannot alone confer patentability." *Id.*

17   Similarly, in *Dealertrack*, the court considered a patent that described "a computer-aided

18   method and system, respectively, for processing credit applications over electronic networks." 674

19

20

21

---

22    [7] For example, Claim 3 described "[a] method for verifying the validity of a credit card transaction over the Internet comprising the steps of":

23            a) obtaining information about other transactions that have
24    utilized an Internet address that is identified with the [ ] credit card transaction;

25            b) constructing a map of credit card numbers based upon the
26    other transactions and;

27            c) utilizing the map of credit card numbers to determine if the
      credit card transaction is valid.

28   *CyberSource*, 654 F.3d at 1370.

United States District Court

For the Northern District of California

F.3d at 1317.[8]  The invention "proposed to automate the process [by which car dealers sought loans for their customers] through the use of a 'central processor,' which receives credit application data from dealers, processes the data to conform to the individual application forms of different banks, forwards the completed applications to banks selected by the dealer, receives answers from the banks, and forwards those answers back to the dealer."  *Id.*  The court compared the claim to that found ineligible in *Bilski* and found that the claim described merely an abstract idea because it "explain[s] the basic concept of processing information through a clearinghouse, just as claim 1 in *Bilski II* explain[ed] the basic concept of hedging."  *Id.* at 1333 (citations and internal quotation marks omitted).  The claims were patent-ineligible because they were so general as to "wholly

---

[8]  For example, Claim 1 described "[a] computer aided method of managing a credit application, the method comprising the steps of:

    [A] receiving credit application data from a remote application entry and display device;

    [B] selectively forwarding the credit application data to remote funding source terminal devices;

    [C] forwarding funding decision data from at least one of the remote funding source terminal devices to the remote application entry and display device;

    [D] wherein the selectively forwarding the credit application data step further comprises:
        [D1] sending at least a portion of a credit application to more than one of said remote funding sources substantially at the same time;
        [D2] sending at least a portion of a credit application to more than one of said remote funding sources sequentially until a finding [sic, funding] source returns a positive funding decision;
        [D3] sending at least a portion of a credit application to a first one of said remote funding sources, and then, after a predetermined time, sending to at least one other remote funding source, until one of the finding [sic, funding] sources returns a positive funding decision or until all funding sources have been exhausted; or,
        [D4] sending the credit application from a first remote funding source to a second remote finding [sic, funding] source if the first funding source declines to approve the credit application.

*Dealertrack*, 674 F.3d at 1331.

16

**A16**

**United States District Court**
For the Northern District of California

preempt the clearinghouse concept." *Id.* The court further found that the fact that the method was computer-aided did not impose a meaningful limitation because the claim "does not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent. The claims are silent as to how a computer aids the method, the extent to which a computer aids the method, or the significance of a computer to the performance of the method." *Id.* (internal citations and quotation marks omitted). Thus, "[t]he undefined phrase 'computer aided' is no less abstract than the idea of a clearinghouse itself." *Id.* Finally, the court concluded that the claim's limitation to the field of car loans did not render it less abstract, because "[a]lthough directed to a particular use, it nonetheless covers a broad idea." *Id.* at 1334. Therefore, the invention was patent-ineligible under § 101.

Similar to both *CyberSource* and *Dealertrack*, in *Fort Properties, Inc. v. Am. Master Lease LLC*, the court considered a patent that described "an investment tool designed to enable property owners to buy and sell properties without incurring tax liability." 671 F.3d 1317, 1318 (Fed. Cir. 2012). The patent described a process to take advantage of an exception to the taxation of real estate sales proceeds under "26 U.S.C. § 1031, which allows an owner of investment property to exchange one property for another of like kind without incurring tax liability if" certain conditions are met. *Id.*[9] As in *CyberSource* and *Dealertrack*, the court found that the invention was patent-ineligible. First, it failed the machine-or-transformation test because the "claims, like the invention in *Bilski*, disclose an investment tool not requiring the use of a computer." *Id.* at 1322. In addition, despite

-------------------

[9] Claim 1 disclosed "[a] method of creating a real estate investment instrument adapted for performing tax-deferred exchanges comprising:

    aggregating real property to form a real estate portfolio;

    encumbering the property in the real estate portfolio with a master agreement; and

    creating a plurality of deedshares by dividing title in the real estate portfolio into a plurality of tenant-in-common deeds of at least one predetermined denomination, each of the plurality of deedshares subject to a provision in the master agreement for reaggregating the plurality of tenant-in-common deeds after a specified interval.

*Fort Properties*, 671 F.3d at 1319.

17

**A17**

United States District Court
For the Northern District of California

the fact that the patents described processes that "were tied to the physical world" of real estate transactions, this was "insufficient to render the abstract concept of [investment] patentable." *Id.* Instead, the court concluded that the patent's claims merely disclosed the "abstract concept" of "an investment tool, particularly a real estate investment tool designed to enable tax-free exchanges of property." *Id.* at 1322.

Subsequently, in *CLS Bank*, the Federal Circuit upheld the patent-eligibility of an invention that described "a computerized trading platform for exchanging obligations in which a trusted third party settles obligations between a first and second party so as to eliminate 'settlement risk,'" which is "the risk that only one party's obligation will be paid, leaving the other party without its principal." *CLS Bank*, 685 F.3d at 1343.[10] The court rejected the district court's conclusion that the claims were "directed to the fundamental concept of employing an intermediary to facilitate simultaneous exchange of obligations in order to minimize risk." *Id.* at 1353 (citations and quotation marks omitted). It found that the claims likely satisfied the machine-or-transformation test

---

[10] For example, Claim 33, which was typical of the method claims, described "[a] method of exchanging obligations as between parties, each party holding a credit record and a debit record with an exchange institution, the credit records and debit records for exchange of predetermined obligations, the method comprising the steps of:

> (a) creating a shadow credit record and a shadow debit record for each stakeholder party to be held independently by a supervisory institution from the exchange institutions;

> (b) obtaining from each exchange institution a start-of-day balance for each shadow credit record and shadow debit record;

> (c) for every transaction resulting in an exchange obligation, the supervisory institution adjusting each respective party's shadow credit record or shadow debit record, allowing only these [sic] transactions that do not result in the value of the shadow debit record being less than the value of the shadow credit record at any time, each said adjustment taking place in chronological order; and

> (d) at the end-of-day, the supervisory institution instructing one of the exchange institutions to exchange credits or debits to the credit record and debit record of the respective parties in accordance with the adjustments of the said permitted transactions, the credits and debits being irrevocable, time invariant obligations placed on the exchange institutions.

*CLS Bank*, 685 F.3d at 1343-44.

18

**A18**

because they required "computer implementation." *Id.* at 1354-55. More importantly, the court

concluded that the claims were "limited to a very specific application of the concept of using an

intermediary to help consummate exchanges between parties." *Id.* at 1355. The claims thus

> cover the practical application of a business concept in a specific way, which requires computer implemented steps of exchanging obligations maintained at an exchange institution by *creating electronically maintained shadow credit and shadow debit records*, and particularly recite that such shadow credit and debit records be held independently of the exchange institution by a supervisory institution; that start-of-the-day balances be obtained from the exchange institution; that adjustments be made to the credit records based on only certain specified allowed transactions under the "adjusting" limitation; that such adjustments be made in chronological order; that at the end of the day, instructions be given to the exchange institution to reflect the adjustments made on the basis of the permitted transactions; and that such adjustments affect irrevocable, time invariant obligations placed on the exchange institution.

*Id.* (emphasis added). The court further found that due to the patent's specific innovation of using

shadow records as described above, the patent left "broad room for other methods of using

intermediaries to help consummate exchanges, whether with the aid of a computer or otherwise, and,

thus, do not appear to preempt much in the way of innovation." *Id.* at 1355-56. The court

determined that "[w]hile the use of a machine in these limitations is less substantial or limiting than

the industrial uses examined in *Diehr* (curing rubber) or *Alappat* (a rasterizer), the presence of these

limitations prevents us from finding it manifestly evident that the claims are patent ineligible under §

101." *Id.* at 1356.

Distinguishing *CLS Bank*, the Federal Circuit recently found that patents disclosing "systems

and methods for administering and tracking the value of life insurance policies in separate accounts"

fell short of patent-eligibility under § 101. *See Bancorp*, 2012 WL 3037176 at *1.[11] As the court

---

[11] For example, Claim 9 of the '792 patent described "[a] method for managing a life insurance policy on behalf of a policy holder, the method comprising the steps of:

> [1] generating a life insurance policy including a stable value protected investment with an initial value based on a value of underlying securities;
>
> [2] calculating fee units for members of a management group which manage the life insurance policy;

19

**A19**

described, "[t]he value of a separate account policy fluctuates with the market value of the underlying investment assets. That poses a problem from an accounting standpoint, as BOLI [Bank Owned Life Insurance] and COLI [Corporate Owned Life Insurance] plan owners must ordinarily report, on a quarter-to-quarter basis, the value of any policies they own." *Id.* at 1269. In order to address that volatility,

> [s]table value protected investments . . . provid[e] a mechanism for stabilizing the reported value of the policies, wherein a third-party guarantor (the 'stable value protected writer') guarantees a particular value (the 'book value') of the life insurance policy regardless of its market value. To offset the risk to a potential guarantor for providing that service, the guarantor is paid a fee and restrictions are placed on the policyholder's right to cash in on the policy. . . . As we previously explained, the asserted patents provide[ ] a computerized means for tracking the book value and market value of the policies and calculating the credits representing the amount the stable value protected writer must guarantee and pay should the policy be paid out prematurely.

*Id.* at 1270 (internal citations and quotation marks omitted). The *Bancorp* court affirmed the district court's holding that the patented claims failed the machine-or-transformation test ("MOTT") because, even with respect to those claims that required implementation on a computer, "the specified computer components are no more than objects on which the claimed methods operate, and [] the central processor is nothing more than a general purpose computer programmed in an unspecified manner." *Id.* at *5; *see also id.* at *10-11 (affirming district court's analysis). The court

---

[3] calculating surrender value protected investment credits for the life insurance policy;

[4] determining an investment value and a value of the underlying securities for the current day;

[5] calculating a policy value and a policy unit value for the current day;

[6] storing the policy unit value for the current day; and

[7] one of the steps of:
[a] removing the fee units for members of the management group which manage the life insurance policy, and
[b] accumulating fee units on behalf of the management group.

*Id.* at *2-3.

United States District Court

For the Northern District of California

1    also "noted that although it would be inefficient to do so, the steps for tracking, reconciling and

2    administering a life insurance policy with a stable value component can be completed manually."

3    *Id.* (internal citations and quotation marks omitted); *see also id.* at *10-11 (affirming district court's

4    analysis). Without the insufficient computer limitations, the *Bancorp* court concluded that "nothing

5    remains in the claims but the abstract idea of managing a stable value protected life insurance policy

6    by performing calculations and manipulating the results," which "impermissibly preempt[s] the

7    mathematical concept of managing a stable value protected life insurance policy." *Id.* at *12

8    (internal citations and quotation marks omitted). The court distinguished *CLS Bank* because, "the

9    computer limitations [in *Bancorp*] do not play a 'significant part' in the performance of the claimed

10   invention," nor are they "directed to a 'very specific application' of the inventive concept." *Id.*

11        Finally, just this August in *Highmark*, the Federal Circuit found that a patented diagnostic

12   system "in which a user enters data regarding a patient's symptoms and a computer generates a list

13   of possible diseases or conditions that might be causing such symptoms" was patent-ineligible under

14   § 101 "because it is directed to the 'abstract idea' that particular symptoms are likely caused by

15   particular diseases or conditions." 2012 WL 3181659 at *17. The court concluded that the

16   computer implementation of this system did not render it patent-eligible because it merely applies

17   the abstract idea "using conventional computer technology." *Id.* (citing, *e.g.*, *MySpace*, 672 F.3d at

18   1267 (Mayer, J., dissenting) ("While running a particular process on a computer undeniably

19   improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a

20   computer-implemented claim is insufficient to bring it within section 101.") (footnote omitted)).

21        c.    Summary

22        From this collection of case law, this Court discerns several principles that are instructive in

23   the instant case. First, a patent may not simply restate laws of nature or abstract ideas (*e.g.*,

24   mathematical formulas, basic principles of risk management, etc.), or apply them in some

25   rudimentary fashion; instead, the invention must add some "innovative concept" to "transform[] the

26   process into an inventive application of the formula[, idea, or law of nature]." *Mayo*, 132 S. Ct. at

27   1292; *see also id.* at 1294 ("[T]o transform an unpatentable law of nature into a patent-eligible

28   application of such a law, one must do more than simply state the law of nature while adding the

21

**A21**

words 'apply it.'") (citing *Benson*, 409 U.S. at 71–72). Second, while the MOTT is an important

clue for determining patent eligibility, the test does not "trump" the law of nature or abstract idea

exclusion. *Id.* at 1303. Third, when analyzing a patent's claimed elements, the use of a computer is

not itself sufficient to satisfy either the MOTT or the eligibility analysis more generally. *Bancorp*,

2012 WL 3037176 at *9 ("[T]he use of a computer in an otherwise patent-ineligible process for no

more than its most basic function – making calculations or computations – fails to circumvent the

prohibition against patenting abstract ideas and mental processes."). Fourth, an abstract idea or law

of nature even if limited to one field of application (*e.g.*, hedging in energy markets) is still patent-

ineligible. *Bilski*, 130 S. Ct. at 3231. And finally, as an extension of the field-of-use principle

described above, a patent need not preempt an entire field in order to be ineligible; rather, the

question is whether "upholding the patents would risk *disproportionately* tying up the use of the

underlying [abstract ideas or] natural laws, inhibiting their use in the making of further discoveries."

*Mayo*, 132 S. Ct. at 1294 (emphasis added); *Highmark*, 2012 WL 3181659 at *17.

        3.    <u>Patent Eligibility in This Case</u>

With these principles and the above case law in mind, the Court holds that Plaintiff's patent

describes an abstract idea of price optimization and is therefore patent-ineligible. With the Federal

Circuit's admonitions in mind that patent-ineligibility must be obvious under § 101's coarse

eligibility filter, the Court concludes in the instant case that the '713 patent's abstractness is

"manifestly apparent." *CyberFone Sys., LLC v. Cellco P'ship*, --- F. Supp. 2d ----, CIV.

11-827-SLR, 2012 WL 3528115, at *8 (D. Del. Aug. 16, 2012) (patent claims "represent nothing

more than a disembodied concept of data sorting and storage and, therefore, the court finds the

abstract nature of this patented process to be manifestly apparent").

        a.    <u>Machine-or-Transformation Test ("MOTT")</u>

As discussed above, the machine-or-transformation test ("MOTT") is an important, though

not dispositive, "investigative tool" through which the Court can examine eligibility under § 101.

*Bilski*, 130 S. Ct. at 3227. Plaintiff argues only that its invention satisfies the "machine" prong of

the MOTT. Therefore, the Court considers only that prong.

**United States District Court**
For the Northern District of California

22

**A22**

United States District Court

For the Northern District of California

1    "[T]o impart patent-eligibility to an otherwise unpatentable process under the theory that the

2    process is linked to a machine, the use of the machine 'must impose meaningful limits on the claim's

3    scope.' In other words, the machine 'must play a significant part in permitting the claimed method

4    to be performed.'" *CyberSource*, 654 F.3d at 1375 (quoting *In re Bilski* ("*Bilski I*"), 545 F.3d 943,

5    961 (Fed. Cir. 2008); *SiRF Tech.*, 601 F.3d at 1333); *Bancorp*, 2012 WL 3037176 at *10 ("To

6    salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention,

7    facilitating the process in a way that a person making calculations or computations could not."). The

8    Federal Circuit has "defined a 'machine' as 'a concrete thing, consisting of parts, or of certain

9    devices and combination of devices. This includes every mechanical device or combination of

10    mechanical powers and devices to perform some function and produce a certain effect or result.'"

11    *SiRF Tech.*, 601 F.3d at 1332.

12           i.   <u>Specific Machine</u>

13    Plaintiff argues in conclusory fashion that Claim 1 contains "many machine elements,"

14    including "a network," "devices," "a machine-readable medium," and "a computerized system."

15    Opp. at 21. However, merely identifying general "machine elements" does not satisfy the MOTT;

16    were that so, virtually any use of devices beyond the human body for a claimed method would

17    satisfy the test. Instead, the claim must, at a minimum, identify a *specific* machine." *CyberFone*,

18    2012 WL 3528115 at *5 & n.5 (rejecting plaintiff's argument "that the sending of exploded data

19    transactions over a channel ... also requires a machine" because "plaintiff only summarily makes this

20    argument and does not indicate *what* type of machine is required") (emphasis in original) (quoting

21    *Bilski I*, 545 F.3d at 961). Merely listing "a network" or "devices" is akin to the "channel" rejected

22    in *CyberFone*, and is insufficient to "impose meaningful limits on the claim's scope," *id.* at *5 n.5

23    (quoting *Bilski I*, 545 F.3d at 961), or to separate the machine-related elements from mere

24    "insignificant extra-solution activity." *Bilski I*, 545 F.3d at 962 (citing *Flook*, 437 U.S. at 590).[12]

25    

26        [12] Moreover, it is not at all clear that a "network" can constitute a "machine." *See CyberSource Corp. v. Retail Decisions, Inc.*, 620 F. Supp. 2d 1068, 1077 (N.D. Cal. 2009)

27    (concluding that the internet is not a machine and that "an unpatentable mental process for collecting data and weighing values does not become patentable by tossing in references to internet

28    commerce"), *aff'd*, 654 F.3d 1366 (Fed. Cir. 2011) (not expressly deciding whether the internet can be considered a machine).

**United States District Court**
For the Northern District of California

1  Even crediting each item listed above as a separate "machine" within the meaning of the MOTT,

2  "[s]toring, retrieving, and providing data . . . are inconsequential data gathering and insignificant

3  post solution activity." *Bancorp Services, L.L.C. v. Sun Life Assur. Co. of Canada*, 771 F. Supp. 2d

4  1054, 1065 (E.D. Mo. 2011), *aff'd*, 687 F.3d 1266 (Fed. Cir. 2012); *see CyberSource*, 654 F.3d at

5  1370 (same). These inconsequential functions are all that the devices and networks identified by

6  Plaintiff provide.

7                ii.       Meaningful Limits

8        Beyond the vague "networks" or "devices" identified in Claim 1, the claim's "machine-

9  readable medium" and "computerized system" each refer to computer implementation. However,

10  the fact that claims may require implementation on a computer does not demonstrate that the claim

11  satisfies the MOTT. *See Bancorp*, 2012 WL 3037176 at *6-7, *9-10 (concluding that some claims

12  required at least one computer, but nonetheless finding that they failed the MOTT). Rather, the

13  question focuses on the nature of the computer implementation at issue. Thus, when the computer

14  "impose[s] a meaningful limit on the scope of a claim, and play[s] a significant part in permitting the

15  claimed method to be performed, *rather than function[ing] solely as an obvious mechanism for*

16  *permitting a solution to be achieved more quickly*, *i.e.*, through the utilization of a computer for

17  performing calculations, that machine limitation renders the method patent eligible." *CLS Bank*, 685

18  F.3d at 1351 (internal citations and quotation marks omitted) (emphasis in original).

19        In the instant case, the computer implementation directed by the '713 patent does not satisfy

20  the MOTT, nor does it rescue the claims from ineligibility more broadly, for two reasons. First,

21  Claim 1 describes the step of "gathering, within a machine-readable medium, statistics generated

22  during" the price testing regarding consumer response to the price offers. However, as noted above,

23  "'mere data-gathering steps cannot make an otherwise nonstatutory claim statutory.'" *CyberSource*,

24  654 F.3d at 1370 (internal brackets omitted) (quoting *In re Grams*, 888 F.2d 835, 840 (Fed. Cir.

25  1989); *In re Meyer*, 688 F.2d 789, 794 (CCPA 1982)). Put another way, steps that "merely

26  determine values for the variables used in the mathematical formulae used in making the

27  calculations . . . do not suffice to render the claimed methods, considered as a whole, statutory

28  subject matter." *In re Grams*, 888 F.2d at 840 (quoting *In re Richman*, 563 F.2d 1026, 1030 (CCPA

United States District Court

For the Northern District of California

1    1977)); *see also CyberFone*, 2012 WL 3528115 at *7 ("[T]he telephone is not an integral part of the

2    claim; it simply functions as a means for collecting data whereas the real focus of the claim is the

3    sorting and storing. . . . In other words, the use of a telephone to capture data does not make the

4    abstract concepts of sorting and storing data somehow patent-eligible.") (internal citation omitted).

5      Nor does the claimed step "specify how the [medium is] specially programmed to perform

6    the steps claimed in the patent. The claims are silent as to how a computer aids the method, the

7    extent to which a computer aids the method, or the significance of a computer to the performance of

8    the method." *Dealertrack*, 674 F.3d at 1333 (internal citations and quotation marks omitted). Thus,

9    merely adding a "machine-readable medium" as the location for storing the gathered data rather

10    than, *e.g.*, a pen and paper, does not impose any meaningful limitation on the claimed method. *See*

11    *Highmark*, 2012 WL 3181659 at *17 (finding use of a general-purpose computer to perform a

12    method did not render invention patent-eligible based in part on the fact that "[a]ny healthcare

13    provider or patient who has ever consulted a medical treatise or home medical reference book to

14    determine what disease or condition might be causing particular symptoms has practiced a

15    non-computerized version of the claimed method"); *CyberSource*, 654 F.3d at 1735 ("[T]he basic

16    character of a process claim drawn to an abstract idea is not changed by claiming only its

17    performance by computers, or by claiming the process embodied in program instructions on a

18    computer readable medium."). Accordingly, use of the machine-readable medium in the claimed

19    method does not satisfy the MOTT.

20      Second, Claim 1 describes the step of "using a computerized system to read said statistics

21    from said machine-readable medium and to automatically determine, based on said statistics, an

22    estimated outcome of using each of the plurality of prices for the product." In other words, the

23    claimed method employs a computer to calculate, based on the data gathered, a demand curve for the

24    product. Further, certain dependent claims offer varying goal functions for the computer to use to

25    calculate the relevant "estimated outcome[s]," including goals such as maximizing revenue, profit,

26    customer lifetime value, customer acquisition, and customer retention. *See* Claims 11-15, 37-41.

27      However, as with the "machine-readable medium" described above, here the claimed step

28    does not require any particular form of a computer; rather, it requires merely "a general purpose

**United States District Court**
For the Northern District of California

1   computer programmed in an unspecified manner." *Bancorp*, 2012 WL 3037176 at *5; *see*

2   *Dealertrack*, 674 F.3d at 1332 (same).  "[T]he use of a computer in an otherwise patent-ineligible

3   process for no more than its most basic function – making calculations or computations – fails to

4   circumvent the prohibition against patenting abstract ideas and mental processes." *Bancorp*, 2012

5   WL 3037176 at *9.  Nor do the claims "refer to a specific machine by reciting structural limitations

6   that narrow the computer implemented method to something more specific than a general purpose

7   computer [or] recite any specific operations performed that would structurally define the computer."

8   *Bancorp*, 771 F. Supp. 2d at 1064 (internal citations and quotation marks omitted).  Thus, "the

9   specified computer components are no more than objects on which the claimed methods operate,"

10  and fail to satisfy the MOTT.  *Bancorp*, 2012 WL 3037176, at *5 (citing *Bancorp*, 771 F. Supp. 2d

11  at 1064).

12          A computer-aided limitation is insufficient to satisfy the MOTT where, as here, the

13  calculations at issue could be performed in the human mind.  *See CyberSource*, 654 F.3d at 1372

14  (rejecting claimed method as abstract where "steps can be performed in the human mind, or by a

15  human using a pen and paper"); *Bancorp*, 2012 WL 3037176 at *5 (Fed. Cir. 2012) (finding

16  computer implementation failed to meet MOTT because, "although it would be inefficient to do so,

17  the steps for tracking, reconciling and administering a life insurance policy with a stable value

18  component can be completed manually") (quoting *Bancorp*, 771 F. Supp. 2d at 1065).  Put another

19  way, the computer limitation is not "integral" to the claimed method because it does not "facilitat[e]

20  the process in a way that a person making calculations or computations could not."  *Id.* at *10 (citing

21  *SiRF Tech.*, 601 F.3d at 1333); *see Bancorp*, 2012 WL 3037176 at *11 ("It is the management of the

22  life insurance policy that is 'integral to each of [Bancorp's] claims at issue,' not the computer

23  machinery that may be used to accomplish it.") (quoting *SiRF Tech.*, 601 F.3d at 1332).

24          Here, the only element of the claimed calculation that might take it outside the realm of the

25  human mind is the claim term "automatically," but to do a calculation "automatically" simply refers

26  to the computer's inherent value in performing calculations *more quickly*, a characteristic that does

27  not render the computer "integral" to the claimed method.  To the contrary, "[w]hile running a

28  particular process on a computer undeniably improves efficiency and accuracy, cloaking an

1    otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it

2    within section 101." *Highmark*, 2012 WL 3181659 at *17 (quoting, 672 F.3d at 1267 (Mayer, J.,

3    dissenting)); *see also Bancorp*, 2012 WL 3037176 at *11 ("Here, in contrast [to *Research Corp.*],

4    the computer merely permits one to manage a stable value protected life insurance policy more

5    efficiently than one could mentally. *Using a computer to accelerate an ineligible mental process*

6    *does not make that process patent-eligible*.") (emphasis added).

7         Accordingly, the '713 patent's claims are insufficiently limited by a computer (or any other

8    machine) to satisfy the machine-or-transformation test.

9              b.    Abstract Idea

10        As noted above, the MOTT, while an "important and useful clue," *Bilski*, 130 S. Ct. at 3226,

11   is not a dispositive test for patent eligibility.  In addition to failing the MOTT, the '713 patent

12   describes a fundamentally abstract concept.

13        As the Supreme Court has explained, "to transform an unpatentable [abstract idea] into a

14   patent-eligible application of such [an idea], one must do more than simply state the [idea] while

15   adding the words 'apply it.'" *Mayo*, 132 S. Ct. at 1294.  Rather, an invention must apply the concept

16   "to a new and useful end." *Id.* (citations omitted).  An invention employing an abstract idea must

17   "also contain other elements or a combination of elements, sometimes referred to as an '*inventive*

18   *concept*,' sufficient to ensure that the patent in practice amounts to *significantly more* than a patent

19   upon the [abstract idea] itself." *Id.* (citations omitted) (emphases added).  In addition, "the steps in

20   the claimed processes (apart from the [abstract ideas] themselves) [should do more than simply]

21   involve well-understood, routine, conventional activity previously engaged in by [people] in the

22   field," and should not preempt the use of the abstract idea in future discoveries. *Id.* (citations

23   omitted).

24        After rejecting the computer limitations in the '713 patent as described above, "the question

25   under § 101 reduces to an analysis of what additional features remain in the claims." *Bancorp*, 2012

26   WL 3037176 at *11 (citing *Mayo*, 132 S. Ct. at 1297 (questioning, after setting aside the claimed

27   law of nature, "[w]hat else is there in the claims before us?").  Having considered the claims and

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   their elements "as a whole," *Diehr*, 450 U.S. at 188, the answer in this case is, not much, and not

2   enough to render the claims patent-eligible.

3       The '713 patent's claimed steps are not meaningfully distinguishable from those found

4   ineligible under Supreme Court and Federal Circuit authority. The '713 patent describes steps such

5   as "testing" prices by "sending . . . messages" to "potential customers," "gathering . . . statistics

6   generated during said testing about how the potential customers responded to the offers," "read[ing]

7   said statistics" and "determin[ing], based on said statistics, an estimated outcome" at each price,

8   "selecting a price at which to sell a product based on the estimated outcome," and "sending" a new

9   set of messages to "potential customers" with the newly selected price. In simple English, the '713

10  patent in essence teaches nothing more than the calculation of a demand curve based on consumer

11  response to different price points.[13]

12      As the Federal Circuit found in *Bancorp*, "[w]hen the insignificant computer-based

13  limitations are set aside from those claims that contain such limitations," "nothing remains in the

14  claims but the abstract idea of [measuring a demand curve and optimizing price] by performing

15  calculations and manipulating the results." *Bancorp*, 2012 WL 3037176 at *11, *12. Instead, these

16  steps describe what any business owner or economist does in calculating a demand curve for a given

17  product. *See id.* at *11 (rejecting claims as abstract where they "require determining values – for

18  example, "an initial value based on a value of underlying securities," "fee units," "surrender value

19  protected investment credits," "an investment value and a value of the underlying securities for the

20  current day," and "a policy value and a policy unit value for the current day" – and then "storing,"

21  "removing," and/or "accumulating" some of those values"). As Amazon notes in its brief, absent the

22  computer limitations, which the Court has already rejected as insignificant, "a merchant in a bazaar

23  could have performed OIP's invention centuries ago—and no doubt did." Reply at 9 (quotation

24

25

26      [13] The Court arrives at this conclusion cognizant of and adhering to the Federal Circuit's

27  admonition that "[i]t is fundamentally improper to paraphrase a claim in overly simplistic
    generalities in assessing whether the claim falls under the limited 'abstract ideas' exception to patent
    eligibility under 35 U.S.C. § 101. Patent eligibility must be evaluated based on what the claims

28  recite, not merely on the ideas upon which they are premised." *CLS Bank*, 685 F.3d at 1351-52; *see
    also CyberFone*, 2012 WL 3528115 at *5 (applying standard).

1    marks omitted).[14]  Thus, there is nothing that "amounts to *significantly more* than a patent upon the

2    [abstract idea] itself."  *Mayo*, 132 S. Ct. at 1294 (emphasis added).

3        The decisions of the Supreme Court and Federal Circuit finding various patents invalid under

4    § 101 are on point.  The '713 patent is as abstract as *Bilski*'s patent – which claimed a method for

5    hedging and described initiating a series of transactions, identifying a counter-risk position, and

6    initiating a second series of transactions to balance risk, 130 S. Ct. at 3223-24 – and the patent in

7    *CyberSource* – which covered steps of gathering information about credit card transactions, making

8    a list of those numbers and transactions, and determining from the list whether the transaction was

9    valid, 654 F.3d at 1370.  As the '713 patent merely claims a method for charting a demand curve for

10   a product and deriving an optimum price based on that demand, it, like the patents in *Bilski* and

11   *CyberSource*, contains no "inventive concept" extending beyond the abstract idea of an elastic

12   demand curve.  *Mayo*, 132 S. Ct. at 1294 (quoting *Flook*, 437 U.S. at 594); *see also Cyberfone*, 2012

13   WL 3528115 at *8 (rejecting a patent as abstract when, "broken down into its component parts, [it]

14   recites steps by which data is obtained, sorted, and stored").  Indeed, as courts have also noted in the

15   context of the transformation prong of the MOTT, the collection and use of data does not render an

16   invention patent-eligible under § 101.  *See CyberFone*, 2012 WL 3528115 at*5 (summarizing

17   plaintiff's arguments "that: 1) the data is transformed by being converted into data subsets; and 2) a

18   storage device is changed when it incorporates new data"); *id.* at *6 (rejecting both arguments as

19   "unpersuasive") (citing *CyberSource*, 654 F.3d at 1367; *Bancorp*, 2012 WL 3037176, at *5).

20

21        [14] Nor do the dependent claims add any meaningful limitation to the independent claims so
22   as to render certain dependent claims patent-eligible.  Although Plaintiff argues generally that the
     dependent claims "impose additional limitations" on the independent claims, it fails to explain how
23   any particular limitation rescues the claim from ineligibility.  The dependent claims merely offer
     examples of potential inputs for the abstract calculations (*e.g.*, for products that are services (claim
24   47), or for products that are associated with the same stock-keeping unit or SKU (claim 48)), or
     examples of goals toward which the abstract process can be oriented, such as maximizing revenue,
25   profit, customer lifetime value, customer acquisition, or customer retention (claims 11-15, 37-41).
     Nothing suggests the '713 patent teaches anything not already taught by the basic principles of
26   economics.  Indeed, the claims themselves do not even specify any particular method of, *e.g.*, profit
     maximization.  While there are specifications in the '713 patent containing exemplary formulas for
27   calculating certain outcomes, the Court may not "import[] limitations from the specification into the
     claim."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005); *see also id.* at 1320.
28   Moreover, use of a formula or algorithm in the claims would not render the invention patent-eligible
     under § 101. *See Benson*, 409 U.S. at 71-72.

Although the claims do include certain concrete steps, such as "sending . . . messages" to "potential consumers" and receiving or "gathering" information from them (which form the basis of the calculations), "[t]he presence of a physical step in the claim to derive data for the algorithm will not render the claim statutory." *In re Grams*, 888 F.2d 835, 840 (Fed. Cir. 1989); *see also Mayo*, 132 S. Ct. at 1297 ("These additional steps [of, *e.g.*, administering a drug to a patient], are not themselves [abstract ideas] but neither are they sufficient to transform the nature of the claim."); *Fort Properties*, 671 F.3d at 1323 ("When viewing the claimed invention as a whole, the physical activities involving the deeds, contracts, and real property are insufficient to render these claims patentable."). Nor will the post-solution activity of sending a second message to potential customers with the newly-calculated price rescue the claims in the instant case. *Mayo*, 132 S. Ct. at 1299 ("'[P]ost-solution activity' that is purely 'conventional or obvious,' . . . 'can[not] transform an unpatentable principle into a patentable process.'") (quoting *Flook*, 437 U.S. at 589); *see also, e.g.*, *In re Schrader*, 22 F.3d 290, 291-92 (Fed. Cir. 1994) (invention "directed to a method for competitively bidding on a plurality of related items" – *i.e.*, an auction – using steps such as "identifying a plurality of related items in a record, offering said plurality of items to a plurality of potential bidders, [and] receiving bids from said bidders," and using one specific goal function, "complet[ing] a sale of all of the items being offered at the highest offered total price," lacked statutory subject matter under § 101).

As *Mayo* explained in the context of a patent for calculating the proper dosage of a drug, "Anyone who wants to make use of these laws must first administer a thiopurine drug and measure the resulting metabolite concentrations, and so the combination amounts to nothing significantly more than an instruction to doctors to apply the applicable laws when treating their patients." *Id.* at 1298. The same can be said of anyone who seeks to use the laws of supply and demand to calculate a demand curve and an optimum price; she must first gather data from which to make a calculation, and after she has made it, she must tell customers about the new price. In the final analysis, the patent simply instructs businesses to apply the concepts of supply and demand. In short, the '713 patent contains no "inventive concept" necessary to patentability. *Id.* at 1294. *See also Dealertrack*, 674 F.3d at 1317, 1333 (finding invention ineligible despite claimed steps of "receiv[ing]" and

**United States District Court**
For the Northern District of California

1   "forward[ing]" information to and from dealers – akin to sending messages to potential customers –

2   because such steps merely described the "basic concept of processing information through a

3   clearinghouse"); *Classen*, 659 F.3d at 1067, 1068 (rejecting third of three patents, which merely

4   "claims the idea of comparing known immunization results that are, according to the patent, found in

5   the scientific literature, but does not require *using* this information for immunization purposes," as

6   too abstract to be eligible because there was no "movement from principle to application.")

7   (emphasis added).

8       Plaintiff's reliance on *CLS Bank* in arguing for patent eligibility is unavailing. For the

9   reasons discussed above, the '713 patent is distinct from that in *CLS Bank*. *CLS Bank*, which the

10  Federal Circuit found that the invention which claimed a particular trading platform to minimize

11  risk, specified the use of "shadow records," which supplied a specific and inventive application of

12  the general concept of "using an intermediary to help consummate exchanges between parties." *CLS*

13  *Bank*, 685 F.3d at 1355. Specifically, the court found:

14          The asserted claims appear to cover the practical application of a
            business concept in a specific way, which requires computer
15          implemented steps of exchanging obligations maintained at an
            exchange institution by creating electronically maintained shadow
16          credit and shadow debit records, and particularly recite that such
            shadow credit and debit records be held independently of the exchange
17          institution by a supervisory institution; that start-of-the-day balances
            be obtained from the exchange institution; that adjustments be made to
18          the credit records based on only certain specified allowed transactions
            under the "adjusting" limitation; that such adjustments be made in
19          chronological order; that at the end of the day, instructions be given to
            the exchange institution to reflect the adjustments made on the basis of
20          the permitted transactions; and that such adjustments affect
            irrevocable, time invariant obligations placed on the exchange
21          institution.

22  *Id.* The use of shadow records to implement the trading platform was an inventive concept and was

23  material to the patent's eligibility. The specific, concrete steps and innovative concepts integral to

24  implementation of the invention in *CLS Bank* are absent from the '713 patent.

25      Similarly, the '713 patent in this case is distinguishable from the two patents upheld in

26  *Classen* because it does not cover any concrete steps of, *e.g.*, actually selling the products at issue or

27  coordinating the sale thereof. *Cf. Classen*, 659 F.3d at 1060 (upholding two patents that included a

28  concrete step of administering the vaccine, whereby information on immunization schedules and the

1    occurrence of chronic disease is "screened" and "compared," the lower risk schedule is "identified,"

2    and the vaccine is "administered" on that schedule).  Instead, the '713 patent explicitly disclaims

3    any application to the actual sale of goods at the selected price.  *See* Docket No. 1, '713 patent col. 5

4    ll. 1-3 ("Actual fulfillment of a purchase of a product, whether tangible or digital, is a separate

5    process not directly considered here.").  Therefore, the patent in this case is more like those in *Mayo*

6    or *Dealertrack*, in which the concrete steps merely described the context in which the calculation or

7    measurement takes place.  Here, the focus of the claims themselves are on the gathering of data and

8    the calculation of an optimum price, not on any specific, concrete, and inventive application thereof.

9    *See Mayo*, 132 S. Ct. at 1291 ("The 'administering' step simply identifies a group of people who

10   will be interested in the correlations, namely, doctors who used thiopurine drugs to treat patients

11   suffering from autoimmune disorders."); *see also Flook*, 437 U.S. at 594-95 (rejecting invention that

12   "simply provides a new and presumably better method for calculating alarm limit values").

13          Finally, Plaintiff argues that the '713 patent is patent-eligible because the price optimization

14   process claimed by the '713 patent does not preempt the entire field of price optimization; it leaves

15   room for other iterations of the principle, such as using vendor databases, cost databases, surveys of

16   competitive prices, online auctions, and other methods.  Plaintiff therefore claims that unlike in

17   *Bilski*, its patent "does not foreclose price-selecting 'approach[es] in all fields.'" Opp. at 13 (citing

18   *Bilski*, 130 S. Ct. at 3231).  Plaintiff overreads *Bilski*. Although *Bilski* rejected certain claims

19   because they "would pre-empt use of this approach [to hedging] in all fields," in the very next

20   paragraph it rejected more limited claims that only described hedging in energy and commodity

21   markets, finding, "*Flook* established that limiting an abstract idea to one field of use or adding token

22   post-solution components did not make the concept patentable."  *Bilski*, 130 S. Ct. at 3231; *see also*

23   *Bancorp*, 2012 WL 3037176 at *12 (rejecting Bancorp's argument "that its claims are not abstract

24   because they are limited to use in the life insurance market" based on *Flook* and *Bilski*).

25          Thus, as *Flook*, *Bilski*, and *Mayo* teach, a patent need not *wholly* preempt the abstract idea of

26   price optimization in all of its forms in order to be ineligible under § 101; rather the degree of

27   preemption relevant to the § 101 analysis is a relative concept.  *See also Mayo*, 132 S. Ct. at 1294

28   ("[U]pholding the patents would risk *disproportionately* tying up the use of the underlying [abstract

United States District Court
For the Northern District of California

1  ideas], inhibiting their use in the making of further discoveries.").[15]  The central question remains

2  whether the patentee seeks "broad monopoly rights over a basic concept, fundamental principle, or

3  natural law without a concomitant contribution to the existing body of scientific and technological

4  knowledge." *Highmark, Inc.*, *supra*, 2012 WL 3181659 at *7.  The Court concludes the '713 patent

5  does.

## IV.   CONCLUSION

7       In sum, the '713 patent fails the machine prong of the MOTT – the only prong argued by

8  Plaintiff – because its only machine elements merely incorporate a computer that is "employed only

9  for its most basic function, the performance of repetitive calculations, and as such does not impose

10 meaningful limits on the scope of those claims." *Bancorp*, 2012 WL 3037176 at *10.  More

11 fundamentally, examining the '713 patent's claims as a whole and hewing closely to the Supreme

12 Court's and Federal Circuit's precedents in this area, *see Bilski*, 130 S. Ct. at 3231, it is clear that the

13 '713 patent falls within the statutory exception for abstract ideas.

14      Accordingly, the Court concludes that the '713 patent is ineligible under § 101.

15 ///

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24

25

26  [15]  Indeed, a rule for patent eligibility based on whether the entire field was preempted would largely beg the question.  Is the "field" in question:  (1) all price setting; (2) price optimization; (3)

27  price optimization using offers and actual consumer purchases; (4) price optimization in e-commerce, or some other claimed field of use?  The question-begging nature of the analysis

28  underscores the wisdom of *Bilski* and *Flook*'s rejection of such an attempt to claim a field-of-use limitation as the determining factor under the § 101 analysis.

**United States District Court**

For the Northern District of California

1    For the foregoing reasons, the Court **GRANTS** Defendant's motion to dismiss Plaintiff's

2    complaint with prejudice on the grounds that the '713 patent is ineligible under § 101.[16]   The Clerk

3    shall enter judgment and close the file.

4    This order disposes of Docket No. 33.

6    IT IS SO ORDERED.

8    Dated:  September 11, 2012

_____
EDWARD M. CHEN
United States District Judge

---

[16]  Because the Court grants the motion to dismiss on the basis of § 101, it need not consider the parties' remaining arguments, including Defendant's arguments with respect to willful infringement.

34

**A34**

United States District Court
For the Northern District of California

1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                  NORTHERN DISTRICT OF CALIFORNIA
7
8   OIP TECHNOLOGIES, INC.,                    No. C-12-1233 EMC
9           Plaintiff,
10      v.
                                         **JUDGMENT IN A CIVIL CASE**
11  AMAZON.COM, INC.,
12          Defendant.
    _____/
13
14      ( )  **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have
15  been tried and the jury has rendered its verdict.
16      (X)  **Decision by Court.**  This action came to trial or hearing before the Court.  The issues
17  have been tried or heard and a decision has been rendered.
18      IT IS SO ORDERED AND ADJUDGED that Judgment is entered in accordance with the
19  **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS filed on September 11, 2012.**
20  The Clerk of the Court is directed to close the file in this case.
21
22  Dated:  September 11, 2012
23                                         _____
24                                         EDWARD M. CHEN
                                           United States District Judge
25
26
27
28

**A35**

US007970713B1

(12) **United States Patent**     (10) **Patent No.:**   **US 7,970,713 B1**

Gorelik et al.     (45) **Date of Patent:**    **Jun. 28, 2011**

(54) **METHOD AND APPARATUS FOR AUTOMATIC PRICING IN ELECTRONIC COMMERCE**

(75) Inventors: **Vladimir Gorelik**, Palo Alto, CA (US); **Andrew Ian Atherton**, San Francisco, CA (US); **Nina Barrameda Zumel**, San Francisco, CA (US)

(73) Assignee: **OIP Technologies, Inc.**, San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1340 days.

(21) Appl. No.: **09/568,001**

(22) Filed: **May 10, 2000**

(51) **Int. Cl.**
    *G06F 17/00*     (2006.01)

(52) **U.S. Cl.** ....... 705/400; 705/1.1; 705/7.29; 705/7.35; 705/26.1; 705/26.61

(58) **Field of Classification Search** ................. 705/400, 705/1.1, 7.29, 7.35, 26.1, 26.61
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,581,072 | A | * | 5/1971 | Nymeyer ........................ 705/37 |
| 5,331,544 | A | * | 7/1994 | Lu et al. ........................ 705/10 |
| 5,778,357 | A | * | 7/1998 | Kolton et al. .................... 707/2 |
| 5,873,069 | A | * | 2/1999 | Reuhl et al. .................... 705/20 |
| 6,196,458 | B1 | | 3/2001 | Walker et al. |
| 6,230,150 | B1 | * | 5/2001 | Walker et al. ................ 705/400 |
| 6,233,564 | B1 | | 5/2001 | Schulze, Jr. |
| 6,424,949 | B1 | | 7/2002 | Deaton et al. |
| 6,477,180 | B1 | | 11/2002 | Aggarwal et al. |
| 6,539,392 | B1 | * | 3/2003 | Rebane ........................ 707/101 |

FOREIGN PATENT DOCUMENTS

WO     WO 02/010961    *   7/2001

OTHER PUBLICATIONS

"Navigating the Intersection of forecasting, market research and pricing" by Cook, Aug. 1995, Pharmaceutical Executive, v15, n8, p. 54-58.*
"Pricing research for decision making" by Mohn, winter 1995, Marketing Research, a Magazine of Management & Applications, v&n1 p. 10-19.*
"Pricing decision in small firms: Theory and practice" by Cunningham, 1993, Management Decision, v31n& p. 46-55.*
A guide to conducting marketing research on the Internet by Emery,Jan. 1996 in Potentials in Marketing v23, n1, p22, entire document.*

* cited by examiner

*Primary Examiner* — Janice A. Mooneyham
*Assistant Examiner* — Michael J Fisher
(74) *Attorney, Agent, or Firm* — Hickman Palermo Truong & Becker LLP

(57) **ABSTRACT**

An automatic pricing method and apparatus for use in electronic commerce environments is described. Automatic pricing uses live price testing to estimate and measure demand for specific products—taking into account where appropriate, a vendor selected segmentation scheme. The results of live price testing are compared using a vendor selected goal function, e.g. profit maximization, to select a new price. A goal function that balances short term gains versus long term gains based on customer lifetime value is described. The live price testing approach used is designed to minimize losses due to price testing through statistical methods. Additionally, methods for distributing price testing across time so as to avoid problems caused by too many ongoing tests as well as side effects from testing are described. The selected price is a win for both purchasers and vendors as the automatic price will approximate the efficiency of a reverse auction without the inconvenience of the auction format while being goal maximizing for the vendor. For example, a vendor that normally sets prices of items for sale to customers can use embodiments of the invention to great effect.

**62 Claims, 7 Drawing Sheets**



OIP00000001



**FIG. 1**
**(Prior Art)**

OIP00000002

Case: 12-1696 Case: 12-1696 CASE PARTICIPANTS ONLY Document: 34 Page: 99 Filed: 08/18/2014 Filed: 08/18/2014



FIG. 2
(Prior Art)

OIP00000003

A207

Case: 12-1696 CASE PARTICIPANTS ONLY Document 85 Page 100 Filed: 08/18/2014



FIG. 3

OIP00000004



**FIG. 4**

OIP00000005

**FIG. 5**

Pricing Module 410

| Dynamic Pricing 500 | Static Pricing 502 | Promotional Pricing 504 | Automatic Pricing for Liquidation 506 | • • • |

OIP00000006



FIG. 6

OIP00000007



**FIG. 7**

OIP00000008

US 7,970,713 B1

**1**

# METHOD AND APPARATUS FOR AUTOMATIC PRICING IN ELECTRONIC COMMERCE

## RELATED APPLICATIONS

This application relates to the following group of applications. Each application in the group relates to, and incorporates by reference, each other application in the group. The invention of each application is assigned to the assignee of this invention. The group of applications includes the following.

| Title | First Inventor | Filing Date | Serial Number |
|-------|----------------|-------------|---------------|
| Method and Apparatus for Determining Customer Lifetime Value and Setting Price | Vlad Gorelik | May 10, 2000 | 09/567,946 |

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to the field of pricing. In particular, the invention relates to methods and apparatus for automatically adjusting pricing on items in an electronic commerce environment.

### 2. Description of the Related Art

Electronic commerce sites enable business to sell products and services to consumers and other businesses. FIG. 1 broadly illustrates the basic configuration used by electronic commerce vendors. A web server **100** is coupled to a database **102** that includes pricing information for products, e.g. the product **105**. When a client, not shown in FIG. 1, requests a web page, e.g. the web page **104**, over a network such as the Internet, the web server **100** generates the web page **104**. The web page **104** may include a reference to the product **105**, e.g. a textual description, a picture, and/or some other reference, as well as a price **106**. The dashed arrows in FIG. 1 illustrate that the web page **104** is generated from the web server **100**, e.g. for the manual elements of the web page **104**, and the database **102**, e.g. for dynamic information such as product information and pricing. Logs such as the logs **110** can be maintained by the web server **100** to monitor usage of the sites hosted by the web server **100**. Additionally, other servers may be used by the vendor to support the electronic commerce site, e.g. application servers, customer relationship management (CRM) systems, and/or other systems.

For a particular product, e.g. a book, a compact disc, a plane ticket, a grocery item, etc., the pricing displayed is typically controlled by one or more product merchandisers. These merchandisers are people with product area specific qualitative knowledge. The merchandisers set prices for items falling within their categories of pricing expertise in conjunction with other business policies.

For example, in the clothing business, there may be a product merchandiser who specializes in women's handbags and another in women's shoes. In order to set the price for an item, the merchandiser will qualitatively evaluate the market and the good considering factors such as: the good itself, the brand strength, market conditions, business goals, seasons, past sales, etc. Looked at from a microeconomics standpoint, the merchandiser is guessing the shape of the demand curve.

**2**

And therefore, guessing the optimal price. This pricing approach will be referred to as manual pricing.

FIG. 2 illustrates the impact that traditional, manual, pricing methodologies have as demand changes over time. The graph **200** shows the passage of time on the X-axis. The relative demand of a given product over time is represented by the dotted curve **202**. The pricing under a manual pricing model is shown as the stepped solid line **204**. Notice that while the manual price **204** can be adjusted, e.g. by a merchandiser, based on current market conditions, it only roughly tracks the demand, and therefore the optimal price.

Thus, at times when demand is peaking—and therefore higher prices could be charged—the manual price does not respond. Similarly, as demand dips sharply, the manual price does not respond either. Further, because of the need for manual intervention to adjust the manual price **204**, the price may not be adjusted frequently enough to capture either large or small market trends.

As the number of items that need to be priced grows and the business rules for determining prices become more complex, the manual pricing model becomes extremely untenable.

Some automated pricing models have been developed that facilitate the adjustment of manual prices based on predictive estimates of demand. These models typically emulate the assumptions that a merchandiser would use and can automate the process of adjusting prices in response to the inputs to the predictive models. The results do not look significantly different from FIG. 2.

In order to address the problems of manual pricing, some electronic commerce providers have adopted auction and/or reverse auction models, as well as variants. Priceline.com with its "Name your price"-style services for airline tickets, groceries, and gasoline, is a notable example of a variant of a reverse auction. However, using a reverse auction comes at the cost of convenience to the transaction, and in Priceline.com's case, consumer choice.

Accordingly, what is needed is a pricing model that allows sellers to automatically adjust the prices of products, and services, for sale in non-negotiated and non-auction settings to provide efficient pricing for both buyers and sellers. Furthermore, an approach for determining the lifetime value of a customer should be provided to allow the vendor to set prices that balance long term gains, e.g. customer repeat business, versus short term gains.

## SUMMARY OF THE INVENTION

A automatic pricing method and apparatus for use in electronic commerce environments is described. Automatic pricing uses live price testing to estimate and measure demand for specific products—taking into account, where appropriate, a vendor selected segmentation scheme. A segmentation scheme can be used by a vendor to differentiate between different types of customers as well as other aspects, a given product may be represented by multiple pricing units, each corresponding to different segments. For now, the term product will be used generically to refer either products, services, or specific pricing units, e.g. a product or service for a particular segment.

Automatically determined prices can be refined as demand changes over time. Accordingly, as demand for a given product changes, the price determined according to the automatic pricing method can change. Embodiments of the invention can handle low volume products by testing a group of similar products, e.g. in the same category, simultaneously to estimate demand for the group of products.

OIP00000009

US 7,970,713 B1

3

The results of live price testing are evaluated using a vendor selected goal function, e.g. profit maximization, to select a new price. Some embodiments of the invention include predefined goal functions for revenue maximization and profit maximization. Additional goal functions can be supplied by the vendor. Additionally, embodiments of the invention may include a goal function that can balance short and long term gains, based on the lifetime value of the customer, for the selected goal function.

Brute force live price testing could have extremely high testing costs. Accordingly, a rigorous testing approach is provided that significantly reduces testing costs while allowing for estimation of demand. This approach uses statistical techniques to estimate demand by testing a significantly smaller number of prices than would otherwise be required. Further, the particular testing methodology is designed to test those prices in a fashion that keeps the testing costs low. Additionally, the tested prices can be selected according to competitive research, vendor supplied suggestions, and/or other sources. The live testing process can determine, using a vendor selected goal function, which of the tested prices are better and worse than the current price for the product to a certain confidence. Then, one of the better prices can be selected.

At this point, the vendor is already doing better according to the goal function than she/he was doing before, e.g. making more money. However, the testing process can be continued to refine the price.

Once the automatically determined price is set, monitoring of what actually occurs can be compared against the predicted results for a price. If there is sufficient variance from the prediction, the product can be re-tested to select a new automatic price.

Additionally, methods for distributing price testing across time so as to avoid problems caused by too many ongoing tests as well as side effects from testing are described. For example, if Reebok™ shoes are price tested while leaving Nike™ shoes prices at the same level, the estimation of demand will be inaccurate. Accordingly, testing is distributed over time with related products price tested concurrently.

The selected price according to the automatic pricing is a win for both purchasers and vendors. The automatic price will approximate the efficiency of a reverse auction, a plus for the purchaser, without the inconvenience of the auction format. At the same time, the selected price is goal maximizing for the vendor. Accordingly, vendors with non-negotiated, non-auction pricing of products can use embodiments of the invention to great effect.

Additionally, embodiments of the invention offer features automatic price selection during liquidation using a similar live price testing method with a different goal function.

Embodiments of the invention can be provided as an outsourced service by a third party, e.g. Pricing Provider, to vendors, e.g. Vendor X. Through the establishment of communications links between Vendor X's electronic commerce facilities and the Pricing Provider, prices for items seen by purchasers to the Vendor X's web site can be provided by the Pricing Provider. Alternatively, the vendor herself/himself can be provided embodiments of the invention, e.g. software and/or hardware, to provide pricing services.

BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 illustrates a prior art electronic commerce system.
FIG. 2 demonstrates the effect of manual pricing as demand adjusts.
FIG. 3 illustrates the segmentation model used to identify pricing units and a demand curve for a pricing unit.

4

FIG. 4 illustrates an electronic commerce system according to one embodiment of the invention.
FIG. 5 illustrates components of a pricing module according to one embodiment of the invention.
FIG. 6 demonstrates the effect of automatic pricing as demand adjusts.
FIG. 7 illustrates the feedback loop controlling pricing.

DETAILED DESCRIPTION

A. System Overview

Electronic commerce vendors face unique hurdles in establishing prices. First, the present day marketplace is such that a number of competitors will price items at, or below, cost. How should a vendor respond to those actions? Similarly, with shopping robots, or agents, consumers who are price conscious can easily search dozens of similar vendors for a particular good or service drastically increasing the speed at which pricing changes influence customer perceptions.

One solution is to move away from traditional, or manual, pricing towards a more automatic pricing model. This model is designed to help vendors price their products and services, appropriately, even when competitors are dropping prices or some customers are so value conscious they are using shopping robots.

Further this model is able to measure actual, current demand for a particular product—and more particularly a particular pricing unit—through live price testing. Those results can be incorporated to allow a vendor to optimize each price according their pricing strategy.

First, the conceptual framework used by embodiments of the invention will be considered. Next, the configuration of an electronic commerce environment according to embodiments of the invention will be considered. Then, the methods for testing and adjusting prices will be considered in greater detail with reference to the goals of automatic pricing. Finally, additional embodiments of the invention will be considered.

B. Conceptual Framework

Pricing for an item should be capable of taking into account factors other than just the particular item. More specifically, a segmentation model such as the segmentation model 300 of FIG. 3 can be used to set prices at a finer grained level. Embodiments of the invention are flexible enough to account for vendor specific segmentation schemes.

The segmentation model 300 is an example segmentation scheme used by vendors according to some embodiments of the invention. Three segmentation axes are defined: SKU 304, e.g. individual pricing units or products; seasonality 302; and customer segments 306. The customer segments 306 may be defined according to the system used by the customer, e.g. from clustering or other data analysis techniques. Similarly, the seasonality 302 can be determined from the vendor's data.

Thus, for a particular SKU, e.g. a Brand X Pocket Umbrella, there may be multiple pricing units, e.g. the pricing unit 310, for each customer segment and season. Thus, the pricing unit 310 may represent the umbrella for new customers (a segment) in winter. Which can be discretely priced as compared to existing customers for that same season as represented by a different pricing unit 310.

Further, although the discussion thus far has been in terms of products, the discussion applies with equal force to services, e.g. airline tickets, etc. Also, sometimes the discussion may refer to a web page, or web site, etc., including a product. For obvious reasons, most tangible goods—and even digital goods—are not actually part of the web site, but rather some reference to them is included in the web site, e.g. photograph,

OIP00000010

A214

US 7,970,713 B1

5

narrative description, etc. Actual fulfillment of a purchase of a product, whether tangible or digital, is a separate process not directly considered here.

Because efficient live price testing requires a certain minimum sales velocity, e.g. customers looking at and buying/not buying a product, clustering is supported within the segmentation scheme. For example, several related products with low sales could be clustered together for testing as a single pricing unit. Similarly, several customer segments could be clustered to allow for the case where there are insufficient customers in some segments. Several examples may be helpful: the particular pricing unit being tested may represent Brand X Pocket Umbrellas and Brand Y Mini-Umbrellas for the customer segment new customers. Similarly, the pricing unit may represent Brand X Pocket Umbrellas for both new and existing customers, etc. The particular clustering selected may be determined by the vendor, by data analysis, and/or through an evaluation of which clusters will produce sufficient sales velocity for live price testing. The particular clustering used at a given time can be dynamically determined and adjusted, e.g. based on current sales velocity.

Returning to the pricing model, from microeconomics, we can predict that for a given pricing unit, e.g. the pricing unit 310 (a Brand X Pocket Umbrella, winter season, new customers), a demand curve will exist as shown in the graph 320 of FIG. 3. The demand curve 322 is shown as a solid line. As in standard economic theory, the curve is downward sloping so that as price increases, quantity decreases.

Similarly, the relative expected value 324 shown as a dotted line represents the value of selling different quantities. The relative expected value 324 can represent price times quantity, e.g. revenue. Other expected value functions may be used, e.g. profit, e.g. price less cost multiplied by the quantity, etc. For a given pricing unit, the expected value 324 has a maximum. Ideally, the pricing model should select the price corresponding to that maximum at all times.

The precise shape of the demand curve 322 in FIG. 3 is based on conjecture. The actual demand curve may vary substantially from a predicted demand curve and will change over time, e.g. as in FIG. 2 where the demand 202 changes over time. The estimation of actual demand therefore is a process used by embodiments of the invention to set prices.

However, for the same reason that the demand curve 322 cannot easily be exactly measured, the expected value 324, is not easy to determine. Accordingly, in order to set a price that will come close to maximizing expected value over time, a systematic approach to determining the demand curve 322 must be used.

The environment used by embodiments of the invention will now be considered together with the configuration of an electronic commerce vendor to use embodiments of the invention.

C. Architecture Configuration and Details

FIGS. 4 and 5 illustrate the system environment used by embodiments of the invention in greater detail. The configuration of FIG. 4 is designed to interface with existing electronic commerce systems, e.g. the electronic commerce environment of FIG. 1.

Architecture

The following lists the elements of FIG. 4 and describes their interconnections. FIG. 4 includes the web server 100, the database 102, the logs 110, the datamart 400, the pricing module 410, and the web page 420. The web page 420 includes the product 422 and the price 424.

The following describes the uses of the elements of FIG. 4. The web server 100 is a web server. Standard web servers such as Apache™ and Internet Information Server™ can be

6

used as the web server 100. The web server 100 produces log files, e.g. the logs 110. The logs 110 will include standard information as that found in a common logfile format, or other specialized information. For example, if the web server 100 can identify the paths of individual users, then per user information could be reviewed instead of, or in addition to, standard web logs. The common logfile format is better described at <http://www.apache.org/docs/mod/mod_log_common.html>. Additionally, the logs 110 may include transaction logs of completed purchases made using the web server 100.

The electronic commerce environment of FIG. 4 differs from the prior art systems in that prices, e.g. the price 424, is no longer provided by the vendor's database, e.g. the database 102. Instead, the price is provided by the pricing module 410. The pricing module 410 will determine the price according to analysis of data in the datamart 400 and the vendor selected pricing approach for a pricing unit. The datamart 400 and pricing module 410 can be remotely hosted relative to the servers supporting the web server 100. They can also be operated by a third party, e.g. as hosted application. This could be used to allow a single third party to provide the datamart 400 and pricing module 410 to multiple electronic commerce vendors. Alternatively, a given electronic commerce vendor can operate their own datamart 400 and pricing module 410 according to specifications provided by a third party together with suitably provided programs. The datamart 400 and the pricing module 410 can be supported by one or more computer systems.

The terms "program", or "computer program", as used in this application, refers to any sequence of instructions designed for execution on a computer system. A program may include a subroutine, a function, a procedure, an object method, an object implementation, an executable application, an applet, a servlet, a source code, an object code, and/or some other sequence of instructions designed for execution on a computer system.

Although a framework where the pricing module 410 directly supplies the price to the web page is shown, the pricing module 410 could update the database 102. The choice of configurations may depend on the vendor's preferences as well as how the services provided by the pricing module 410 are licensed to vendors.

Now, the pricing module 410 will be considered in greater detail. Then, the operation of different pricing modes within the pricing module 410 will be considered.

Pricing Module

FIG. 5 includes the pricing module 410. The pricing module 410 includes several pricing modes: automatic pricing 500, manual pricing 502, promotional pricing 504 and automatic pricing for liquidation 506. Additional pricing modes can be provided by the supplier of the pricing module 410, third parties, and/or the electronic commerce vendors themselves. The pricing modes can be implemented using one or more computer programs for execution on one or more computer systems.

The operation of the pricing module will now be considered in greater detail. The pricing module 410 provides an administrative interface to allow an electronic commerce vendor to set up their site for interaction with the pricing module 410. This administrative interface can be web based using a web server coupled to the pricing module 410.

Additionally, the administrative interface allows the vendor to select pricing modes on a per pricing unit basis. Thus, a single product may be priced using multiple pricing modes depending on the vendor's selection. The vendor can continu-

OIP00000011

US 7,970,713 B1

7

ously adjust the pricing mode selected for an item. Additional administrative features are described below in connection with each pricing mode.

The setup process allows the electronic commerce vendors to provide data about their products, or metadata. This would include, their segmentation scheme, categories of items, which items fall into which categories, etc. For example, if the vendor uses a particular taxonomy, or category, scheme such as the United Nations Standard Products and Services Codes (UN/SPSC), that can be used as well, e.g. for clustering products for testing purposes. Also, historical web logs and transaction data can be supplied through this interface. This provision can also continue, e.g. through streaming delivery of the information to the datamart **400**, and the pricing module **410**. The particular datamart loading procedures can be adjusted based on the vendor's capabilities and those of the selected datamart **400**. For example, datamart technology from Sagent Technologies, Mountain View, Calif., could be used to provide the datamart.

Additionally, the segmentation scheme used by the electronic commerce vendor can be obtained, e.g. according to the vendor's own datamart analysis of purchasers and products, customer relationship management (CRM) system, enterprise resource planning (ERP) system, and/or the vendor's preferences. Some embodiments of the invention supply a base segmentation scheme for the customer segment axis **306** for differentiating between new and existing customers. Enabling this differentiation may require additional links between the vendor's systems and the pricing module **410**, e.g. vendor's system signals the pricing module **410** when the user is an existing customer. Similarly, embodiments of the invention can obtain seasonality data from the vendor's systems, e.g. the database **102**, the vendor's ERP system, the vendor's own datamart analysis of purchasers and products, and/or other sources.

Each of the pricing modes will now be considered in greater detail.

### D. Manual Pricing Mode and Promotional Pricing Mode

The manual pricing **502** and promotional pricing **504** modes are non-automated pricing modes. Traditional prior art techniques can be used to set pricing unit prices. The administrative interface may support direct retrieval of pricing from the vendor's database, e.g. the database **102**, direct entry of prices, and/or retrieval of prices from some other database. The pricing can be set per pricing unit, or for all segments for a given product, e.g. the price for the handbag is $X.

As noted, manual, or traditional, pricing models do not permit a vendor to maximize returns as shown by FIG. **2**. However, a manual pricing mode is provided to allow vendors to select which items will be priced according to which methods. This may also be important if certain items must be priced according to contractual obligations, e.g. minimum price or fixed price.

Similarly, the promotional pricing **504** mode allows a vendor to run promotions without respect for a particular goal.

### E. Automatic Pricing for Liquidation Mode

Embodiments of the invention support an automatic pricing for liquidation **506** mode. This mode allows for automatic price selection to enable product liquidation. Accordingly, the vendor indicates, e.g. using the administrative interface, in the vendor's database **102**, and/or in some other database, that she/he would like to eliminate her stock of a product in a given time period, e.g. Y days. The system then automatically sets prices to sell the product within that time period. The demand measurement techniques described below can be used in conjunction with this pricing technique; however, instead strictly

8

of applying a profit maximizing goal, the goal will be to maximize profit while ensuring that inventory is liquidated in Y days.

Accordingly, as demand for the given inventory item is sampled, a price will be selected that will allow the full remaining quantity to be liquidated by the goal date. For example, suppose **100** coats remain with 10 days left to liquidate the measurement. A price will be selected which, according to the measured demand, will sell the remaining inventory as slowly as possible (that is, at as high a price as possible), while still selling out by the end of the 10 day period.

### F. Automatic Pricing

The automatic pricing **500** pricing mode offered by the pricing module **410** is designed to help vendors automatically reach better pricing decisions through automatic estimation and measurement of actual demand to select prices. Further, the specific demand estimation and measurement process is designed to minimize losses due to the testing process.

FIG. **6** illustrates the goals of automatic pricing with graph **600** illustrating that the automatic price **602** for a pricing unit follows demand **202** for a pricing unit. Thus, the vendor is able to have her/his prices follow demand and receive a better price for the pricing unit at each time and thus greater overall profits. Further, because pricing unit prices are automatically determined using a mixture of: live price testing; competitive information (what competing vendors are charging for a product as determined through price checking and/or shopping agents); as well as any vendor supplied information, e.g. cost, merchandiser recommendations, manufacturer's suggested retail price, etc. This information can be provided through the administrative interface, from the vendor's database **102**, and/or other databases. A dedicated shopping robot can be used, widely available shopping robots can be used, and/or human price shoppers can be used to obtain competitive pricing information.

The use of inputs, e.g. competitors' prices, serves to provide test points for the live testing process and also, when appropriate, as a "tie" breaker between two prices that have very similar results based on live price testing, e.g. take the price the competitor is using if the performance difference between the best found price and the competitor's price is less than some predetermined amount. However, in automatic pricing **502** mode, it is the actual results of the live price testing that determine the price.

Ultimately, the vendor can choose to override the selected price, e.g. by selecting the pricing unit for manual pricing. However, this is not recommended for the reason that the automatically determined price will be based upon actual demand—a quantitatively determined amount—whereas the manually set price is based on qualitative assumptions and models. As such, the automatically determined price will be goal maximizing, e.g. profit, revenue, etc. Further, as discussed below, the automatically determined price can account for customer lifetime value.

### G. Price Testing Method

The estimation and measurement of actual demand through live price testing enables various pricing modes to automatically select prices. The demand testing process will be described with reference to automatic pricing **502** mode. However, the same approach can be used for automated liquidation pricing **508** mode. FIG. **7** illustrates the feedback loop controlling pricing.

Pricing Feedback Loop

A list **710** of pricing units to test is maintained. Pricing units are added to the list **710** based upon explicit requests **702**, e.g. the vendor signals that she/he would like a particular

OIP00000012

US 7,970,713 B1

**9**

price unit automatically priced for the first time or that she/he would like to have price re-determined. Additionally, triggers **704** from the monitoring **716**, described in greater detail below, can cause pricing units to be added to the list **710**. The pricing control **700** controls the flow of all of the processes within the feedback loop.

The selection **712** process allows for orderly testing of demand. If too many pricing units are price tested simultaneously, the results may be affected by the other ongoing tests. Similarly, testing a single pricing unit without similar testing of related pricing units, e.g. Reebok™ shoes without testing Nike™ shoes, may cause distorted results.

Additionally, some individual pricing units may not have sufficient sales velocity for live price testing; accordingly, clustering can be used to test several pricing units simultaneously, with aggregate results used to determine the prices of the each of the pricing units. If appropriate, the selection **712** process can include querying one or more systems for automatic determination of suitable clusters of pricing units.

Another variant is testing multiple price units for bundling purposes. In this configuration, the vendor identifies a bundle of pricing units that she/he would like priced together, e.g. a pricing unit for a computer and a pricing unit for a monitor bundled together as a package. In this instance, the demand for the bundle can be measured and priced—possibly differently from the pricing for each pricing unit alone.

Accordingly, the list **710** is analyzed by the selection **712** process. This process can identify dependencies in testing like those described above, e.g. Reebok™ shoes and Nike™ shoes should be price tested at similar times. Once such dependencies are determined, the particular items being tested are passed to a calibration **714** process.

The pricing control **700** will exert control over the timing of individual tests. For example, if 100 products are currently being calibrated, the pricing control **700** can distribute the tests across time and implement vendor selected pricing policies. For example, no more than Z items tested simultaneously; no more than Y % of tested items with prices above, or below, the item's starting price, etc.

The calibration **714** process can occur for multiple pricing units in parallel and includes live price testing and is described in greater detail below. Once the calibration **714** process for a pricing unit is complete, that pricing unit is moved to monitor **716** process. Additionally, the tested pricing units can be removed from the list **710**. The pricing control **700** can control the ongoing calibrations and monitoring while also allowing for additional selection of items.

Calibration Process

The calibration **714** process for one pricing unit will be considered. This can be used to estimate and measure demand for a pricing unit through live price testing.

Returning to the assumed demand curve shown in graph **320** of FIG. **3**, the demand curve **322** is shown as a solid line. However, the actual demand may vary substantially. For practical reasons, it is not desirable to test a broad range of prices for pricing unit given the potential for testing losses and the long testing period. Therefore, a statistical approach can be employed. This approach relies on the fact that there is already substantial information and certainty about the initial, or current price, for a pricing unit. Further, it relies on the fact that it is easy to determine whether other prices are "better" or "worse" than the current price according to a selected goal function ($f$).

The specific goal function is vendor selectable. Several default goal functions are provided by embodiments of the invention: revenue (price times quantity); profit (price less cost times quantity); and also one of the above goals together

**10**

with an accounting for customer lifetime value. Additionally, some embodiments of the invention include a liquidation goal.

Still other goal functions are possible. For example, a customer acquisition goal function is provided by some embodiments where the goal is to increase the number of new customers through aggressive pricing. This function can be defined in terms of an increase in the size of the customer base per unit time. Similarly, other embodiments include a customer retention goal function. In that instance, the goal is to decrease the customer churn rate (i.e. number of customers leaving). The function can be defined in terms of the percent of customers that were active customers a certain period of time ago, who are still active customers in the present period of time. In some embodiments of the invention, different goal functions can be selected for different customer segments of a given product unit. For example, a customer retention goal could be selected for the "existing customers" segment while the customer acquisition goal could be selected for the "new customer" segment.

Accordingly, the calibration **714** process can be thought of as having two primary phases: fixing and triage. In the first phase, fixing, the initial, or given, price for a pricing unit is tested for a long enough period of time to evaluate the look to buy (L2B) ratio for the pricing unit. The L2B ratio is the number of looks, e.g. web page views of the pricing unit, as compared to the number of purchases of the pricing unit. The L2B information can be obtained from log files and transactions on the web server **100**. When the L2B ratio for the initial price is known within a predetermined statistical confidence, a lower bound on the goal function can be determined: $f_{min} = f$ (SX), where $SX$ is the initial price. Also, phase two, triage, can begin at this point.

In phase two, a list of candidate prices ($SA$, $SB$, $SC$, $SD$, etc.) can be quickly tested for short periods and the results compared with $f_{min}$. The candidate prices can be selected through competitive research, small perturbations of the initial price, merchandiser suggestions, manufacturer price suggestions, etc.

The results for the candidate prices can be evaluated using the goal function ($f$). The evaluation can take into account L2B and the confidence in the measure. For example, if the above four prices were tested, then $f(SA)$, $f(SD)$ are compared with $f_{min}$. Candidates that appear better than the initial price, e.g. $f(\text{price}) > f_{min}$ can be accepted for further triage. Candidates that perform poorer than the initial price are rejected, e.g. discarded from further consideration during this triage phase. Of the accepted candidates, one is selected as the new price and phase one, fix, is resumed with that as the starting price.

This two-phase process will continue until only a single price remains. As the number of tests in phase two, triage, is kept small, the testing costs incurred from selection of bad candidate prices are minimized. Further, each time phase one, fix, is re-entered, a price that appears to be better than the previous price, according to the goal function, is being used, e.g. the vendor is making more revenue/profit/etc.

A walkthrough of an example for a pricing unit, e.g. the pricing unit **310**, may be helpful. Initially, the pricing unit has a starting price, $SX$. Four candidate prices are selected, $SA$, $SB$, $SC$, and $SD$. The candidate prices may have been obtained through competitive research; perturbation of $SX$, e.g. add/subtract a few %; a merchandiser's suggestion, and/or other sources. During phase one, fix, the L2B for $SX$ is computed and $f_{min}$ is determined—to a certain confidence.

OIP00000013

US 7,970,713 B1

**11**

Next, at phase two, triage, short tests are conducted using the candidate prices ($A, $B, $C, and $D). Based on the results, $f($A$), \ldots, f($D$)$ are compared with $f_{min}$. In this instance, $f($A$)$ and $f($B$)$ appear better than $f_{min}$. Accordingly, $C and $D are rejected as candidate prices and removed from further consideration.

Phase one, fix, is restarted with one of $A and $B. In this instance $A was chosen because $f($A$)>f($B$)$. However, the choice could be random as well. After sufficient L2B information is determined a more confident estimation of $f($A$)$ will be known. If the value of $f($A$)$ is greater than $f_{min}$, then $f_{min}=f($A$)$. If however, further testing reveals that $f($A$) <f_{min}$, $f($A$)$ can be eliminated from the candidate list and one of the remaining candidates selected for fixing.

In this example, $f($A$)>f_{min}$ and so $f_{min}=f($A$)$. Phase two, triage, then begins with short price tests of remaining candidates, e.g. $B. In this example, further testing reveals that $f($B$)<f_{min}$, so it is eliminated as a candidate. Accordingly, $A is the new price and the testing process terminates as there are no further candidates for testing. Otherwise, the process would continue until only a single price remained.

As noted, various clustering approaches can be used to test multiple pricing units by estimating the demand for each pricing unit using the aggregate demand over a group of pricing units. The particular cluster selected can be dynamically generated across any of the segmentation axes. For example, a group of similar products within a product segment may be tested as one unit. Or, a group of similar customer segments for a single product may all be tested as one unit. Similarly, special pricing for bundled pricing units can be determined to select a price for the bundle based on the measured demand for the bundle.

Statistical Underpinnings

If q is the true demand for a given price, then the likelihood (L) that nbuys will be observed in nlooks is given by:

$$L(nlooks, nbuys \mid q) = \binom{nlooks}{nbuys} q^{nbuys}(1-q)^{1-nbuys}$$

where:

$$\binom{nlooks}{nbuys} = \frac{nlooks!}{nbuys!(nlooks-nbuys)!}.$$

Now, for a range range of possible values of q, there is a prior distribution of probabilities P(q)=the probability that the true demand is q. From a given set of observations, nbuys out of nlooks, Bayesian updating can be used to update the probability distribution.

$$P_{posterior}(\text{demand}=q)=L(nlooks,nbuys \mid q)P_{prior}$$
$$(\text{demand}=q).$$

The posterior distribution can be normalized to sum to 1 and be updated every time additional data is received by the system. At any point, a mean (average) estimate of demand can be computed together with the confidence value that the true demand is within a given interval of the mean:

$$\bar{q} = \sum_{q_{start}}^{q_{end}} qP(q)$$

**12**

with confidence

$$P(q \in [q_0, q_f]) = \sum_{q_{start}}^{q_{end}} P(q).$$

Prior to receiving data, a uniform distribution can be used. The confidence is considered "good" when the confidence in a given interval around the mean value is above a predetermined threshold.

Inventory Liquidation Comment

In liquidation mode, only the monitor **716** process is needed. Given the liquidation time horizon, Y days; a minimum price, $MP; the number of units remaining N and the estimated L2B—which is related to sales velocity—for the product, the price can be set.

The monitor **716** process can examine the projected sell out date given the current L2B, time remaining to sell out date and units remaining. If the projected sell out time is past Y days, the price is lowered and monitoring continues. If the projected sell out time is before Y days, the price can be raised slightly and monitoring continued.

As a fall back, a "panic mode" can be provided where the price is dropped to $MP, the minimum price, if more than a vendor selected amount of inventory is remaining at a certain point prior to the Y day deadline. In still other embodiments, the vendor may opt to allow the price to free float to ensure liquidation, e.g. set $MP=$0.

Two pricing options can also be provided monotonic and non-monotonic. In monotonic pricing, the monitor **716** process only lowers the price. Therefore, the price is lowered in small increments, but perhaps rapidly. If the price is too low, the price is held despite the fact that sell out may occur prior to the Y day deadline. In non-monotonic pricing, the price can be raised and lowered during the liquidation process so as to sell as slowly as possible (maximizing goal) while still selling out the inventory.

Monitoring and Triggers

As FIGS. **6** and **7** suggest, the automatic price should be adjusted as demand changes with time. This is accomplished through monitoring of pricing unit sales. An expected value for the goal function, e.g. $f($selected price$)$, was determined by the calibration **714** process for a given pricing unit. The monitoring **716** process can use that expected value and monitor results from actual sales.

If the actual results, $f_{actual}($selected price$)$, are varying outside a predetermined range, e.g. confidence interval plus or minus a vendor selectable reactivity setting, then the price should be adjusted. At first, information derived from the earlier calibration **714** process can be used to estimate the change to the demand curve, and accordingly a new price. That new price can be monitored and if adjustments are too frequently needed or the value of the objective function cannot be maintained, then a trigger, e.g. the trigger **704**, can be sent to cause a new calibration for that pricing unit.

The range of deviation allowed from the goal is in part set by the confidence in the estimation of the initial expected value. That can then be further adjusted by a vendor selectable amount to increase, or decrease, the tolerance for deviation between the actual results and the predicted results. A large vendor selected range will increase price certainty, but decrease reactivity to changes in demand. A small vendor selected range will increase system reactivity, but decrease price certainty for end customers who may find that prices are

OIP00000014

**A218**

13

fluctuating too frequently for a particular pricing unit. Where appropriate, different vendor selected ranges can be applied to different pricing units.

Thus, the process acts as a large feedback loop with monitoring causing triggers which serve to cause demand estimation and measurement and in turn cause the selection of new prices. The pricing determinations can be made on a per pricing unit basis, e.g. according to a vendor's segmentation model. For example, some electronic commerce vendors may segment customers according to whether they use shopping robots or not, accordingly, different prices could be offered to each of those two customer segments.

As noted, the goal function is vendor selectable, it can also be vendor designed to meet vendor specific needs. Embodiments of the invention may support an application programmers interface (API) for defining goal functions and/or allow the definition of goal functions via the administrative interface.

One particularly difficult problem for electronic commerce vendors is ascertaining the value of their customer relations. The next section describes an approach to valuing the customer quantitatively for use as part of a goal function.

H. Accounting for Repeat Business: Quantifying the Lifetime Value of the Customer

Until now, the goal function has been considered as $f(\text{price})$. However, the goal function has not explicitly accounted for the benefits of return business, e.g. balancing the short term goal ($f$) versus the longer term value of a customer over her/his lifetime.

Lifetime customer value can be modeled as an exponential distribution: P(return to buy|buy today)=kP(buy today), or in words: the probability that a customer will make a return purchase—given that they bought something—is proportional (k) to the probability that the customer made the initial purchase. The proportionality constant (k) can range from zero to one.

With some assumptions a model of average behavior of customers can be arrived at: P(return N times|bought N−1 times)=kP(bought N−1 times), which equals P(return N times|bought once)=k$^V$ P(bought once), assuming that k is independent of purchase price and independent of a customer's previous purchases. This average therefore is over all customers in the population (e.g. it can be subdivided by segments), over all of their purchases, irrespective of the price of each purchase.

This model can be verified using historical data. From a particular initial group of customers the number of customers in that group who made 1, 2, 3, . . . N purchases can be tabulated. It is particularly important that when considering a person who made, for example, 5 purchases, that that same person was counted as having made 1, 2, 3, and 4 purchases. The proportionality constant, k, can be estimated by a line fit through the logarithm of the counts with the exponent of the slope of the line being an estimate of k.

This model however can be further extended to account for different probabilities of return, e.g. different k at different stages of a customer's life cycle (based on the number of purchases made). In this configuration, a piecewise linear fit to the above curve can compute a different k for each stage of a customer's lifecycle. This helps capture the fact that there may be a significant drop off in repeat business after a given number of purchases, e.g. 5 purchases, that would change the way the customer lifetime value should be viewed after she/he has made five purchases.

Still further extensions are possible, the timing of the repeat visits can be considered as well. If intervals between purchases are known for customers and the maximum time

14

period is T days, one of the above types of graphs can be considered by ignoring data for customers (in the tabulation process above) where the time period between purchases exceeded the T day horizon. For example, if a customer's third purchase was outside the T day horizon, then she/he would not be tabulated as having made a third purchase. Accordingly, the "lifetime" value of the customer with the time horizon of T days can be ascertained, e.g. how valuable is this customer to me over the next hour, day, week, month, year, etc.

This estimate of retention rate can be used to estimate lifetime value for a customer:

$$LTV = \sum_{n=1}^{\infty} k^n a,$$

where a is the average value of a purchase according to the basic goal function, e.g. average revenue per purchase, average profit per purchase, etc. The summand can be computed to a given level of precision, e.g. stop when the increase is less than a predetermined amount.

The value for a can easily be determined from past transactions for customers within a particular customer segment.

If a piecewise curve fit approach has been used to estimate a different k for different stages of the customer lifecycle, then the different values of k for each stage of the customer's life should be used with the formula for LTV suitably modified.

Estimations of the LTV can be used to further optimize pricing with respect to a specific customer, given knowledge of that customer's purchase history and which customer segment he or she belongs to. For example, by discounting a product for a certain customer segment, we increase the demand for the product within that customer segment, and hence increase the number of those customers from whom we can expect to extract the Lifetime Value. This increased demand comes at the cost of a suboptimal immediate gain. By quantifying this tradeoff, we can enable a vendor to balance an appropriate short term loss against the likelihood of future returns. Specifically, once the optimal price for a product has been determined by the methods above, the information about the demand curve generated by the live price testing can be used to estimate how a certain discount will increase the demand for the product. Estimations of the LTV can be used to map that increased demand into an increase in the expected gain from a given group of customers (e.g., a group of customers in a given segment who have made a given number of purchases), over a given period of time. Thus, we can determine a schedule of discounts based around the nominal optimal price, in order to attract and retain the most valuable customers.

Additional Applications

The lifetime customer value modeling approach can also be used outside of the automatic pricing mode, e.g. to adjust manually set prices. In fact, it can even be applied in traditional retail environments. An example will be helpful.

Consider a retailer (either brick-and-mortar, online, or a mixture of the two), Retailer, that sells products to customers and uses a customer loyalty card, e.g. supermarket card; a store credit card; and/or some mechanism whereby customer identities for repeat business purposes can be ascertained. In such an instance, LTV can be computed for those customers and prices for some items downwardly adjusted to reflect the customer's LTV.

OIP00000015

US 7,970,713 B1

**15**

Accordingly, a customer could enter Retailer, select several items and identify themselves. Based on that customer's LTV, prices for one or more items they selected could be lowered. The specific amount the prices are lowered can be a function of the LTV, e.g. g(LTV). Thus, if the LTV for a customer is $1000, a portion of that $1000 could be returned now as a bonus discount.

An explanation of how this is relevant will be helpful. Consider Competitor, a competitive retailer to Retailer who does not offer bonus discounts. Like Retailer, Competitor attempts to select the best prices for its products. If both Retailer and Competitor have online components, they may use the automatic pricing mode to optimize their pricing.

Consider then Customer: Customer has a choice between shopping at Retailer and Competitor for a particular set of goods. Customer will know that if she goes to Competitor she will pay a price set by Competitor that is short term goal maximizing, e.g. it cannot accurately reflect Customer's value to Competitor. On the other hand, Customer will know that Retailer will give her discounts to encourage her to return. Retailer is confident in its targeting of discounts to Customer based on the quantitative assessment of Customer's LTV, and what stage Customer is at in that lifetime, etc. Accordingly, Retailer's pricing may be better for Customer than Competitor's, but also goal maximizing for Retailer in the long term since it will not give undue discounts.

I. Conclusion

Thus, an automatic pricing method and apparatus has been described. The automatic pricing method is applicable to electronic commerce environments where non-negotiated, non-auction transactions are occurring. The method reduces the need for electronic commerce vendors to manually determine prices for their products and services. Instead, the automatic pricing method uses live price testing to estimate and measure demand and allow price to be set according to a vendor selectable goal. The goal can balance short term gains versus long term gains.

Additionally, an approach to measuring customer lifetime value has been described that can be used both in an electronic commerce environment and in traditional bricks-and-mortar stores to allow prices to be adjusted to account for long term benefits to the vendor according to a quantitative model of customer lifetime value.

In some embodiments, the pricing module 410 can be hardware based, software based, or a combination of the two. In some embodiments, pricing module 410 is comprised of one or more computer programs that are included in one or more computer usable media such as CD-ROMs, floppy disks, or other media. In some embodiments, pricing module programs, pricing mode programs, automatic pricing mode programs, automatic liquidation mode pricing programs, and/or connectivity programs between an electronic commerce vendor and a pricing module are included in one or more computer usable media.

Some embodiments of the invention are included in an electromagnetic wave form. The electromagnetic waveform comprises information such as pricing mode programs and pricing module programs. The electromagnetic waveform may include the programs accessed over a network.

The foregoing description of various embodiments of the invention has been presented for purposes of illustration and description. It is not intended to limit the invention to the precise forms disclosed. Many modifications and equivalent arrangements will be apparent.

**16**

What is claimed is:

1. A method of pricing a product for sale, the method comprising:

testing each price of a plurality of prices by sending a first set of electronic messages over a network to devices;

wherein said electronic messages include offers of said product;

wherein said offers are to be presented to potential customers of said product to allow said potential customers to purchase said product for the prices included in said offers;

wherein the devices are programmed to communicate offer terms, including the prices contained in the messages received by the devices;

wherein the devices are programmed to receive offers for the product based on the offer terms;

wherein the devices are not configured to fulfill orders by providing the product;

wherein each price of said plurality of prices is used in the offer associated with at least one electronic message in said first set of electronic messages;

gathering, within a machine-readable medium, statistics generated during said testing about how the potential customers responded to the offers, wherein the statistics include number of sales of the product made at each of the plurality of prices;

using a computerized system to read said statistics from said machine-readable medium and to automatically determine, based on said statistics, an estimated outcome of using each of the plurality of prices for the product;

selecting a price at which to sell said product based on the estimated outcome determined by said computerized system; and

sending a second set of electronic messages over the network, wherein the second set of electronic messages include offers, to be presented to potential customers, of said product at said selected price.

2. The method of claim 1, wherein the step of sending a first set of electronic messages includes sending the first set of electronic messages directly to potential customers.

3. The method of claim 2 wherein the step of sending a first set of electronic messages to potential customers includes sending web pages to potential customers, wherein the web pages offer the product for one of the plurality of prices that are being tested.

4. The method of claim 1, wherein the step of sending a second set of electronic messages over the network includes sending the second set of electronic messages to potential customers.

5. The method of claim 4, wherein:

the step of selecting a price is performed by causing said computerized system to automatically select a price based on the estimated outcome; and

the step of sending the second set of electronic messages to potential customers includes sending web pages to potential customers, wherein the web pages include an advertisement that offers the product for the price selected by said computerized system.

6. The method of claim 1 wherein the step of selecting a price is performed by causing said computerized system to automatically select a price based on the estimated outcome.

7. The method of claim 1 wherein:

the step of testing each price includes generating a value for each price based on how the potential customers responded to offers that contained said price; and

OIP00000016

**A220**

US 7,970,713 B1

17

the value generated for each price represents an outcome of offering the product for the corresponding price.

**8**. The method of claim **7** further comprising the steps of:
testing a current price by repeatedly performing the following steps until the value generated for the current price represents the outcome within a predetermined statistical confidence:
sending electronic messages that offer said product at said current price, and
gathering statistics about how the potential customers responded to the offers that contain the current price.

**9**. The method of claim **7** wherein:
the method includes the step of testing a current price by:
sending electronic messages that offer said product at said current price;
gathering statistics about how the potential customers responded to the offers that contain the current price;
generating a value for the current price based on how the potential customers responded to offers that contained said current price; and
the step of selecting a price includes the steps of:
performing comparisons between the value generated for the current price with the values generated for each price of the plurality of prices; and
selecting a particular price of the plurality of prices based on said comparisons.

**10**. The method of claim **9** wherein:
the plurality of prices constitute a plurality of candidates for replacing said current price as the price for said product; and
the method further comprises the step of ceasing to consider one or more prices of said plurality of prices as candidates for replacing said current price based on the values generated for said one or more prices.

**11**. The method of claim **7** wherein the step of generating a value that represents an outcome of offering the product for the corresponding price includes generating a value that is based on an estimate of revenue that would result from offering the product for the corresponding price.

**12**. The method of claim **7** wherein the step of generating a value that represents an outcome of offering the product for the corresponding price includes generating a value that is based on an estimate of profit that would result from offering the product for the corresponding price.

**13**. The method of claim **7** wherein the step of generating a value that represents an outcome of offering the product for the corresponding price includes generating a value that is based on an estimate of a customer lifetime value that would result from offering the product for the corresponding price.

**14**. The method of claim **7** wherein the step of generating a value that represents an outcome of offering the product for the corresponding price includes generating a value that is based on an estimate of customer acquisition that would result from offering the product for the corresponding price.

**15**. The method of claim **7** wherein the step of generating a value that represents an outcome of offering the product for the corresponding price includes generating a value that is based on an estimate of customer retention that would result from offering the product for the corresponding price.

**16**. The method of claim **1** wherein the step of testing a price includes:
tracking how many potential customers are presented offers that offer said product at said price; and
tracking how many of the potential customers that are presented with offers that offer said product at said price completed a purchase of the product.

18

**17**. The method of claim **16** further comprising generating statistics during said testing by generating a conversion ratio for each price of said plurality of prices based on
how many potential customers are presented with an offer of said product at said price; and
how many of the potential customers that are presented an offer of said product at said price completed a purchase of the product.

**18**. The method of claim **17** wherein:
the first set of messages are sent to potential customers to present said potential customers with the offers contained in the messages; and
the step of generating a conversion ratio includes generating a look to buy (L2B) ratio for each price of said plurality of prices based on
how many potential customers are presented with electronic messages that offer said product at said price; and
how many of the potential customers that are presented with electronic messages that offer said product at said price completed a purchase of the product.

**19**. The method of claim **1** wherein:
the product has a current price;
the current price is associated with a first value that represents and estimate of an outcome of selling the product at the current price;
the first value is associated with a particular confidence value;
the method further comprises the steps of
generating a second value for the current price based on how potential customers respond to electronic messages that contain offers of the product at the current price; and
establishing a previously presented price for the product if the second value is outside a range defined by the first value plus or minus the confidence value.

**20**. The method of claim **1** wherein:
the product has a current price;
the current price is associated with a first value that represents and estimate of an outcome of selling the product at the current price;
the first value is associated with a particular confidence value;
the product is associated with a particular reactivity threshold;
the method further comprises the steps of
generating a second value for the current price based on how potential customers respond to electronic messages that contain offers of the product at the current price; and
establishing a previously presented price for the product if the second value is outside a range defined by the first value plus or minus (the confidence value plus the reactivity threshold).

**21**. The method of claim **1** wherein the product is a service for sale.

**22**. The method of claim **1** wherein:
the product is a first product of a plurality of products;
said plurality of products includes a second product;
the first product corresponds to a first pricing unit in a segmentation scheme;
the second product corresponds to a second pricing unit in the segmentation scheme;
both the first pricing unit and the second pricing unit are associated with the same stock-keeping unit (SKU);

OIP00000017

**A221**

US 7,970,713 B1

19

the method further comprises, for each product of said plurality of products, performing the steps of testing, gathering, and selecting; and

wherein the price selected for said first product is selected independent of the price selected for said second product.

**23**. The method of claim **22** wherein:

the first pricing unit is associated with a first season; and

the second pricing unit is associated with a second season that is different from said first season.

**24**. The method of claim **22** wherein:

the first pricing unit is associated with previously presented customers; and

the second pricing unit is associated with existing customers.

**25**. The method of claim **22** wherein:

the first pricing unit is associated with customers that are presented the offers in a first manner; and

the second pricing unit is associated with customers that are presented the offers in a second manner that is different from said first manner.

**26**. The method of claim **1** wherein:

the product is a first product of a plurality of products;

the first product corresponds to a plurality of pricing units in a segmentation scheme; and

the method further comprises, for each product of said plurality of products, performing the steps of testing, gathering, and selecting.

**27**. A computer-readable medium carrying instructions which, when executed by one or more processors, cause the one or more processors to price a product for sale by performing the steps of:

testing each price of a plurality of prices by sending a first set of electronic messages over a network to devices;

wherein said electronic messages include offers of said product;

wherein said offers are to be presented to potential customers of said product to allow said potential customers to purchase said product for the prices included in said offers;

wherein the devices are programmed to communicate offer terms, including the prices contained in the messages received by the devices;

wherein the devices are programmed to receive orders for the product based on the offer terms;

wherein the devices are not configured to fulfill orders by providing the product;

wherein each price of said plurality of prices is used in the offer associated with at least one electronic message in said first set of electronic messages;

gathering, within a machine-readable medium, statistics generated during said testing about how the potential customers responded to the offers, wherein the statistics include number of sales of the product made at each of the plurality of prices;

using a computerized system to read said statistics from said machine-readable medium and to automatically determine, based on said statistics, an estimated outcome of using each of the plurality of prices for the product;

selecting a price at which to sell said product based on the estimated outcome determined by said computerized system; and

sending a second set of electronic messages over the network, wherein the second set of electronic messages include offers, to be presented to potential customers, of said product at said selected price.

20

**28**. The computer-readable medium of claim **27**, wherein the step of sending a first set of electronic messages includes sending the first set of electronic messages directly to potential customers.

**29**. The computer-readable medium of claim **28** wherein the step of sending a first set of electronic messages to potential customers includes sending web pages to potential customers, wherein the web pages offer the product for one of the plurality of prices that are being tested.

**30**. The computer-readable medium of claim **27**, wherein the step of sending a second set of electronic messages over the network includes sending the second set of electronic messages to potential customers.

**31**. The computer-readable medium of claim **30**, wherein:

the step of selecting a price is performed by causing said computerized system to automatically select a price based on the estimated outcome; and

the step of sending the second set of electronic messages to potential customers includes sending web pages to potential customers, wherein the web pages include an advertisement that offers the product for the price selected by said computerized system.

**32**. The computer-readable medium of claim **27** wherein the step of selecting a price is performed by causing said computerized system to automatically select a price based on the estimated outcome.

**33**. The computer-readable medium of claim **27** wherein:

the step of testing each price includes generating a value for each price based on how the potential customers responded to offers that contained said price; and

the value generated for each price represents an outcome of offering the product for the corresponding price.

**34**. The computer-readable medium of claim **33** further comprising the steps of:

testing a current price by repeatedly performing the following steps until the value generated for the current price represents the outcome within a predetermined statistical confidence:

sending electronic messages that offer said product at said current price, and

gathering statistics about how the potential customers responded to the offers that contain the current price.

**35**. The computer-readable medium of claim **33** wherein:

the computer-readable medium includes the step of testing a current price by:

sending electronic messages that offer said product at said current price;

gathering statistics about how the potential customers responded to the offers that contain the current price; and

generating a value for the current price based on how the potential customers responded to offers that contained said current price; and

the step of selecting a price includes the steps of:

performing comparisons between the value generated for the current price with the values generated for each price of the plurality of prices; and

selecting a particular price of the plurality of prices based on said comparisons.

**36**. The computer-readable medium of claim **35** wherein:

the plurality of prices constitute a plurality of candidates for replacing said current price as the price for said product; and

the computer-readable medium further comprises the step of ceasing to consider one or more prices of said plurality of prices as candidates for replacing said current price based on the values generated for said one or more prices.

OIP00000018

US 7,970,713 B1

21

**37**. The computer-readable medium of claim **33** wherein the step of generating a value that represents an outcome of offering the product for the corresponding price includes generating a value that is based on an estimate of revenue that would result from offering the product for the corresponding price.

**38**. The computer-readable medium of claim **33** wherein the step of generating a value that represents an outcome of offering the product for the corresponding price includes generating a value that is based on an estimate of profit that would result from offering the product for the corresponding price.

**39**. The computer-readable medium of claim **33** wherein the step of generating a value that represents an outcome of offering the product for the corresponding price includes generating a value that is based on an estimate of a customer lifetime value that would result from offering the product for the corresponding price.

**40**. The computer-readable medium of claim **33** wherein the step of generating a value that represents an outcome of offering the product for the corresponding price includes generating a value that is based on an estimate of customer acquisition that would result from offering the product for the corresponding price.

**41**. The computer-readable medium of claim **33** wherein the step of generating a value that represents an outcome of offering the product for the corresponding price includes generating a value that is based on an estimate of customer retention that would result from offering the product for the corresponding price.

**42**. The computer-readable medium of claim **27** wherein the step of testing a price includes:

tracking how many potential customers are presented offers that offer said product at said price; and

tracking how many of the potential customers that are presented with offers that offer said product at said price completed a purchase of the product.

**43**. The computer-readable medium of claim **42** further comprising generating statistics during said testing by generating a conversion ratio for each price of said plurality of prices based on

how many potential customers are presented with an offer of said product at said price; and

how many of the potential customers that are presented an offer of said product at said price completed a purchase of the product.

**44**. The computer-readable medium of claim **43** wherein:

the first set of messages are sent to potential customers to present said potential customers with the offers contained in the messages; and

the step of generating a conversion ratio includes generating a look to buy (L2B) ratio for each price of said plurality of prices based on

how many potential customers are presented with electronic messages that offer said product at said price; and

how many of the potential customers that are presented with electronic messages that offer said product at said price completed a purchase of the product.

**45**. The computer-readable medium of claim **27** wherein:

the product has a current price;

the current price is associated with a first value that represents and estimate of an outcome of selling the product at the current price;

the first value is associated with a particular confidence value;

22

the computer-readable medium further comprises the steps of

generating a second value for the current price based on how potential customers respond to electronic messages that contain offers of the product at the current price; and

establishing a previously presented price for the product if the second value is outside a range defined by the first value plus or minus the confidence value.

**46**. The computer-readable medium of claim **27** wherein:

the product has a current price;

the current price is associated with a first value that represents and estimate of an outcome of selling the product at the current price;

the first value is associated with a particular confidence value;

the product is associated with a particular reactivity threshold;

the computer-readable medium further comprises the steps of

generating a second value for the current price based on how potential customers respond to electronic messages that contain offers of the product at the current price; and

establishing a previously presented price for the product if the second value is outside a range defined by the first value plus or minus (the confidence value plus the reactivity threshold).

**47**. The computer-readable medium of claim **27** wherein the product is a service for sale.

**48**. The computer-readable medium of claim **27** wherein:

the product is a first product of a plurality of products;

said plurality of products includes a second product;

the first product corresponds to a first pricing unit in a segmentation scheme;

the second product corresponds to a second pricing unit in the segmentation scheme;

both the first pricing unit and the second pricing unit are associated with the same stock-keeping unit (SKU);

the computer-readable medium further comprises, for each product of said plurality of products, performing the steps of testing, gathering, and selecting; and

wherein the price selected for said first product is selected independent of the price selected for said second product.

**49**. The computer-readable medium of claim **48** wherein:

the first pricing unit is associated with a first season; and

the second pricing unit is associated with a second season that is different from said first season.

**50**. The computer-readable medium of claim **48** wherein:

the first pricing unit is associated with previously presented customers; and

the second pricing unit is associated with existing customers.

**51**. The computer-readable medium of claim **48** wherein:

the first pricing unit is associated with customers that are presented the offers in a first manner; and

the second pricing unit is associated with customers that are presented the offers in a second manner that is different from said first manner.

**52**. The computer-readable medium of claim **27** wherein:

the product is a first product of a plurality of products;

the first product corresponds to a plurality of pricing units in a segmentation scheme; and

the computer-readable medium further comprises, for each product of said plurality of products, performing the steps of testing, gathering, and selecting.

OIP00000019

A223

US 7,970,713 B1

23

53. The method of claim **1** wherein the computerized system is located remotely relative to said devices.

54. The method of claim **1** wherein the step of sending a first set of electronic messages over a network to devices is performed by a web server sending web pages to computers that are executing browsers configured to interpret and render the web pages.

55. The method of claim **1** wherein the step of selecting a price at which to sell said product based on the estimated outcome is performed at a location that is remote relative to said devices.

56. The method of claim **1** wherein the step of testing each price includes serially testing each of the prices by:

during a first period of time, including a first price in any offer messages sent to any of said devices, wherein the first price is included without regard to which specific devices the offer messages are being sent; and

during a second period of time, including a second price in any offer messages sent to any of said devices, wherein the second price is included without regard to which specific devices the offer messages are being sent.

57. The method of claim **1** wherein the step of testing each price includes testing at least some of the prices in parallel by:

during a particular period of time, including a first price in messages sent to a first plurality of said devices; and

during said particular period of time, including a second price in messages sent to a second plurality of said devices.

58. The computer-readable medium of claim **27** wherein the computerized system is located remotely relative to said devices.

24

59. The computer-readable medium of claim **27** wherein the step of sending a first set of electronic messages over a network to devices is performed by a web server sending web pages to computers that are executing browsers configured to interpret and render the web pages.

60. The computer-readable medium of claim **27** wherein the step of selecting a price at which to sell said product based on the estimated outcome is performed at a location that is remote relative to said devices.

61. The computer-readable medium of claim **27** wherein the step of

testing each price includes serially testing each of the prices by:

during a first period of time, including a first price in any offer messages sent to any of said devices, wherein the first price is included without regard to which specific devices the offer messages are being sent; and

during a second period of time, including a second price in any offer messages sent to any of said devices, wherein the second price is included without regard to which specific devices the offer messages are being sent.

62. The computer-readable medium of claim **27** wherein the step of

testing each price includes testing at least some of the prices in parallel by:

during a particular period of time, including a first price in messages sent to a first plurality of said devices; and

during said particular period of time, including a second price in messages sent to a second plurality of said devices.

\*  \*  \*  \*  \*

OIP00000020

**A224**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 7,970,713 B1 | Page 1 of 1 |
| APPLICATION NO. | : 09/568001 | |
| DATED | : June 28, 2011 | |
| INVENTOR(S) | : Vladimir Gorelik et al. | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

COLUMN 16
Claim 1: Line 15: delete "receive offers for" and insert --receive orders for--.

COLUMN 18
Claim 19: Line 26: delete "and estimate" and insert --an estimate--.

Claim 20: Line 42: delete "and estimate" and insert --an estimate--.

COLUMN 21
Claim 45: Line 64: delete "and estimate" and insert --an estimate--.

COLUMN 22
Claim 46: Line 13: delete "and estimate" and insert --an estimate--.

Signed and Sealed this
Ninth Day of August, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*

OIP00000021

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2014, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

*/s/ Matthew D. Powers*
Matthew D. Powers

**Form 19**

FORM 19.  Certificate of Compliance With Rule 32(a)

---

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑    The brief contains [           *13,611*           ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐    The brief uses a monospaced typeface and contains [ *state the number of* ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑    The brief has been prepared in a proportionally spaced typeface using
[                    *Microsoft Word for Mac 2011*                    ] in
[                    *14 point Times New Roman Font*                    ], or

☐    The brief has been prepared in a monospaced typeface using
[          *state name and version of word processing program*          ] with [
[          *state number of characters per inch and name of type style*          ].

/s/ Matthew D. Powers

(Signature of Attorney)

Matthew D. Powers

(Name of Attorney)

Appellant

(State whether representing appellant, appellee, etc.)

8/18/2014

(Date)

Reset Fields